IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI,
JACKSON DIVISION



| | |
|---|---|
| JAMES ALDRIDGE, RELATOR, on behalf of<br>UNITED STATES OF AMERICA, | PLAINTIFF |
| V. | CIVIL ACTION NO: 3:07cv309 HTW-LRA |
| CORPORATE MANAGEMENT, INC.,<br>a Mississippi corporation (CMI);<br>STONE COUNTY HOSPITAL, INC;<br>STONE COUNTY NURSING AND<br>REHABILITATION CENTER, INC;<br>QUEST MEDICAL SERVICES, INC;<br>QUEST REHAB, INC;<br>H. TED CAIN, professionally and in his individual capacity;<br>JULIE CAIN;<br>STARR ANN LAMIER;<br>TERRI BEARD; and JOHN DOES I-XX, | DEFENDANTS |

## COMPLAINT

(*Filed under Seal*)

(*Jury Trial Requested*)

Plaintiff James Aldridge, the Relator, pursuant to 31 U.S.C. §§ 3729 - 3732, on behalf of United States of America (United States), alleges and complains as follows:

### I. PARTIES

1. Plaintiff James Aldridge, ("the Relator"), former Chief Operating Officer of Stone County Hospital, is an adult resident citizen of Mandeville, Louisiana, who brings the instant action on behalf of the United States.

2. Defendant Corporate Management, Inc. ("CMI"), is a Mississippi corporation and can be served with process through its agent H. Ted Cain, at 146 West Pine Ave., Wiggins, MS 39577.

3. Defendant Stone County Hospital Inc., is a Mississippi corporation.

4. Defendant Stone County Nursing and Rehabilitation Center, Inc., is a Mississippi corporation.

5. Defendant Quest Medical Services, Inc., is a Mississippi corporation.

6. Defendant Quest Rehab, Inc., is a Mississippi corporation.

7. Defendant H. Ted Cain is the Incorporator, President, Treasurer, Secretary and Director of all named corporate Defendants in this action and can be served with process at 146 West Pine Ave., Wiggins, MS 39577.

8. Defendant Julie Cain, wife of H. Ted Cain, is the former Chief Executive Officer of Stone County Hospital, Inc.

9. Defendant Starr Ann Lamier is the Chief Operating Officer of Stone County Hospital, Inc.

10. Defendant Terri Beard is the Director of Operations of Stone County Hospital.

11. Defendants John Does I-XX are named Defendants who may be later identified more specifically and whose actual names may substituted.

## II. JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 31 U.S.C. §§ 3730(b) and 3732(a).

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a). Defendants resided in this district and were doing business in this district at all times material to this action. The claims set forth in this Complaint arose, in part, in this district.

## III. THE RELATOR

14. Defendant CMI hired and employed the Relator as a hospital administrator. During the relevant time period, CMI owned, managed, and operated hospitals and other health care facilities. As part of his duties at CMI, Relator worked as a hospital administrator for Defendant Stone County Hospital.

15. Through Relator's administrative duties at Stone County Hospital, his other work for CMI during 2005-2006, and his participation in the services provided by CMI and its hospitals and health care facilities, Relator became aware of the matters set forth in this Complaint which constitute violations of the False Claims Act. When Relator attempted to curtail the fraudulent activities, he was terminated by Defendants.

## IV. THE MEDICARE AND MEDICAID PROGRAMS

16. The United States, through the Department of Health and Human Services ("HHS") and its component agency, the Center for Medicare and Medicaid Services

3

("CMS"), administers Medicare's "Part A" program. CMS pays Medicare bills, called "claims," received from hospitals such as Stone County Hospital and others operated by CMI, which treat Medicare patients. All such claims are paid with federal funds.

17. Stone County Hospital is a Medicare "provider." The hospital has an agreement with CMS that Stone County Hospital may treat Medicare patients and bill Medicare for that treatment, but only if it bills Medicare according to Medicare rules.

18. The United States, through the Department of Health and Human Services ("HHS") and its component agency, the Center for Medicare and Medicaid Services ("CMS"), administers Title XVIII of the Social Security Act under 42 U.S.C. §§ 1395, et seq. (Medicare Part B Program). The Medicare Part B Program is a 100% federally subsidized health insurance system for disabled persons or persons over the age of 65. The Medicare Program pays for certain specified medically necessary services rendered to patients covered by Medicare Part B. One of the services paid for under Medicare Part B is durable medical equipment ("DME"). During the relevant time period, DME providers were permitted to bill services to Medicare only after obtaining a Certificate of Medical Necessity from a licensed physician stating that the equipment billed is necessary for the care of the Medicare patient to whom it is prescribed.

