IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JAMES ALDRIDGE, RELATOR,
on behalf of UNITED STATES OF AMERICA,                    PLAINTIFF

v.                                        CIVIL ACTION NO.: 1:16-cv-369-HTW-LRA

CORPORATE MANAGEMENT, INC., et al.,                      DEFENDANTS

---

### DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants **Corporate Management, Inc.**, **Stone County Hospital, Inc.**, **H. Ted Cain**, **Julie Cain**, **Thomas Kuluz**, and **Starann Lamier** ("Defendants") state as follows in support of their Motion for Summary Judgment:

### INTRODUCTION

This case is a prime example of the False Claims Act being stretched far beyond its intended purpose. The United States is seeking to re-litigate long-settled decisions made by its own Fiscal Intermediaries, and in so doing impose treble damages on Defendants for nothing more than abiding by the actions of the FIs.

Most notably, the United States' own FI expert openly claims that the United States has made the decision to reimburse Critical Access Hospitals **regardless of whether fraud or abuse is believed to be present**. This policy decision demonstrates that the False Claims Act is an inappropriate vehicle to challenge Defendants' Medicare cost reports, and precisely why a robust administrative review system exists. The United States remedy against Defendants (if any exists) lies there, not in this punitive action.

And the supposed foundation of the government's case—the amount of Ted Cain's salary—has been plainly disclosed to the FI for years, yet the FI **never** disallowed any portion of

1

the salary, even after an audit. The United States cannot now hold Defendants at fault for the purported failings of the government's FI.

The same is true for the amount of Julie Cain's salary. The FI had a duty, and ample opportunity, to review her salary and make any disallowances it felt necessary, but no adjustment was ever made. Defendants cannot be faulted for not guessing that the Department of Justice would disagree with its FI years later.

And while the United States seeks to drum up the prejudicial nature of two BMWs owned by CMI and SCH (at different times), the United States' claims are entirely lacking in substance. Instead, the evidence shows that Defendants were not reimbursed by Medicare for the purchase price or depreciation of the vehicles, nor did they seek Medicare reimbursement for personal use of the vehicles.

Finally, even if this 12-year-old action is allowed to continue, the scope of it should be drastically limited, because the United States' 2015 claims are entirely dissimilar from those initially pursued by the relator and therefore do not relate back to the relator's complaint filed eight years prior.

## NARRATIVE STATEMENT OF UNDISPUTED FACTS

1.      Stone County Hospital ("SCH") is a 25-bed hospital located in Wiggins, Mississippi. (*See* Declaration of Thomas Kuluz, Doc. No. 301-1, at ¶¶ 3, 8.).

2.      Corporate Management, Inc. ("CMI") is a corporation located in Gulfport, Mississippi. (*See* Doc. No. 301-1 at ¶ 3).

3.      From 2004 to the present, CMI has provided management services to SCH. (*See* Doc. No. 301-1 at ¶ 3).

4.      From 2004 to the present, H. Ted Cain has served as the Chief Executive Officer

of CMI. (*See* Doc. No. 301-1 at ¶ 5.).

5.     From 2000 to the present, Ted Cain has owned SCH. (*See* Doc. No. 301-1 at ¶ 4.).

6.     From 2004 to the present, Ted Cain has owned CMI. (*See* Doc. No. 301-1 at ¶ 4.).

7.     From 2003 to 2012, Julie Cain was employed as the Chief Executive Officer/Administrator of SCH. (*See* Doc. No. 301-1 at ¶ 7.).

8.     From 2005 to 2018, Starann Lamier was employed as the Chief Operating Officer of CMI. (*See* Doc. No. 301-1 at ¶ 6.).

9.     From 1996 to the present, Tommy Kuluz has served as the Chief Financial Officer of CMI and its predecessor (with a break in employment from June 2008 to January 2010). (*See* Doc. No. 301-1 at ¶ 2.).

10.     SCH operates as a Critical Access Hospital ("CAH"). (*See* Doc. No. 301-1 at ¶ 8.).

11.     By virtue of its CAH status, SCH is entitled to receive reimbursement from Medicare for certain costs related to the provision of care to Medicare beneficiaries. (*See* Deposition of George Saitta, Doc. No. 301-2, at 24:25-28:25; Doc. No. 301-1 at ¶ 9.).

12.     The Center for Medicare and Medicaid Services delegates the responsibilities of Medicare reimbursement for CAHs to Medicare Administrative Contractors ("MAC"), previously known as Fiscal Intermediaries ("FI"). (*See* Deposition of William Tisdale, Doc. No. 301-3, at 98:9-12; Doc. No. 301-1 at ¶ 10.).

13.     The United States designated William Tisdale, the Director of Provider Audit and Reimbursement Quality for Guidewell Source (a MAC) and longtime auditor for FIs/MACs, as an expert witness. According to Mr. Tisdale, "Continuity of Medicare claims reimbursement for CAHs is essential, even in the event of allegations of malfeasance, to maintain availability of healthcare services in rural areas." Mr. Tisdale testified that it's Medicare's regular practice to still

pay critical access hospitals, even if there is potential fraud or abuse. (*See* United States' Designation of an Expert Witness, William Tisdale, Doc. No. 301-4, at ¶ 2; Doc. No. 301-3 at 73:2-73:5.).

14.     As part of its reimbursement from Medicare, SCH receives periodic, interim payments throughout the year from the applicable FI/MAC. (*See* Doc. No. 301-1 at ¶ 11.).

15.     After the conclusion of each fiscal year, SCH submits a Medicare cost report to the FI/MAC, providing additional information on the costs to be reimbursed. (*See* Doc. No. 301-1 at ¶ 11.).

16.     In addition, CMI's costs related to its management of SCH are entitled to Medicare reimbursement. (*See* Doc. No. 301-1 at ¶ 12.).

17.     For SCH to receive reimbursement for such costs, CMI submits a Home Office Cost Statement to the FI/MAC after the conclusion of each fiscal year, providing information on the costs to be reimbursed. (*See* Doc. No. 301-1 at ¶ 12.).

18.     CMI first submitted a Home Office Cost Statement to the FI for fiscal year 2004. (*See* Doc. No. 301-1 at ¶ 13.).

19.     In supporting documentation submitted to the FI with each Home Office Cost Statement for fiscal years 2004-09, CMI disclosed the salary it paid to Ted Cain. (*See* CMI 2004-09 Schedule G Workpapers, Doc. No. 301-5; United States' Responses and Objections to Defendants' First Requests for Admission, Doc. No. 301-6, at ¶¶ 1-12.).

20.     In supporting documentation submitted to the FI with each Home Office Cost Statement for fiscal years 2004-09, CMI disclosed the amount of Ted Cain's salary being allocated to SCH for Medicare reimbursement purposes. (*See* Doc. No. 301-5; Doc. No. 301-6 at ¶¶ 1-12.).

21.     From 2004 to the present, no FI/MAC has made any adjustment to the amount of

Ted Cain's salary being claimed for Medicare reimbursement purposes. (*See* Doc. No. 301-1 at ¶ 13.).

