IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**JAMES ALDRIDGE, RELATOR,**
on behalf of the
**UNITED STATES OF AMERICA**                                                        **PLAINTIFF**

v.                                                    Civil Action No. 1:16-CV00369 HTW-LRA

**CORPORATE MANAGEMENT INC.,**
et al                                                                                                      **DEFENDANTS**

### ORDER

Before this court is a Motion for Approval to Pay Attorneys' Fees and Expenses **[doc. no. 410],** filed by the Defendants herein, Corporate Management, Inc. ("CMI"), Stone County Hospital, Inc. ("SCH"), H. Ted Cain ("Ted Cain"), Julie Cain, and Thomas Kuluz ("Kuluz"), (collectively "Defendants").   The Plaintiffs, the United States of America and the Relator James Aldridge, oppose the motion.  Briefing has been completed and this court is ready to make its ruling.

### BACKGROUND

This was a *qui tam* action brought under the auspices of the False Claims Act ("FCA"). After years of litigation culminating in an eight-and-a-half-week trial, the jury found Ted Cain, Julie Cain, Tommy Kuluz, Corporate Management, Inc., and Stone County Hospital, Inc., liable for Medicare Fraud under the False Claims Act. The jury also found Ted Cain, Julie Cain, and CMI., liable under the common law theory of unjust enrichment, and found Stone County

1

Hospital, Inc., liable for payments made to it based on a mistake of fact. The jury found in favor of defendant Starann Lamier, finding that she was not liable for any of the alleged violations.

The jury awarded damages of over $10 million dollars. The FCA requires that the court treble the damages for violation of the Act, and additionally provides for civil penalties, such that the total award exceeded $32 million dollars.

Ted Cain was the 100% owner of CMI and of Stone County Hospital, two of the Defendants in this case, as well as numerous other businesses. Ted Cain's business empire was complicated, and the businesses interconnected. Some of these other businesses had even benefitted from the fraudulent cost reports that Defendants had submitted to Medicare, which were the subject of this litigation.[1]  Stone County Hospital had closed prior to commencement of the trial and Memorial Hospital (not a Ted Cain Company) was not operating a hospital in the former Stone County Hospital facility.

During the trial, the court learned that Memorial Hospital was, and presumably still is, leasing the property where Stone County Hospital former operated and is making monthly lease payments to Wiggins Acute Care, another company owned 100% by Ted Cain. Despite Defendants' hard-waged battle to avoid disclosing bank records for Wiggins Acute Care, the court ultimately learned that Memorial Hospital (lessee) was making a lease payment of over $100,000 monthly to Wiggins Acute Care, one of Ted Cain's wholly owned companies.

---

[1] The evidence at trial showed, *inter alia*, that several of Ted Cain's businesses were housed in the same building as CMI. While CMI was eligible for reimbursement by Medicare for lease expenses, these other entities were not. Some of the businesses were not even related to health care. Yet cost reports were submitted to Medicare by these Defendants for reimbursements for lease payments for the entire building, including spaces occupied by Ted Cain's other businesses.

This court also learned, over the course of the trial, that Ted Cain and the other Defendants had transferred almost all of the assets of Ted Cain, Julie Cain, and the Ted Cain companies to a family trust in the year immediately preceding the trial. Cain first transferred all of the assets into HTC Elite, another company wholly owned by him, then transferred ownership of HTC Elite to the trusts. Tommy Kuluz testified that Woodland Village Nursing, Diamondhead Nursing, Wiggins Nursing, Stone County Hospital Nursing, Leakesville Rehab and Nursing, Quest Pharmacy, the Focus Group, Melody Manor Convalescence, Harrison Co. Commercial Lot LLC, and Cain Cattle Corporation, became 99% owned by the Cain family trust "sometime in 2019" via HTC Elite. Ted Cain, who had been the 100% owner of these companies prior to 2019, became a 1% owner of each. Jan. 27, 2020 Rough Tr. at pp. 6-25. According to Kuluz, the only entities that did not become 99% owned by the trust were Stone County Hospital and CMI.

Ted Cain said the trust was for the benefit of his children. One of the HTC documents, however, lists as a purpose, "the aim to shield assets from creditors." Feb. 7, 2020 Rough Tr. at 145. The Government took the reasonable view that this transaction was an effort to make the Defendants judgment proof. Ted Cain admits that he has control over these trusts.

The Government also made the court aware that during the period in which the trial was being conducted, Ted Cain had listed several properties for sale that he owned, including his residence in Ocean Springs, Mississippi.