19. Beneficiaries of the Medicare program are required to pay "copayments", or "coinsurance," amounting to 20 percent of the reasonable charge for items or services provided to them through the Medicare Part B program. Beneficiaries who are provided

services in "swing beds" and certain other designated health care facilities are required to pay copayments for each day they are "residents" of those facilities. CMS requires that providers participating in the Medicare program collect these copayments from Medicare beneficiaries to whom they provide items or services.

20.     In addition to the copayments described above, Medicare beneficiaries also are required to pay an annual deductible. This deductible must be paid by the beneficiary before Medicare will pay for any items or services for that individual. As with copayments, CMS requires that participating Medicare providers collect this annual deductible from Medicare beneficiaries.

21.     At all times relevant to this Complaint, HHS, through CMS, reimbursed Defendants through the Medicare Program for health care services provided to qualified patients.

22.     Health services supplied by providers are reimbursable under the Medicare Part B Program if the services provided are reasonable and medically necessary. A provider seeking reimbursement, however, must meet certain obligations. These obligations include the duty to:

    a.    bill Medicare for only reasonable and necessary medical services, 42 U.S.C. § 1395y(a)(1)(A);

    b.    not make false statements or misrepresentations of material facts concerning requests for payment under Medicare,

>   42 U.S.C. §§ 1320a-7b(a)(1)(2), 1320a-7; 1320a-7a; 42 C.F.R. § 1001.101(a)(1);
>
>   c.  provide evidence that the service given is medically necessary, 42 U.S.C. § 1320c-5(a)(3); and
>
>   d.  certify when presenting a claim that the service provided is a medical necessity, 42 U.S.C. § 1395n(a)(2)(B).

Other sections of the United States Code and Code of Federal Regulations restate these obligations.

23. The United States, through the Department of Health and Human Services ("HHS") and its component agency, the Center for Medicaid and Medicare Services ("CMS"), administers Title XIX of the Social Security Act 42 U.S.C. § 1396 *et seq.* (The Medicaid Program). The Medicaid Program is a jointly funded, federal-state health insurance program for certain low income and needy individuals including children, the aged, blind, and/or disabled, and individuals who are eligible to receive federally assisted income maintenance payments.

24. At all times relative to the Complaint, HHS, through CMS, reimbursed Defendants through the Medicaid Program for health care services provided to qualified patients.

### IV. GENERAL ALLEGATIONS

25. The False Claims Act (FCA) provides, in relevant part:

> (a) Any person who– (1) knowingly presents, or causes to be presented to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval ...; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government ... is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person...

31 U.S.C. § 3729(a)(1), (2).

26. Defendants violated the False Claims Act by submitting Medicare claims for services rendered in violation of the Medicare Anti-Kickback Statute and/or the Stark Laws.

27. The Medicare Anti-Kickback Statutes prohibit (1) the solicitation or receipt of remuneration in return for referrals of Medicare patients and (2) the offer or payment or remuneration to induce such referrals. 42 U.S.C. § 1320(a-7)(b).

28. The Stark Laws (and specifically Stark II which became effective January 1, 1995) ("Stark"), prohibit physicians from referring Medicare patients to an entity for certain "designated health services", including in-patient and out-patient hospital services, if the referring physician has a non-exempt "financial relationship," including a "compensation relationship"with such entity. 42 U.S.C. § 1395(nn)(a)(1), (h)(6). Stark's prohibition is not limited to situations where the physician directly refers the patient to a particular entity. Stark prohibits a physician from requesting an item or service for a patient which is performed by a provider of a designated health service with

7

which the physician has a compensation relationship. Entities and persons, such as Defendants, may not present or cause to be presented to Medicare claims for services furnished pursuant to a prohibited referral, and Stark II expressly prohibits payments of Medicare claims for services rendered in violation of its provisions. 42 U.S.C. § 1395(nn)(a)(1), (g)(1).

29. As specified below, the transactions and activities entered into and participated in by Defendants are violative of these prohibited financial relationships and do not meet the exceptions or safe harbors provided by law.