22.     In 2009, the FI with authority over Mississippi Medicare providers was TriSpan Health Services, Inc. ("TriSpan"). (*See* 4/7/09 TriSpan Letter, Doc. No. 301-7; Deposition of Sandra Rose, Doc. No. 301-8, at 18:23-19:1.).

23.     In 2009, TriSpan conducted a desk audit of CMI's 2007 Home Office Cost Statement. (*See* Doc. No. 301-7; Doc. No. 301-8 at 20-24.).

24.     Among other costs examined in the desk audit, TriSpan questioned the amount of the increase in CMI's Salaries of Officers. (*See* Doc. No. 301-7; Doc. No. 301-8 at 63.).

25.     The Salaries of Officers cost corresponds to a particular line (Schedule B, Line 11) on the Home Office Cost Statement. (*See* Doc. No. 301-8 at 66-67, 76:14-22.).

26.     The Salaries of Officers line in CMI's 2007 Home Office Cost Statement included only the salary of Ted Cain, as evidenced by the fact that the figures listed in the Salaries of Officers line exactly match the figures listed on the cost statement workpaper disclosing Ted Cain's salary. (*See* Doc. No. 301-8 at 74:2-76:3.).

27.     In the desk audit of CMI's 2007 Home Office Cost Statement, TriSpan made no adjustment to the cost claimed for CMI's Salaries of Officers. While finding that the Salaries of Officers had "increased substantially," TriSpan found that the increase was "explain[ed] satisfactorily" by "[t]he combination of services to an increased number of facilities and for an increased number of months in the [Home Office Cost Statement] year as well as customary salary increases over the years." Accordingly, the salary increase "[p]ass[ed] further review." (*See* Doc. No. 301-7; Doc. No. 301-8 at 64:6-65:12.).

28.     No FI/MAC has ever made any adjustment to the amount of Julie Cain's salary

from SCH being claimed for Medicare reimbursement purposes. (*See* Doc. No. 301-1 at ¶ 14.).

29.     From 1997 to 2006, CMI (and/or its predecessor company) owned a 1997 BMW 740 IL. The purchase price of the vehicle was listed in each CMI Home Office Cost Statement for fiscal years 2004 to 2007. (*See* 2004-07 CMI Asset Depreciation Short Reports, Doc. No. 301-9; Doc. No. 301-6 at ¶¶ 1-12; Deposition of Thomas Kuluz, Doc. No. 301-10, at 44:25-46:1; Doc. No. 301-1 at ¶¶ 15-16.).

30.     CMI never sought or received reimbursement from Medicare for the purchase price or depreciation of the 1997 BMW 740 IL. (*See* Doc. No. 301-9; Doc. No. 301-6 at ¶¶ 1-12; Doc. No. 301-10 at 44:25-46:1; Doc. No. 301-1 at ¶¶ 15-16.).

31.     From 2006 to 2014, SCH owned a 2007 BMW 750 LI. The purchase price of the vehicle was listed in each SCH Medicare Cost Report for fiscal years 2009 to 2011. (*See* 2007-11 SCH Asset Depreciation Short Reports, Doc. No. 301-11; Doc. No. 301-1 at ¶¶ 17-18.).

32.     SCH only sought reimbursement for depreciation costs of the 2007 BMW 750 LI on the Medicare cost reports for fiscal years 2007-09. Then, on the 2010 cost report, SCH voluntarily self-disallowed an amount equal to all depreciation claimed on the 2007-09 Medicare cost reports. SCH did not seek reimbursement for depreciation costs of the 2007 BMW 750 LI for any year after 2009. (*See* Doc. No. 301-11; Doc. No. 301-1 at ¶¶ 17-18; Stone County Hospital Schedule of Non-Allowable Vehicle Expenses for the Cost Report Period From 1/1/10-12/31/10, Doc. No. 301-12.).

33.     When the CMI Home Office Cost Statements and SCH Medicare Cost Reports were prepared, amounts related to personal use of the 1997 BMW 740 IL or the 2007 BMW 750 LI were not sought for reimbursement. (*See* Doc. No. 301-10 at 78:19-80:3.).

34.     From 2004 to the present, no FI/MAC has ever made any adjustment to the amount

being claimed for Medicare reimbursement related to the 1997 BMW 740 IL or the 2007 BMW 750 LI. (*See* Doc. No. 301-1 at ¶ 19.).

35.     This lawsuit was first initiated by Relator James Aldridge on May 31, 2007. Aldridge filed the Complaint under seal and named CMI, SCH, Stone County Nursing and Rehabilitation Center, Inc., Quest Medical Services, Inc., Quest Rehab, Inc., H. Ted Cain, Julie Cain, Starann Lamier, Terri Beard, and fictitious parties as Defendants. (*See* Doc. No. 2).

36.     In his sealed complaint, Aldridge brought claims under the False Claims Act, alleging that Defendants submitted Medicare claims for services in violation of the Anti-Kickback Statute and/or the Stark Laws. Specifically, Aldridge alleged that Ted Cain and CMI required SCH and a related hospital to purchase medical supplies from a company owned by Ted Cain, transferred patients between SCH and a nursing facility owned by Ted Cain in such a way as to maximize Medicare and Medicaid reimbursement (without regard for the medical justification for the transfers), and failed to collect copays and deductibles from Medicare beneficiaries. (*See* Doc. No. 2).

37.     The United States filed a Complaint in Intervention on September 18, 2015. The United States named H. Ted Cain, Julie Cain, CMI, and SCH as Defendants. (*See* Doc. No. 116).

38.     In its complaint, the United States alleged that SCH and CMI improperly received Medicare reimbursement for the salaries of Ted and Julie Cain and the 1997 and 2007 BMWs, CMI performed duplicative and/or unnecessary services for SCH, and related-party expenses were improperly included on the SCH and CMI cost reports. (*See* Doc. No. 116).

39.     The United States filed its Amended Complaint on December 4, 2015. In it, the United States added Starann Lamier and Thomas Kuluz as Defendants. The Amended Complaint otherwise includes substantially similar allegations as those stated in the Complaint in

Intervention. (*See* Doc. No. 118).

40.    In its order of July 27, 2016, the Court stated that no allegations from the Relator's Complaint remain against the Defendants, apart from what is stated in the United States' Amended Complaint. (*See* Doc. No. 143).

## ARGUMENT

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) (quoting Fed. R. Civ. P. 56(c)). "To avoid summary judgment, the nonmovant must adduce evidence which creates a material fact issue concerning each of the essential elements of its case for which it will bear the burden of proof at trial." *Abbott v. Equity Grp.*, 2 F.3d 613, 619 (5th Cir. 1993).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he mere existence of **some** alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact." *Id.* at 247-48 (emphasis in original). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

"Needless to say, unsubstantiated assertions are not competent summary judgment evidence." *Forsyth*, 19 F.3d at 1533. "Summary judgment, to be sure, may be appropriate, even in cases where elusive concepts such as motive or intent are at issue, . . . if the nonmoving party rests

merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Id.* (quoting *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993)). "Simple, conclusory statements alleging the existence of a factual issue are insufficient to defeat a motion for summary judgment." *In re Plywood Antitrust Litig.*, 655 F.2d 627, 643 (5th Cir. 1981) (quoting *Lefrak v. Arabian Am. Oil Co.*, 487 F. Supp. 808, 815 (E.D.N.Y. 1980)).