ANALYSIS

This is only a part of the financial quagmire that served as the backdrop to the Government's request for prejudgment relief under the FDCPA ( Federal Debt Collection Procedures Act). The Government contended that the Defendants, and Ted Cain in particular,

had engaged in efforts to shield, hide or otherwise dissipate assets and showed a propensity to continue this behavior. This court held several hearings on the issue of prejudgment relief, at which both Plaintiffs and Defendants presented their arguments.

This court, too, was quite concerned with the timing and the scope of the Defendants' actions in moving and transferring assets prior to and on the eve of trial. The Defendants raised the prospect, however, that a writ of attachment or garnishment could jeopardize the continued operation of Memorial Hospital at its current location. Memorial was the only hospital within an approximately fifty-mile radius, and was needed in the area. The court did not want to risk this outcome if there was another way to protect the assets from dissipation, especially since the government's request was being made at a time when Defendants had not yet been found guilty of wrongdoing in the case.

This court opted for an approach that would not be as far-reaching as the procedures allowed under the FDCPA, but would maintain the status quo. This court ordered that the Defendants not transfer, sell or dispose of any funds or assets without permission of the court. Accommodations were made for Defendants to pay" those recurring bills and payroll obligations that were part of the normal course of business." Any bills over $50,000 were to be submitted to the court and to the Government. If appropriate, the court would approve them for payment.

After the jury returned its verdict, but prior to entry of the judgment, the United States renewed its application for writs of attachment to the real property under the FDCPA and sought a writ of garnishment [doc. no. 410-1 at p. 1-2]. The United States renewed its concern that as time passes between the jury verdict and entry of the judgment the more time Defendants would have to draw down assets and the more time other creditors would have to secure any interests they might have.

This court set a future hearing date for all remaining matters, and obtained from the defense and from Ted Cain and Julie Cain personally, on the record, their assurance that all of their assets and property would remain in the same status, including the assets of Stone County Hospital, CMI, Wiggins Acute Care, the family trust, cash, bank accounts, stocks etcetera. [doc. no. 410-1 at p. 18-20].

The court stated that defense counsel should email the regular bills to the court with a copy to the Government, and approval by the court, if appropriate, would be made the same day. The court subsequently agreed, in order to facilitate prompt payment of payroll, that a bill would be presumptively approved if the Government did not expressly object to it.

The Government has objected only to the April 2020 request by Defendants to pay the outstanding bill from Carr Allison, one of law firms[2] retained by Defendants to represent them. The bills were for February and March of 2020, for a total of $257,156.87.

Defendants make three main arguments in support of their motion: 1) that these are normal bills and should be paid like other regular bills; 2) that the FDCPA does not limit Defendants' ability to pay attorney invoices; and 3) preventing them from paying the attorney invoices would deny Defendants access to counsel.

---

[2] Defendants currently have no less than six attorneys that have entered an appearance in this case on their behalf: Ronald Musgrove (of Musgrove Smith Law); Brett Ross (of Carr Allison); Daniel Harris (of Carr Allison); Michael Bentley (of Bradley Arant Boult Cummings, LLP); Nicole Huffman (of Carr Allison, PC); Michael Bentley (of Bradley Arant Boult Cummings, LLP); and W. Wayne Drinkwater, Jr. (of Bradley Arant Boult Cummings, LLP). The first four attorneys represented the Defendants throughout the trial.  All four were generally present each day of the trial. The latter two attorneys entered their appearances on April 21, 2020 [doc. nos. 392 and 393],  after this court had entered its order against dissipating assets, and have appeared for each proceeding in this case since that time.   All six attorneys were present by video or telephone for the May 6, 2020 proceedings and the June 4, 2020 proceedings. For the June 8, 2020 proceedings Defendants were represented by five persons via video conferencing or telephone.  Additionally, Attorney John Banaham, was on the phone line on behalf of the Cain Trusts, but was not a participating party. Four attorneys were present for the Defendants for the proceedings on February 4, 2021.

The first two arguments are easily addressed.  First, whether the Carr Allison invoices are characterized as "normal bills" is of little or no consequence for purposes of determining whether this court should allow them to be paid.   Pursuant to this court's order, the court has the discretion to order the attorneys' fees and expenses paid, or not, whether in the normal course of business or outside the normal course of business.  Secondly, this court did not grant the Government's request under the FDCPA, but imposed a less severe means by which to keep the Defendants' assets in tact; so, it is not really relevant whether the FDCPA provides for attorneys' fees to be withheld.