30. Where, as here, the government through its governmental reimbursement programs, has conditioned payment of a claim upon a claimant's certification of compliance with a statute or regulation, a claimant submits a false or fraudulent claim when the claimant falsely certifies compliance with that statute or regulation. Defendants submitted their claims with the required certification for Part A and Part B claims but falsely stated that they were in compliance with statutes and regulations, including but not limited to the False Claims Act, Medicare Anti-Kickback Statutes, and Stark Laws.

**Cost Report Fraud**

31. As a condition of their participation in the Medicare program, defendants Stone County Hospital and Stone County Nursing and Rehabilitation Center are required to certify annual cost reports. As part of those cost reports, they must certify that the services identified therein are provided in compliance with applicable laws and

…
…
…
…

regulations governing participation in federal health care benefits programs. Defendants Stone County Hospital and Stone County Nursing and Rehabilitation Center falsely certified that the services identified in their annual cost reports were provided in compliance with these laws and regulations.

32. Thus, Defendants violated laws and regulations regarding the provision of healthcare services, including the Medicare Anti-Kickback Statute and the Stark Laws, and Defendants submitted false claims by falsely certifying that the services identified in their annual cost reports were rendered in compliance with these laws and regulations.

33. Defendants Stone County Hospital and Stone County Nursing and Rehabilitation Center are permitted to include in their annual cost reports only those costs related to qualified services provided for the benefit of Medicare and Medicaid beneficiaries. Defendant Ted Cain knowingly included in the cost reports of Stone County Hospital and Stone County Nursing and Rehabilitation Center costs that are not reimbursable under the Medicare and Medicaid programs. In addition, defendant Cain conspired with the other defendants named herein to include and conceal these unallowable costs. As a result of this conduct by Defendants, Medicare and Medicaid reimbursed Defendants in an amount much higher than that to which they were legally entitled.

34. Additionally, Defendants submitted specific claims for services under Part B rendered in violation of the Medicare-Anti-Kickback Statute and of the Stark Laws.

The Defendants caused physicians and physician practices to present to the United States claims for services under Part B rendered in violation of these laws. Each such claim constitutes a false or fraudulent claim under the FCA because of the following specific factual bases.

**Inflated Supply Costs**

35. During the relevant time period, CMI owned, among other health care facilities, Stone County Hospital and Stone County Nursing Home. CMI also had entered into a contract for the management of Greene County Hospital. Ownership and management of the Stone County facilities and management of the Greene County Hospital was controlled by defendant Ted Cain.

36. Greene County, through its board of supervisors and trustees, owned Greene County Hospital and Greene County Nursing Home. The county board of supervisors hired CMI to manage the hospital. Upon information and belief, the contract for CMI's management of Greene County Hospital allowed defendant Cain to buy the facility at any time. CMI and Greene County were making an effort to convert the failing hospital into a classification known as "Critical Access Hospitals," those designed for rural areas, which receive a federal reimbursement of their costs plus an additional one percent. Pursuant to the reimbursement scheme for Critical Access Hospitals, the more money such a hospital spent in a given year, the more money it would receive from the government the following year.

37. Beginning on or about September 29, 2005, Relator served as the Chief Executive Officer at Greene County Hospital. There he helped staff the hospital and build it into a fully functional facility. He became Chief Operating Officer at Stone County Hospital on or about September 1, 2006. He worked at Greene County Hospital in May and June of 2006, but in July Relator was told he was being moved to Stone County for a salary increase. In August 2006, he worked at both Green County Hospital and at Stone County Hospital. In September, Relator began working full-time at Stone County Hospital.

38. Mississippi law requires that state-owned health care facilities accept bids from competing companies and buy equipment from the lowest bidder. Contrary to Mississippi law, defendant Cain required that the hospitals and other facilities owned or managed by CMI purchase supplies from defendants Quest Medical Services, Inc. and Quest Rehab, Inc., medical supply companies owned by Cain, despite the fact that his companies charged prices much higher than other medical supply companies competing for legitimate bids. As part of this scheme, Cain's medical supply companies overcharged for basic necessities such as hospital beds. As a result of this illegal practice, facilities owned or managed by CMI could report higher expenses on their cost reports and thereby guarantee greater reimbursement from the government. As an additional result, Cain and his medical supply companies received significant sums of money to

which they were not entitled under Mississippi law or applicable Medicare and Medicaid statutes and regulations.