As stated below, Defendants request that the Court grant summary judgment and dismiss this case in its entirety, because the United States has admitted that any false statements contained in Medicare cost reports are not material to its decision of whether to reimburse Critical Access Hospitals. Thus, a False Claims Act lawsuit is an inappropriate vehicle to address concerns of improperly claimed costs; instead, the United States' remedy (if any) is found in well-established administrative processes.

Alternatively, Defendants request that the Court grant partial summary judgment and dismiss all of the United States' claims concerning (1) the amount of Ted Cain's salary, (2) the amount of Julie Cain's salary, (3) BMWs owned by CMI or SCH, (4) related-party expenses (other than salaries of CMI employees), and (5) any claims for payment submitted by Defendants before September 18, 2009, or after December 4, 2015.

## I.    ANY ALLEGED FALSE STATEMENTS WERE IMMATERIAL TO THE UNITED STATES' PAYMENT DECISIONS

Three years ago, the Supreme Court made abundantly clear that an allegedly false statement is not actionable under the False Claims Act unless it is material to the government's decision of whether to pay the claim—that is, if the government makes its decision to pay the claim irrespective of the allegedly false statement, there can be no liability under the False Claims Act. The United States' own expert, a long-time FI/MAC department director, expressly opines that it is the United States' routine practice to continue to pay Critical Access Hospitals regardless of

9

whether the claims for payment are fraudulent or improper. Therefore, by the government's own admission, allegedly fraudulent statements on CAHs' Medicare cost reports are immaterial to the government's payment decision and thus cannot support a False Claims Act action. Given that the United States' claims in this case arise only from statements made in Defendants' cost reports, this action should accordingly be dismissed.

The Supreme Court decided *Universal Health Services v. United States ex rel. Escobar*, 136 S. Ct. 1989, in 2016. In *Escobar*, the Court emphasized that "[u]nder the [False Claims] Act, the misrepresentation must be material to the other party's course of action." *Id.* at 2001. "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at 2002 (quoting 31 U.S.C. § 3729(b)(4)). "[M]ateriality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Id.* (quoting 26 R. Lord, Williston on Contracts §69:12, p. 549 (4th ed. 2003)).

> The materiality standard is demanding. The False Claims Act is not "an all-purpose antifraud statute," or a vehicle for punishing garden-variety breaches of contract or regulatory violations. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.
>
> . . . .
>
> [I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003-04 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)).

Summary judgment is an appropriate stage at which to dismiss a False Claims Act suit for

lack of materiality. *Id.* at 2004 n.6. And since *Escobar*, the Fifth Circuit has stated that the United States must present evidence of materiality to survive a motion for summary judgment. *Abbott v. BP Exploration & Prod.*, 851 F.3d 384, 387 (5th Cir. 2017) ("In order to survive [a defendant's] motion for summary judgment, Plaintiffs must create a dispute of material fact as to the following four elements of an FCA claim: '(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim).'") (quoting *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2008)).

The United States has not presented evidence that Defendants' allegedly false statements in SCH and CMI's cost reports were material to the government's payment decision. Indeed, the record evidence establishes **exactly the opposite**. The United States designated William Tisdale as an expert witness in this matter. According to his expert designation, Mr. Tisdale "is currently the Director of Provider Audit and Reimbursement (PARD) Quality for GuideWell Source, and formerly he was the PARD Director at Novitas Solutions, Inc. (Novitas), the Medicare Administrative Contractor (MAC) for Jurisdiction H, which includes the states of Mississippi, Louisiana, Arkansas, Texas Oklahoma, New Mexico and Colorado." (Doc. No. 301-4 at 2). "His experience includes the review and audit of cost reimbursed institutional providers for over 35 years and specifically the review and audit of Critical Access Hospitals since their creation by the Balanced Budget Act of 1997." (*Id.*). According to Mr. Tisdale's designation, "Continuity of Medicare claims reimbursement for CAHs is essential, even in the event of allegations of malfeasance, to maintain availability of healthcare services in rural areas." (*Id.* at 3, ¶ 2). When given the opportunity to expound on this position, Mr. Tisdale testified as follows:

Q. Okay. So are you telling me that even if there are allegations of malfeasance against a critical access hospital, that Medicare is going to continue to provide payments to the critical access hospital?

A. **They can, yes.**

Q. Uh-huh. And I believe you say it's essential that they do so, right?

A. **I'm referring to the fact that critical access hospitals are an essential part of the health care network, so -- and that goes back to the statement about being in rural, underserved areas.**

Q. Okay. What kind of malfeasance would we be talking about here?

A. **We're talking about allegations of fraud or abuse of the Medicare program.**

Q. So even if there is potential fraud or abuse, Medicare -- it's Medicare's regular practice to still pay critical access hospitals?

A. **Yes.**

(Doc. No. 301-3 at 72:12-73:5).

In the words of the United States' own expert witness, it is the regular practice of Medicare to reimburse CAHs even when fraud or abuse is suspected, therefore establishing that the fraudulent or false nature of the claim for payment is **not material** to the government's decision to pay the claim. And as discussed above, materiality is an essential element of a False Claims Act suit, which must be established by the United States to avoid summary judgment. Thus, this action is due to be dismissed.

Several courts have dismissed False Claims Act suits when the government's payment decision was not impacted by the allegedly false statement, including cases involving Medicare cost reports. In *United States ex rel. Mathews v. HealthSouth Corp.*, 2007 U.S. Dist. LEXIS 52397 (W.D. La. July 18, 2007), the plaintiff brought a False Claims Act suit, alleging the defendant rehabilitation facility misrepresented compliance on its Medicare cost reports with a rule allowing the defendant to be reimbursed on a cost basis (known as the "75-percent rule"), then fraudulently reassigned patient statuses to come into compliance. *Id.* at *2-*5. The court, however, held that compliance with the 75-percent rule was not material to the provider's reimbursement status and dismissed the case. *Id.* at *17-*20. The court found that the Fiscal Intermediary to whom the cost

reports were submitted had a duty to audit compliance with the 75-percent rule, but it routinely failed to perform such audits. Thus, whether the provider was actually in compliance with the 75-percent rule was immaterial to the payment decision because there was no evidence the FI would've observed the noncompliance and modified the reimbursement status. *Id.* at \*19. *See also United States ex rel. Duffy v. Lawrence Mem'l Hosp.*, 2018 U.S. Dist. LEXIS 170004, at \*21 (D. Kan. Oct. 2, 2018) ("[T]here must be some showing that the [alleged false statement] is sufficiently critical that the Government modified or would likely have modified its reimbursement behavior on the basis of that information.").

Similarly, in *United States ex rel. Petratos v. Genentech, Inc.*, 855 F.3d 481 (3d Cir. 2017), the Third Circuit dismissed a Medicare fraud case against a pharmaceutical company under *Escobar*'s materiality standard. There, the plaintiff alleged that the defendant suppressed information about a cancer drug, causing physicians to submit Medicare claims that weren't reasonable or necessary. The court dismissed the case because "there are no factual allegations showing that CMS would not have reimbursed these claims had these [alleged reporting] deficiencies been cured," *Id.* at 490, and the relator conceded as much. "Simply put, a misrepresentation is not 'material to the Government's payment decision,' when the relator concedes that the Government would have paid the claims with full knowledge of the alleged noncompliance." *Id.* (quoting *Escobar*, 136 S. Ct. at 1996).