This court now addresses the third argument.   Defendants say that defense counsel cannot realistically continue to represent them without being paid, so Defendants are, in effect, being deprived of assistance of counsel of their choice for post-trial matters and for appeal.  This, Defendants say, without providing explanation or legal authority, would result in the denial of due process of law to Defendants under the Fifth[3] and Fourteenth[4] Amendments to the Constitution.  Further, according to Defendants, the Government has not identified any legal authority prohibiting payment of defense counsel.

---

[3] The Fifth Amendment to the U.S. Constitution provides, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

[4] Section 1 of the Fourteenth Amendment to the U.S. Constitution provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws".

This court begins by restating the backdrop against which this court's order was initially entered. During the trial, this court became aware, for the first time, that the assets of Ted Cain, Julie Cain and the Ted Cain-owned companies had been transferred into a trust and that Ted Cain was claiming to have little to no assets left. This court also found out during the trial that Ted Cain had several of his properties listed for sale with real estate agents during the time the trial was taking place. Of even greater concern though, were Defendants' representations, through counsel, that there was no source of funds from which to pay the note on the hospital property without the full amount of the lease payments from Memorial. Defendants contended before this court that without that monthly payment from Memorial, the mortgage on the hospital property could not be paid. Yet, Defendants now insist that they be allowed to pay their attorneys $257,156.87. This court is concerned about which of the Defendants' contradictory positions was actually true. Was there a lack of funds to pay the note on the hospital property, *or* are there sufficient funds lying around to pay a quarter of a million dollars to Carr Allison, plus what is being paid to the Musgrove firm, plus what is being paid to the two new attorneys who have entered the case? Both parts of the question cannot be answered in the affirmative.

Under the circumstances here, and given the Defendants' track record over the course of these proceedings and previously, including Defendants' seeming efforts to hide, transfer or shield assets, this court must carefully scrutinize Defendants' request. A jury has determined that these defendants defrauded the United States of millions of dollars. The Government should be able to collect on its judgment. The United States continually questioned Defendants' assertion that Ted Cain, CMI and Stone County Hospital, had no other funds available to satisfy that note. 1/28/20 Rough Tr. at 196:1-18; 1/31/20 Rough Tr. at 1:15-19; id. at 2:2-20; id. at 7:2-10; id. at 18:7-20:23. This court itself questioned defense counsel on this point. 1/28/20 Rough

Tr. at 197:11-14; 1/31/20 Rough Tr. at 10: 15-17; id. at 11:3-6; id. at 11:18-21; id. at 13:16-18. Defense counsel Harris stated : "there are not other funds from other sources that can be utilized." Id. at 10:18 -14:3.  Counsel stated that the difference between what Memorial pays and the amount due on the note was approximately $35,000, and "is used for equipment leases and other obligations regarding the hospital." 1/28/20 Rough Tr. at 203:11-204:20.

According to the Government, the bank statements from Wiggins Acute Care (lessor) show that Defendant Ted Cain transfers out any funds beyond what is necessary to pay the $94,510.16 note to Bank of Biloxi.  The Government provides as examples the following: on March 29, 2019, Ted Cain wrote himself a check for $29,602 from Wiggins Acute Care; on June 28, 2019, Ted Cain wrote himself a check for $25,608.18 from Wiggins Acute Care; on October 31, 2019, Ted Cain wrote a check to HTC Elite for $61,000. This is contradictory to counsel's statement that no funds had gone from Wiggins Acute Care to HTC Elite. 1/31/20 Rough Tr. at 30:7-17.

This court previously discussed that the Ted Cain assets had been transferred to family trusts.  The assets were first transferred to HTC Elite, then from HTC Elite to the family trusts, over which Ted Cain and his lawyers acknowledge that Ted Cain has control.

Testimony also established that Ted Cain regularly disregarded the boundaries between the companies he owned.  It is therefore quite troubling that Stone County Hospital was paying the legal fees of all defendants, yet testimony and evidence established that Stone County Hospital had not been in operation for almost a year. What then, was the true source of those funds?

8

Testimony also established that Ted Cain would write checks from his personal account to his companies, and that the line was quite blurred between Stone County Hospital and Wiggins Acute Care as demonstrated by the lease agreement with Memorial.

This court is necessarily skeptical about the source of funds from which these attorneys fee payments will be made in light of the co-mingling of funds that has been shown. All of this leads the court to require that the Defendants provide thorough, clear documentation and explanation of the source of funds from which these attorneys' fees are to be paid.

Defendants say the Government had not provided any legal authority that would prevent the Defendants from using their own funds to pay their own attorneys' fees. In response, though, the Government cites *to U.S. v. Compassionate Home Care Servs., Inc.*, 2017 WL 9535169 **1-2 (E.D.N.C. Sept. 8, 2017 and *U.S. v. Teevens*, 862 F. Supp. 1200, 1225 & n.46 (D.Del. 1992).