**Patient Ping Pong**

39.     Defendants Cain and CMI routinely instructed Relator and other hospital employees and administrators to take patients from Stone County Nursing Home and have them admitted at Stone County Hospital for certain periods of time to ensure the hospital was full and receiving maximum Medicare and Medicaid benefits.  These directives were given without regard for the medical condition of the affected patients and with knowledge that the condition of the patients did not meet the conditions necessary to bill Medicare or Medicaid for hospital care.  As a result of this scheme, Stone County Hospital's year-end reports reflected that the hospital was full, or nearly full, and that the hospital incurred the expenses necessary to care for patients who did not warrant hospital care.

40.     Defendants Ted Cain, Julie Cain, Starr Ann Lemier, Terri Beard, and CMI carefully determined the amount of time nursing home patients would remain at Stone County Hospital in order to maximize the amount of reimbursement from the government.  Nursing home patients from Stone County Nursing and Rehabilitation Center often remained at Stone County Hospital for exactly 100 days, the maximum period of reimbursement for "swing bed" patients, before being returned to the nursing home.  Defendants Ted Cain, Julie Cain, Starr Ann Lemier, Terri Beard, and CMI also

would regularly account for the 60-day wellness periods – those times when the "patients" were back at the nursing home – required under the law before the 100-day period would reset, as well as the maximum 14-day period that a bed in a nursing home could be empty before the home was required to try to fill it.

**Routine Waiver of Copayments and Deductibles**

41.     Through his employment with CMI, Relator learned that Defendants routinely waived patient copayments and deductibles.  Prior to actions taken by Relator to correct this practice, Defendants made no effort whatsoever to collect copayments and deductibles from Medicare beneficiaries receiving Medicare Part B services, residing in "swing beds," or admitted as hospital patients.

42.     This failure to collect copayments and deductibles constitutes a violation of the federal Anti-Kickback Statute and caused Medicare to pay more to Defendants than was allowable under the law.

43.     Throughout his employment with CMI, Relator questioned the fraudulent conduct described herein.  Relator was expressly told in October 2006 to fraudulently admit nursing home patients into Stone County Hospital.  When Relator refused, the result was written reprimands and eventually his termination.

## COUNT I

Claim By and on Behalf of the United States under the False Claims Act - Presenting False Claims

44.     This is a claim under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

45.     Plaintiff realleges and incorporates by reference paragraphs 1 through 43 as though fully set forth herein.

46.     By virtue of the acts described herein, Defendants knowingly presented, or caused to be presented, to the United States government false or fraudulent claims for Medicare and/or Medicaid reimbursement, in violation of 31 U.S.C. § 3729. The precise number of false claims shall be determined through discovery and established at trial.

47.     By virtue of the false claims presented or caused to be presented by Defendants, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT II

Claim By and on Behalf of the United States under the False Claims Act - Conspiracy to Submit False Claims

48.     This is a claim under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

49. Plaintiff realleges and incorporates by reference paragraphs 1 through 43 as though fully set forth herein.

50. By virtue of the acts described herein, Defendants conspired together to defraud the government in order to get false or fraudulent claims paid by Medicare and Medicaid, in violation of 31 U.S.C. § 3729(a)(3), as amended. In furtherance of the conspiracy, Defendants acted to affect the objects of the conspiracy alleged herein. The precise number of false claims shall be determined through discovery and established at trial.

51. By virtue of the false claims presented or caused to be presented by Defendants, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States:

1. On Counts I and II, under the False Claims Act, against Defendants for treble the amount of the United States' actual damages (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

2. For all costs of this civil action; and

3. For such other and further relief as the Court deems just and equitable.

WHEREFORE, relator James Aldridge demands and prays that judgment be entered in his favor:

1. On Counts I and II, under the False Claims Act, for a percentage of all civil penalties and damages obtained from Defendants pursuant to 31 U.S.C. § 3730, reasonable attorney's fees, and all costs incurred against Defendants; and

2. Such other relief as the Court deems just and proper.

Respectfully submitted,

_____
J. Cliff Johnson II (MSB #9383)
J. Brad Pigott
Pigott Reeves Johnson, P.A.
775 N. Congress Street
Post Office Box 22725
Jackson, Mississippi 39225-2725
Telephone: (601) 354-2121
Facsimile: (601) 354-7854

John F. Hawkins, Esquire (MS Bar #9556)
John P. Scanlon, Esquire (MS Bar #101943)
HAWKINS, STRACENER & GIBSON, PLLC
129B S. President Street
Post Office Box 24627
Jackson, Mississippi 39225-4627

ATTORNEYS FOR RELATOR JAMES ALDRIDGE