In this case, the record evidence is that Medicare reimburses CAHs regardless of whether the claim for payment is false or fraudulent. Thus, just as in *Mathews*, the allegedly fraudulent nature of SCH and CMI's cost reports would not affect the government's payment decision and was not material. And, just as in *Petratos*, this lack of materiality is based on the plaintiff's own admission that the allegedly false statements didn't impact payment. Therefore, the United States

has failed to establish an essential element of its claims, and this action should be dismissed.[1]

Such a dismissal would not result in any inequity. After all, as Mr. Tisdale testified, the United States has set up extensive administrative processes for the audit and adjudication of amounts sought for reimbursement on Medicare cost reports (including initial cost report reviews, desk reviews, requests for information, audits, re-openings, internal appeals, and external appeals), and the United States is free to utilize that process to challenge improper claims. But according to Mr. Tisdale, the United States has made a policy decision to continue reimbursements to CAHs in order "to maintain availability of healthcare services in rural areas." (*Id*. at 3, ¶ 2). Whether such a choice is right or wrong is for the United States to decide. **But the United States must live with the choice it has made.** By electing to reimburse CAHs irrespective of any alleged fraud, the United States has taken such claims outside the purview of the False Claims Act. The United States' remedy, if any is appropriate, is instead through administrative processes. This action should accordingly be dismissed.

## II. THE AMOUNT OF TED CAIN'S SALARY WAS DISCLOSED BUT STILL REIMBURSED

It is undisputed that the amount of Ted Cain's salary paid by CMI and allocated to SCH for Medicare reimbursement processes was disclosed to the Fiscal Intermediary on every Home Office Cost Statement submitted by CMI for years 2004-09. It is also undisputed that the applicable FI or MAC has never made any adjustment to the Medicare reimbursement sought for Ted Cain's

---

[1] The United States' unjust enrichment and payment by mistake of fact claims should be dismissed along with the FCA claims. Under Mississippi law, unjust enrichment and mistake claims require that payment have been made by "mistake of fact" or the "payor's negligence." *Willis v. Rehab Solutions, PLLC*, 82 So. 3d 583, 588 (Miss. 2012) (quoting *Union Nat'l Life Ins. Co. v. Crosby*, 870 So. 2d 1175, 1182 (Miss. 2004)). "The law is clear that unjust enrichment applies when one party has mistakenly paid another party. Unjust enrichment applies in situations where no legal contract exists, and the person charged is in possession of money or property which, in good conscience and justice, he or she should not be permitted to retain, causing him or her to remit what was received." *Id.* But according to Mr. Tisdale, the United States has made an intentional choice, not a mistaken or negligent one, to continue payment to CAHs amidst fraud allegations. Therefore, these claims should also be dismissed.

salary.

As stated above, the elements of a False Claims Act claim that must be proven by the United States are: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *Abbott*, 851 F.3d at 387 (quoting *Longhi*, 575 F.3d at 467). Because Ted Cain's salary was repeatedly disclosed to the FI but never disallowed, there is no evidence that (1) Defendants presented a knowingly false claim concerning the amount of Ted Cain's salary or (2) the amount of Ted Cain's salary was material to the government's payment decision.

## A.     The Amount of Ted Cain's Salary Does Not Create a Knowingly False Claim

"It is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674-75 (5th Cir. 2003). The False Claims Act also includes a scienter element, requiring the presentment of "knowingly" false claims. *See* 31 U.S.C. §3729(a). "Knowing" is defined as "a person, with respect to information: has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information; and require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1). This "*mens rea* requirement is not met by mere negligence or even gross negligence." *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008). "[T]he FCA requires a statement known to be false, which means a lie is actionable but not an error." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). A plaintiff "cannot survive summary judgment merely by submitting evidence of false claims; she must have evidence that the defendants knowingly or recklessly cheated the government." *United States ex*

*rel. Taylor-Vick v. Smith*, 513 F.3d 228, 232 (5th Cir. 2008).

Medicare reimbursement of owner compensation is governed by Chapter 9 of the Medicare Provider Reimbursement Manual. (*See* PRM Chapter 9, Doc. No. 301-13). This chapter does not impose a strict limit or cap on owner salaries; instead, reimbursement of the salaries is tied to a reasonableness inquiry. *See* PRM § 900 ("A reasonable allowance of compensation for services of owners is an allowable cost, provided the services are actually performed in a necessary function (42 CFR 413.102)."). Section 902.3 defines Reasonableness as follows:

> Reasonableness requires that the compensation allowance be such an amount as would ordinarily be paid for comparable services by comparable institutions depending upon the facts and circumstances of each case. Reasonable compensation is limited to the fair market value of services rendered by the owner in connection with patient care. Fair market value is the value determined by the supply and demand factors of the open market.

By the terms of the PRM, then, a determination of reasonableness involves a multi-faceted inquiry, "depending on the facts and circumstances of each case." And critically, **the PRM places the duty of evaluating the reasonableness of owner compensation on the Fiscal Intermediary.** As stated in PRM § 905.1, "Contractors have the responsibility for evaluating the reasonableness of an owner's compensation in terms of the criteria provided in §§ 904.1 and 904.2." And it is undisputed that when the PRM uses the word "contractor," it is referring to the applicable FI/MAC. (*See* Doc. No. 301-8 at 95:13-17.). The PRM then provides in § 904 many factors for the FI to consider in fulfilling this duty, repeatedly listing steps that "the contractor" is required to take. The FI/MAC may then make and enforce its determination utilizing the extensive administrative processes described above (including initial cost report reviews, desk reviews, requests for information, audits, re-openings, internal appeals, and external appeals).

CMI annually submitted Home Office Cost Statements to the applicable FI or MAC. In each Home Office Cost Statement for fiscal years 2004-09, CMI expressly disclosed the exact

amount of Ted Cain's salary, as well as the exact amount of the salary being allocated to SCH for Medicare reimbursement purposes. Defendants, therefore, provided the FI with all that was necessary to begin a reasonableness inquiry—if the FI desired more information, it had multiple administrative avenues to request and obtain that information from Defendants. But no FI or MAC has ever indicated that Ted Cain's salary was an unreasonable amount.

And an FI did, at least at one point, review the amount of Ted Cain's salary without disallowing any of it. In 2009, TriSpan Health Services, the FI over Mississippi, conducted a desk audit of the Salaries of Officers cost listed in CMI's 2007 Home Office Cost Statement. In the course of that audit, TriSpan found that the Salaries of Officers had "increased substantially," but the increase was "explain[ed] satisfactorily" by "[t]he combination of services to an increased number of facilities and for an increased number of months in the [Home Office Cost Statement] year as well as customary salary increases over the years." Accordingly, the salary increase "[p]ass[ed] further review." (*See* Doc. No. 301-7; Doc. No. 301-8 at 64:6-65:12.). And, as the figures in the Salaries of Officers line exactly matched the figures disclosing Ted Cain's salary, it was apparent from the face of the Home Office Cost Statement that a review of the Salaries of Officers was actually a review of the salary of Ted Cain. (*See* Doc. No. 301-5; Doc. No. 301-8 at 74:2-76:3.). Even after this audit and review, TriSpan made no adjustment to the reimbursement for Ted Cain's salary.