In *Compassionate Home Care,* a False Claims Act case, the court denied defendant's motion to release garnished and sequestered funds to pay defense counsel. The court there said:

> District courts have broad discretion to release sequestered, frozen, or garnished funds. The court has authority to release such funds "in the interest of fundamental fairness if wrongdoing is not yet proven and the restrained property is a defendant's only means of securing counsel." As the first requirement implies, "[r]eleasing restrained funds to pay attorney's fees is premised on the fact that wrongdoing is not yet proven when the fee application is made.

In the case before us, wrongdoing has been proven to the satisfaction of a jury of Defendants' peers. Moreover, Defendants have apparently paid their numerous other attorneys,[5]

---

[5] Defendants hired Michael Bentley and Wayne Drinkwater after the court had entered its order preventing dissipation of assets, but none of the other four attorneys in the case has withdrawn. All six attorneys continue to actively represent these Defendants collectively.

and continue to hire more.[6]   Much like the case *sub judice,* in *Compassionate Home Care* a new attorney entered an appearance after funds had been sequestered.  Two new attorneys have entered the instant case after the courts' order maintaining the status quo. This raises even more questions about the dissipation of assets and the source of payment to the numerous attorneys in the case from Defendants who claim not to have enough assets to pay the mortgage on the hospital property.

The Defendants in *Teeven,* supra, made the same arguments as the defense counsel in the instant case – that inability to pay attorneys' fees might result in the denial of the attorney of the defendant's  choice. The *Teeven* court denied the request and reiterated its "underlying concern that these seized properties not be wasted or dissipated. Like the Defendants here, the *Teeven* defendants had listed properties for sale and had also shown a tendency to dissipate assets. *Id.* at 1226

This court, while sympathetic to defendant's attorneys' desire to be paid, has serious questions about the source of funds from which the Carr Allison attorneys are to be compensated. This court is persuaded that payment of the attorneys' fees to Carr Allison cannot be made until Defendants provide clarification on the source of funds.

Additionally, Carr Allison must provide a detailed itemized statement of the work performed and the expenses claimed.  Relative to the expense that defense counsel says it prepaid on behalf of Defendants, Carr Allison must submit proof of mileage for witnesses and for the attorneys, including the originating location.  Hotel expenditures also should be documented.  Given the history of Defendants' seeming efforts to hide, transfer or dissipate assets, these

---

[6] A separate action has been brought in this federal district court naming as defendants: Harold Cain; Julie Cain; HTC Enterprises, LLC; HTC Elite, L.P; the Evan Trace Cain GST Trust; the Logan Patrick Cain GST Trust; and Lucinda K. Sloan. *Aldridge v. Cain et al,* Civ. Action No. 1:20-cv-321 HTW-MTP.  Ted Cain and Julie Cain have retained Tristan Russell Armer and James H. Heidelberg of the law firm of Heidelberg, Steinberger, Colmer & Burrow, PA as their attorneys in that proceeding.

Defendants must be required to provide this court with sufficient detail to ensure that the fees and expenses awarded are reasonable. A copy of the statement shall be provided to the Plaintiffs with those privileged portions redacted. An unredacted copy shall be provided to this court, for its *in camera* review. Defendants are to remember that the fact of billing is not, itself, privileged, and Plaintiffs' copies should only be appropriately redacted. Defendants should submit their itemized statement of fees and expenses no later than two weeks from the date of this order.

## CONCLUSION

For all the reasons stated, this court grants in part, and denies in part, Defendants "Motion For Approval to Pay Attorneys' Fees and Expenses." [doc. no. 410]. This court is prepared to authorize payment of approved expenses, and will authorize proven mileage, meals and reasonable hotel bills. Approval for the payment of the Defendants' attorneys' fees to Carr Allison, however, is conditioned upon defense counsel providing to this court the following: 1) a satisfactory and clear explanation of the source of funds from which the fees at issue will be paid; 2) a thorough explanation of the contradiction in defense counsel's representation to this court that the Defendants had no funds available to satisfy the note on the hospital property other than the lease payments from Memorial; and 3) a detailed itemized statement of the attorneys' fees earned and expenses incurred for which counsel is seeking payment.

Upon receipt of these items, this court will determine the amount of funds to be released for payment of attorneys' fees and expenses as this court deems appropriate.

SO ORDERED AND ADJUDGED, this 9th day of April, 2021.

s/ HENRY T. WINGATE  
UNITED STATES DISTRICT JUDGE