Because (1) the reasonableness inquiry as to Ted Cain's salary is an open-ended determination, (2) that open-ended determination was delegated expressly to the FI, (3) Defendants provided the FI with the exact amount of Ted Cain's salary, and (4) the FI/MAC never disallowed any portion of Ted Cain's salary (even after an audit), Defendants cannot possibly have submitted a **knowingly** false claim based on the amount of the salary. Defendants cannot be charged, under

penalty of False Claims Act liability, with **guessing** what precise amount is reasonable or unreasonable in the eyes of the FI—what is needed is the FI's input. And the FI provided that input by making no adjustment to the salary reimbursement, even after the 2009 audit. Whether the FI made those determinations rightly or wrongly is not for Defendants to decide, and is certainly not Defendants' fault. As described below, the FIs/MACs are the exclusive agent for the United States, and Defendants are entitled to rely on the FI's determinations without later being sued for such reliance. All claims concerning the amount of Ted Cain's salary should accordingly be dismissed.[2]

Courts including the Fifth Circuit have dismissed similar claims due to lack of a knowingly false claim, and this Court should do likewise. In *United States v. Southland Management Corporation*, 326 F.3d 669 (5th Cir. 2003), the Department of Housing and Urban Development (HUD) brought a False Claims Act suit against an apartment complex owner regarding an alleged false certification that the housing provided was decent, safe, and sanitary. *Id.* at 674. But the Fifth Circuit dismissed the case for lack of a false claim. According to the court, "There will be wide difference of opinion of what is, and what is not, decent, safe, or sanitary." *Id.* at 675. And the contract between HUD and the owner provided a mechanism for HUD to seek abatement of any issues, but that mechanism was never exercised. *Id.* at 676. In an often-cited special concurrence, Judge Edith Jones found that the claims were not knowingly false because HUD was aware of the alleged deficiencies but continued to make payments. *Id.* at 683 (Jones, J., concurring specially).

Similarly, in *United States ex rel. Berg v. Honeywell International*, 740 F. App'x 535 (9th Cir. 2018), the Ninth Circuit rejected a False Claims Act suit based on allegations of false promises of savings due to false calculations. *Id.* at 537. The Court found that, because "Honeywell disclosed

---

[2] Even though Ted Cain's salary was only disclosed on the 2004-09 Home Office Cost Statements, this dismissal should extend to all claims regarding the amount of Ted Cain's salary. The amount listed on the 2007 cost report, which was subject to the desk audit and not adjusted, was higher than any salary amount for the years 2010 and beyond. (*See* Expert Witness Report of George A. Saitta, Doc. No. 301-14, at 3-4.).

the 'Electrical Baseline Adjustment' and the components of its calculations to the Army," it did not present a knowingly false claim. *Id.* at 538. "[T]he statutory phrase 'known to be false' does not mean incorrect as a matter of proper accounting methods, it means a lie." *Id.* (quoting *Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996)). "That the Army should have rejected Honeywell's proposals under the ESPC statutes and regulations does not mean that Honeywell's detailed calculations were false." *Id.*

Just as in *Southland*, there can be wide differences of opinion in what a reasonable compensation level is, and it's the FI's job to make that determination, but the FI never exercised the available mechanisms (including but not limited to initial cost report reviews, desk reviews, requests for information, audits, re-openings, internal appeals, and external appeals) and disallowed any of the reimbursement sought. And similar to *Berg*, Defendants at bar disclosed the exact amount of Ted Cain's salary paid by CMI, the exact amount being allocated to SCH for Medicare reimbursement, and the exact allocation method for making the allocation. Even if the FI "should have" rejected the claim for reimbursement of his salary (which Defendants deny), that "does not mean that [the salary claims] were false." *See Berg*, 740 F. App'x at 538. This claim for payment cannot now said to be false, and such claims by the United States should be dismissed.

### B. The Amount of Ted Cain's Salary Was Not Material to the Government's Payment Decisions

As described above, Ted Cain's salary was plainly and repeatedly disclosed to the government, but the government continued to provide reimbursement for the salary, even after an audit. Therefore, the alleged falsity of the salary amount was not material to the government's payment decision, and for this alternative reason all claims related to the amount of Ted Cain's salary should be dismissed.

The United States must present evidence of materiality to survive a motion for summary

judgment. *Abbott*, 851 F.3d at 387. And materiality is lacking "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated." *Escobar*, 136 S. Ct. at 2004. Such knowledge is present here.

First, CMI submitted its Home Office Cost Statements, which plainly disclosed the amount and allocation of Ted Cain's salary, to the FI or MAC designated by the government. And it cannot be legitimately disputed that a submission to the FI or MAC in this situation is a submission to the United States itself. FIs "operat[e] the Medicare program as an agent of the United States." *Peterson v. Weinberger*, 508 F.2d 45, 48 (5th Cir. 1975). FIs/MACs are prescribed duties by regulation, including "receipt, disbursement, and accounting for funds used in making Medicare payments, auditing the records of providers in order to ensure payments have been proper, resolving disputes over cost reimbursement, reviewing and reconsidering payments to providers, and recovering overpayments to providers." *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 54 (1984). "Fiscal intermediaries, such as BCBSA, function much like an administrative agency. They 'act on behalf of the Secretary, carrying on for [her] the governmental administrative responsibilities imposed by the [Medicare Act].'" *United States v. Blue Cross & Blue Shield*, 156 F.3d 1098, 1112 (11th Cir. 1998) (quoting S. Rep. No. 89-404 (1965)). "HHS and the Secretary rely heavily on the participation of fiscal intermediaries, who possess accounting and health care expertise, in order to efficiently administer the Medicare program." *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 2002 U.S. Dist. LEXIS 26847, at *17 (S.D. Tex. Sept. 5, 2002) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 73 (2d Cir. 1998)). FIs "are actually considered 'officers or employees' of the United States within the meaning of the Medicare Act." *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 201 F.3d 277, 285 (4th Cir. 1999) (quoting *Your Home Visiting Nurse Servs., Inc. v. Shalala*, 525 U.S. 449, 456 (1999)).

FIs are even extended the protections of sovereign immunity. *Blue Cross & Blue Shield*, 156 F.3d at 1112. Given this comprehensive delegation of responsibility over Medicare cost reports and that CMI submitted its cost reports to the FI disclosing Ted Cain's salary, it is without question that Ted Cain's salary was disclosed to the United States.

Because of this disclosure, and because the government continued to reimburse the salary, the alleged falsity of the claim was not material to the government's payment decision, and all claims relating to the amount of Ted Cain's salary should be dismissed. This case is similar to *Mathews*, discussed above, where the court found a lack of materiality because the allegedly misrepresented compliance was unlikely to be noticed since the FI routinely failed to perform the audit duties it was delegated. Because the FI was unlikely to discover the alleged noncompliance, it was improbable that the noncompliance would affect the government's payment decision. Here, the salary amount for Ted Cain was plainly disclosed, but the FI repeatedly took no action on it, even after an audit, therefore demonstrating that the alleged noncompliance was not material to the payment decision. As stated by the DC Circuit when analyzing materiality, "[C]ourts need not opine in the abstract when the record offers insight into the Government's actual payment decisions." *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1032 (D.C. Cir. 2017). Based on the United States' actual payment decisions, this Court should dismiss all claims related to the amount of Ted Cain's salary.

III. **THE AMOUNT OF JULIE CAIN'S SALARY DOES NOT CREATE A KNOWINGLY FALSE CLAIM**

Similar to Ted Cain's salary, the amount of Julie Cain's salary does not create a knowingly false claim. As the spouse of Ted Cain, Julie Cain's salary was reviewable by the FI "under the test of reasonableness" laid out in the owner compensation chapter of the Provider Reimbursement Manual. *See* PRM § 902.5. Therefore, under § 905.1, it was the FI's duty to evaluate the

reasonableness of her compensation, but no FI or MAC ever indicated that she was paid an unreasonable amount. And while the FI had the ability to request additional information concerning Julie Cain's salary if it desired, no FI or MAC ever did so. Therefore, because (1) the reasonableness inquiry is an open-ended determination, (2) that open-ended determination was delegated expressly to the FI, and (3) the FI/MAC never disallowed any portion of Julie Cain's salary, Defendants cannot possibly have submitted a **knowingly** false claim based on the amount of the salary.

Additionally, the amount of Julie Cain's salary paid by SCH was within the range of reasonability provided by the United States. As alleged by the United States in its Amended Complaint, Julie Cain's salary ranged from $153,458 up to $279,000 between 2003 and 2012. According to the United States' expert witness George Saitta, average CEO compensation at CAHs in 2012 was $177,600, and the 75th percentile for such salaries was $225,000. (*See* Doc. No. 301-14 at 9-10.). As Julie Cain's salary was at times below both the average and the 75th percentile of comparable salaries (and never more than 24% higher than the 75th percentile), the amount of the salary certainly cannot be so unreasonable as to create a knowingly false claim. Therefore, all claims concerning the amount of Julie Cain's salary should be dismissed.

## IV. DEFENDANTS DID NOT IMPROPERLY SEEK REIMBURSEMENT FOR THE BMWS

The United States makes several claims concerning a 1997 BMW owned by CMI and a 2007 BMW owned by SCH. However, because Defendants were not improperly reimbursed for the purchase price and depreciation costs of the BMWs, those amounts were disclosed in Defendants' cost reports, the BMWs are not "luxury items" as defined by the Provider Reimbursement Manual, and Defendants did not seek reimbursement related to any personal use of the BMWs, all claims concerning the BMWs should be dismissed.

### A. Defendants were not Reimbursed for the Purchase Price or Depreciation Cost of the BMWs

CMI owned the 1997 BMW, and it filed its first Medicare Home Office Cost Statement in 2005 (for fiscal year 2004). While CMI listed the 1997 BMW in its 2004-06 cost reports, CMI never sought reimbursement related to the purchase price of the BMW. Neither did it seek reimbursement for depreciation of the vehicle, as it had been fully depreciated prior to fiscal year 2004. Thus, because CMI was never reimbursed by Medicare for the purchase price or depreciation of the 1997 BMW, no "claim" (much less a false claim) related to these amounts was ever made. (*See* Doc. No. 301-9; Doc. No. 301-10 at 44:25-46:1; Doc. No. 301-1 at ¶¶ 15-16.).

SCH acquired the 2007 BMW in 2006, and it never sought Medicare reimbursement for the purchase price of the 2007 BMW. While SCH did seek reimbursement for depreciation costs of the 2007 BMW for fiscal years 2007-09, SCH voluntarily self-disallowed an amount equal to all depreciation claimed in 2007-09 on the 2010 cost report. (*See* Doc. No. 301-11; Doc. No. 301-1 at ¶¶ 17-18; Doc. No. 301-12.). Therefore, Defendants have not been reimbursed for the purchase price or depreciation of either of the BMWs, and all claims related to those amounts should be dismissed.

### B. The Purchase Price and Depreciation Cost of the BMWs Were Not Knowingly False Claims or Material to the Government's Payment Decisions

Because the purchase price of both the 1997 and 2007 BMW and the depreciation claimed for the 2007 BMW (as well as the lack of depreciation for the 1997 BMW) were disclosed to the Fiscal Intermediary in multiple CMI and SCH cost reports, all claims related to those amounts should be dismissed because Defendants cannot have submitted knowingly false claims for those amounts, nor were any such claims material to the government's payment decision.

"[T]he FCA requires a statement known to be false, which means a lie is actionable but not an error." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir.

2004). The purchase price and depreciation claimed for the BMWs were presented to the FI in the cost reports, providing the FI with ample opportunity to find the amounts excessive and disallow them. But the FI never did so. Even if Defendants' claim for payment could be said to be erroneous (which Defendants dispute), it absolutely cannot be said that the claim was a lie, as the purchase and depreciation amounts were plainly disclosed. Defendants, therefore, made no knowingly false claim concerning these amounts.

Neither were these amounts material to the government's decision to pay the claim. Just as in *Mathews*, described above, where the court found a lack of materiality because the FI was unlikely to discover the alleged noncompliance, materiality is lacking here. Because the alleged noncompliance (allegedly excessive purchase price/depreciation) was plainly disclosed to the FI on multiple cost reports without action, the amounts were not material to the payment decision. "[C]ourts need not opine in the abstract when the record offers insight into the Government's actual payment decisions." *McBride*, 848 F.3d at 1032. Thus, this Court should dismiss all claims related to the BMW purchase and depreciation amounts.

### C. The BMWs Do Not Constitute Luxury Items

Under the Provider Reimbursement Manual, costs for "luxury items or services" are not reimbursable. *See* PRM § 2104.3, Doc. No. 301-15. But the definition of luxury items is far from definitive—"luxury items or services" are defined as "those that are substantially in excess of or more expensive than the usual items or services rendered within a provider's operation to the majority of patients." *Id.* Section 2104.3 provides two examples of luxury items (room accommodations and food items), but they are far from clarifying in this context, as they only concern items actually provided to patients. The section says nothing about the types of vehicles for which Medicare providers may seek reimbursement. And according to the United States' own

expert, William Tisdale, it is the FI/MAC's job to make the determination of whether something constitutes a luxury item, and it's a "subjective" standard as applied to vehicles. (*See* Doc. No. 301-3 at 78:15-19, 81:11-14.). Importantly, Mr. Tisdale is the only witness in the case to testify that he has ever seen the luxury standard applied to vehicles, and even he admits that he's seen it "[n]ot very often" and could not recall any specifics of any such situation. (*Id.* at 92:2-24).

The amorphous definition of "luxury items or services," the references in both the definition and examples only to items provided to patients, and the sparse prior application to company vehicles compel the conclusion that this provision of the Provider Reimbursement Manual does not pertain to company vehicles; instead, as both the definition and examples indicate, it pertains to items or services provided to patients (in particular, to some patients but not others). And given that the FI had the opportunity and duty to disallow costs for luxury items but did not do so regarding the BMWs, this Court should find that the BMWs did not constitute luxury items.

### D.    Defendants Did Not Seek Reimbursement For Personal Use of the BMWs

Finally, there is no evidence that Defendants sought reimbursement for costs related to any personal use of the BMWs. On the contrary, the only record evidence is that such costs were **not** included on Defendants' cost reports. (*See* Doc. No. 301-10 at 78:19-80:3.). Thus, Defendants made no false claims related to personal use of the BMWs.

Therefore, all claims related to the 1997 and 2007 BMWs are due to be dismissed.

## V.    DEFENDANTS DID NOT SEEK REIMBURSEMENT FOR IMPROPER RELATED-PARTY EXPENSES

In its amended complaint, the United States alleged without detail that Defendants improperly sought reimbursement for related-party expenses. But apart from the home-office costs of CMI, the United States has not adduced any evidence concerning reimbursement for related-

party costs. Even the United States' expert witness George Saitta testified that he is not stating any opinions as to the propriety of any related-party costs in this action. (*See* Doc. No. 301-2 at 17:23-18:22). Defendants accordingly request that any claims related to related-party costs be dismissed.

## VI. THE UNITED STATES' CLAIMS SHOULD BE LIMITED TO CLAIMS FOR PAYMENT SUBMITTED BETWEEN SEPTEMBER 18, 2009, AND DECEMBER 4, 2015

Finally, all claims arising out of claims for payment submitted prior to September 18, 2009, should be dismissed because they are outside the statute of limitations. And because no wrongdoing after the date of the United States' amended complaint (December 4, 2015) has been alleged (and the United States has not submitted evidence of any such wrongdoing), the United States' claims should be limited as of that date. Thus, all claims not arising from Defendants' 2009-14 cost reports should be dismissed.

### A. Claims Arising Before September 18, 2009, are Barred by the Statute of Limitations

The statute of limitations for claims under the False Claims Act is contained in 31 U.S.C. § 3731(b), which states as follows:

> A civil action under section 3730 may not be brought--
> (1) more than 6 years after the date on which the violation of section 3729 is committed, or
> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
> whichever occurs last.

The statute of limitations begins to run from "the filing of the false claim." *Smith v. United States*, 287 F.2d 299, 304 (5th Cir. 1961). Therefore, under this statute, the general rule is that suit must be filed within six years of when the allegedly false claim was submitted. The six-year limit may be extended to up to 10 years if, and only if, suit is filed no more than three years "after the date

when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances." 31 U.S.C. § 3731(b).

When the United States intervenes in a False Claims Act suit brought by a relator, a specific-relation back provision applies:

> If the Government elects to intervene and proceed with an action brought under 3730(b), the Government may file its own complaint or amend the complaint of a person who has brought an action under section 3730(b) to clarify or add detail to the claims in which the Government is intervening and to add any additional claims with respect to which the Government contends it is entitled to relief. For statute of limitations purposes, any such Government pleading shall relate back to the filing date of the complaint of the person who originally brought the action, to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person.

31 U.S.C. § 3731(c).

Because the United States' claims in this suit do not arise out of the same conduct, transactions, or occurrences of the relator's complaint, the United States' claims do not relate back to the filing of the relator's complaint, and the six-year statute of limitations applies, measured from the date of the United States' complaint in intervention (September 18, 2015).

### 1. The United States' Claims Do Not Relate Back to the Relator's Claims

As stated above, the United States' claims only relate back to the date of the relator's complaint if the claims "aris[e] out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint." 31 U.S.C. § 3731(c). "[A] new claim or pleading will not relate back when it 'asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.' Rather, to relate back, a new claim must be 'tied to a common core of operative facts . . . .'" *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 382 (5th Cir. 2017) (quoting *Mayle v. Felix*, 545 U.S. 644, 650 & 664

(2005) (internal citations omitted)). Relation back is improper if the new pleading "attempts to introduce a new legal theory based on facts different from those underlying the timely claims." *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 881 (D.C. Cir. 2010) (quoting *United States v. Hicks*, 283 F.3d 380, 388 (D.C. Cir. 2002)). Similarly, even if a new pleading "shares some elements and some facts in common with the original claim," it does not relate back if "its effect is to fault [the defendants] for conduct different from that identified in the original complaint." *Id.* (quoting *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009) (internal quotations omitted)).

The relator's initial complaint, filed in 2007, alleged that Defendants required SCH and a related hospital to purchase medical supplies from a company owned by Ted Cain, transferred patients between SCH and a nursing facility owned by Ted Cain in such a way as to maximize Medicare and Medicaid reimbursement, and failed to collect copays and deductibles from Medicare beneficiaries. By contrast, the United States' complaint and amended complaint, filed in 2015, alleged that SCH and CMI improperly received Medicare reimbursement for the salaries of Ted and Julie Cain and the 1997 and 2007 BMWs, CMI performed duplicative and/or unnecessary services for SCH, and related-party expenses were improperly included on the SCH and CMI cost reports.

Because the United States' allegations do not arise out of the same conduct, transactions, or occurrences as the relator's allegations, the United States' complaint does not relate back to the filing of the relator's complaint. Nowhere in the relator's complaint are any allegations concerning (1) the salaries of Ted or Julie Cain, (2) BMWs or other vehicles owned by Defendants, or (3) duplicative or unnecessary management of SCH by CMI. While both complaints mention "related-party expenses," there is no factual overlap between those allegations.

The only other similarity between the two sets of allegations is that they arise from Defendants' cost reports; however, this meager connection is far from enough to satisfy the relation-back doctrine. In *United States ex rel. Bledsoe v. Community Health Systems*, 501 F.3d 493 (6th Cir. 2007), the Sixth Circuit made clear that not all Medicare fraud allegations arise out of the same conduct, transaction, or occurrence for relation-back purposes. *Id.* at 516-19. In that case, the initial complaint alleged fraudulent "miscoding and upcoding [of] items billed to Medicare and Medicaid," *id.* at 516, while the new complaint also included allegations of "improperly billing Medicare and Medicaid under CPT code 94799 for a 'call back' charge for which no procedure is associated," "improperly double-billing Medicare and Medicaid for cardiopulmonary resuscitation under CPT code 99201 and improperly billing for other procedures unbundled and billed under CPT Code 92950," and "fraudulently bill[ing] Medicare and Medicaid for equipment and supplies." *Id.* at 518-19. Even though all these allegations related to Medicare claims, the court found that the new allegations did not relate back to the initial complaint, because they did not involve the upcoding or miscoding alleged in the initial complaint. *Id.*

Similarly, in *Miller*, the relator asserted claims regarding a contract for work on sewer systems in Egypt, known as Contract 20A. 608 F.3d at 875. The United States intervened, asserting claims regarding Contract 20A but adding Contracts 7 and 29, which also concerned sewer work in Egypt. *Id.* at 876. The DC Circuit found that the government's claims regarding Contracts 7 and 29 did not relate back to the relator's complaint "because each contract is unique and no two involved the same 'conduct, transaction[], or occurrence[].'" *Id.* at 882. While "all three contracts are similar . . . in that each was funded by the USAID and required work related to sewer systems in Egypt," they contained differences in "the work to be performed, who was prequalified to participate in the bidding that was allegedly rigged, when the contract was awarded, who won the

contract, and the amount of the winning bid." *Id.* at 881.

As held in *Bledsoe*, relation back is not permitted in this case simply because both the relator and the United States alleged cost-report fraud. Instead, the specific type of fraud alleged by the United States must appear in the relator's complaint, and such allegations are lacking here. And just as in *Miller*, it is insufficient for the United States to allege misconduct in a **similar** context—the allegations must arise from the **same** conduct, transaction, or occurrence, but that is not present. Accordingly, the United States' claims do not relate back to the relator's complaint.[3]

Alternatively, the United States cannot avail itself of the relation-back doctrine for any claims arising after the date of the relator's complaint. *See United States v. Kellogg Brown & Root, Inc.*, 2015 U.S. Dist. LEXIS 82427, at *12 (E.D. Tex. June 24, 2015) ("[A]llegations concerning events occurring subsequent to the filing of the original petition cannot possibly relate back to the earlier date of filing.") (quoting *Abramson v. Boedeker*, 379 F.2d 741, 744 (5th Cir. 1967)). And even if relation-back is permitted, it must be limited by the ten-year statute of repose contained in 31 U.S.C. § 3731(b). *See United States v. Scan Health Plan*, 2017 U.S. Dist. LEXIS 174308, at *27-28 (C.D. Cal. Oct. 5, 2017).

### 2.    The 6-Year Statute of Limitations is Applicable

Given that the United States' claims do not relate back to the relator's complaint, the statute of limitations on the United States' claims is measured from the date of its complaint in intervention. And the applicable statute of limitations is the standard six-year statute of limitations, not the ten-year statute of repose. The ten-year statute is only applicable if "the official of the United States charged with responsibility to act in the circumstances" is unaware of "facts material

---

[3] Because the United States' False Claims Act claims do not relate back to the relator's complaint, neither do the state-law claims. *See United States ex rel. Acad. Health Ctr., Inc. v. Hyperion Found., Inc.*, No. 3:10-CV-552-CWR-LRA, 2014 U.S. Dist. LEXIS 93185, at *165 n.69 (S.D. Miss. July 9, 2014).

to the right of action" for a period of time (at least three years after the claim is filed) and should not reasonably have been aware. 31 U.S.C. § 3731(b). But the United States' claims arise out of Defendants' cost reports, which were submitted to the FI/MAC each year to be processed and reviewed. Because of this submission, the United States either knew of should've known of the necessary, material facts once the cost reports were processed each year. Thus, the ten-year statute of repose is unavailable to the United States.

In a similar context, the Eleventh Circuit has held that a FI's knowledge was tantamount to the government's knowledge, preventing the tolling of the statute of limitations. *United States v. Kass*, 740 F.2d 1493 (11th Cir. 1984). That suit concerned a contract action by the United States related to an alleged Medicare over-reimbursement, and it involved a six-year statute of limitations that was tolled for "all periods during which . . . facts material to the right of action are not known and reasonably could not have been known by an official of the United States charged with the responsibility to act in the circumstances." *Id.* at 1496 (quoting 28 U.S.C. § 2416(a)). The court found that Blue Shield, the FI, was aware of the required facts by September 4, 1974, and stated: "At least as early as September 4, 1974, the government, through its agent Blue Shield, had the facts making up the 'very essence of the right of action.'" *Id.* at 1498. Because suit was not filed within six years of that date, the court found the suit to be time-barred. *Id.* at 1499; *see also United States ex rel. Wilkins v. N. Am. Constr. Corp.*, 2001 U.S. Dist. LEXIS 20538, at *14 (S.D. Tex. Sept. 25, 2001) ("[A] 'responsible official' under section 2416 is not limited to officials in the Department of Justice who have the authority to initiate litigation.").

As described above, FI/MACs act as agents for the United States, functioning as an administrative agency and even cloaked with sovereign immunity. Just as found in *Kass*, the FI/MAC is "the official of the United States charged with responsibility to act in the

circumstances" in this case, and their processing of Defendants' cost reports negates any contention that the United States was unaware of the necessary facts. Only the six-year statute of limitations is therefore applicable.

### B.     No Wrongdoing After December 4, 2015, Has Been Alleged or Proven

The United States' amended complaint was filed on December 4, 2015, and the last cost reports filed by CMI and SCH at that time were for fiscal year 2014. The United States' expert witness, George Saitta, did not state any opinions beyond the 2013 cost report. (*See* Doc. No. 301-14; Doc. No. 301-2 at 133:6-10.). Thus, as the United States has neither alleged nor presented evidence of wrongdoing beyond the 2014 cost report, all such claims should be dismissed.

### <u>CONCLUSION</u>

The United States has created a well-developed system for Medicare reimbursement concerns to be addressed. Yet the United States has chosen to eschew that system and seek punitive liability against Defendants, largely concerning actions that the United States' own Fiscal Intermediaries have reviewed and approved. This course of conduct has gone on long enough. As demonstrated above, Defendants have not engaged in conduct violative of the False Claims Act. The United States' dispute, if it has one, is with its Fiscal Intermediaries, not with Defendants. Defendants accordingly request that this action be dismissed.

Respectfully submitted,

/s/ Ronnie Musgrove
Ronnie Musgrove, MSB #3698
Attorney for the Defendants
**Musgrove/Smith Law**
599 Highland Colony Parkway, Suite 110
Ridgeland, MS 39157
Telephone: (601) 852-1696
Facsimile: (601) 852-1714

/s/ Nicole C. Huffman
Nicole C. Huffman, MSB # 101457
Attorney for the Defendants
**Carr Allison**
14231 Seaway Road
Building 2000, Suite 2001
Gulfport, Mississippi 39503
Telephone: (228) 864-1060
Facsimile: (205) 864-9160

/s/ Brett Ross
Brett Ross, admitted *pro hac vice*
Daniel B. Harris, admitted *pro hac vice*
Attorneys for the Defendants
**Carr Allison**
100 Vestavia Parkway
Birmingham, Alabama 35216
Telephone: (205) 822-2006
Facsimile: (205) 822-2057

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of July, 2019, the foregoing document was served upon the following using the CM/ECF system:

Benjamin C. Mizer
Michael D. Granston
Daniel R. Anderson
A. Thomas Morris
Civil Division
U.S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044

Angela Givens Williams
Assistant United States Attorney
501 East Court Street, Suite 4430
Jackson, MS 39201

J. Brad Pigott
Pigott & Johnson, PA
775 North Congress Street
Jackson, MS 39202

John F. Hawkins
Hawkins Gibson, PLLC
Post Office Box 24627
Jackson, MS 39225

John P. Scanlon
Pyle, Mills, Dye & Pittman
800 Avery Blvd. N., Suite 101
Ridgeland, MS 39157

/s/ Daniel B. Harris
OF COUNSEL