IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JAMES ALDRIDGE, RELATOR,
on behalf of UNITED STATES OF AMERICA                    PLAINTIFF

V.                                    CIVIL ACTION NO. 1:16-CV-369 HTW-LGI

CORPORATE MANAGEMENT, INC., et al                          DEFENDANTS

## ORDER

Before this court are two motions filed by the Defendants herein, Corporate

Management, Inc. ("CMI"), Stone County Hospital, Inc. ("SCH"), H. Ted Cain ("Ted

Cain"), Julie Cain, and Thomas Kuluz ("Kuluz"): 1)  Motion  for Judgment as a Matter of

Law [ecf doc. no.430]; and 2) Motion for a new Trial [ecf doc. no. 432].  The Plaintiff

United States of America ("United States" or "Government") opposes the motions.  Briefing

has been completed and this court is ready to make its ruling.

## FACTUAL AND PROCEDURAL BACKGROUND

The Relator in this case, James Aldridge brought a *qui tam* action against these

Defendants under the False Claims Act (FCA). The FCA imposes significant penalties on

anyone who "knowingly presents a false or fraudulent claim for payment or approval" to the

federal government. 31 U.S.C. §3729(a)(1)(A). "Claim" includes a direct request to the

Government for payment, as well as reimbursement requests made to the recipients of federal

funds under federal programs. See §3729(b)(2)(A).  The Act's scienter requirement defines

"knowing and "knowingly" to mean that a person has "actual knowledge of the information,"

1

"acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." §3729(b)(1)(A); *Universal Health Services, Inc., v. Escobar,* 136 S.Ct. 1989 (2016).

Stone County Hospital ("SCH") was a Critical Access Hospital located in Wiggins, Mississippi. Ted Cain, the sole owner of Stone County Hospital, Inc., submitted the application to Medicare in 2001 to convert SCH into a Critical Access Hospital. "Critical Access Hospital" is a designation given to eligible rural hospitals by the Centers for Medicare and Medicaid Services ("CMS"). This designation was created through the Balanced Budget Act of 1997 (Public Law 105-33) in response to a significant number of closures of rural hospitals in the 1980's and early 1990's. The "Critical Access Hospital" designation and method of reimbursement is designed to reduce the financial vulnerability of rural hospitals, thereby improving access to healthcare in rural communities. These hospitals, therefore, receive certain benefits, such as cost-based reimbursement for Medicare services.

As part of this conversion, Ted Cain certified that he was familiar with the Medicare or other federal health program laws, regulations, and program instructions governing this type of hospital and that he agreed to abide by them. P-304. He also certified that he "understood that payment of a claim by Medicare or other federal health care program was *conditioned* on the claim and the underlying transaction *complying with such laws, regulations, and program instructions.*" *Id.* (emphasis added). These laws, regulations, and program instructions are found in the Provider Reimbursement Manual ("PRM"). 1/16/20 Tr. 7:14-21 (Tisdale).

From 2004 up until he leased the facility to another hospital, Ted Cain held the position of Chief Executive Officer/President of CMI. At all times pertinent to this suit, Ted Cain was the sole owner of CMI and SCH. Ted Cain's wife, Julie Cain held the position of CEO/Administrator of SCH from 2003 to 2012.

### Cost reporting process

Payments from Medicare to a Critical Access Hospital are based on the Critical Access Hospital's costs and the share of those costs that are allocated to Medicare patients. As a Critical Access Hospital, Medicare reimbursed SCH at allowable costs plus 1%.

Following the conclusion of each year, SCH, through CMI, prepared and submitted a Medicare cost report, detailing the costs for which SCH sought reimbursement for that cost reporting year. CMI annually prepared a home office cost statement detailing the management costs CMI allocated to SCH's cost report for purposes of Medicare reimbursement. Throughout the year, SCH received interim payments from Medicare based off the prior year's cost report. At all times pertinent to this suit, SCH submitted its Medicare Cost Reports for each cost reporting year to the applicable Fiscal Intermediary ("FI") or the Medicare Administrative Contractor ("MAC") [1].

### Home Office and Allocation

A group of commonly owned or controlled health care providers may share a home office to perform certain centralized administrative services for its component providers. In

---

[1] A Fiscal Intermediary, FI, was the entity that the Center for Medicare Services contracted to review the annual cost reports submitted by health care providers seeking reimbursement from Medicare. The name of the contractor was subsequently changed to Medicare Administrative Contractor, or MAC. When Stone County Hospital was initially converted to a Critical Access Hospital, it submitted its cost reports to the FI. In later years, the entity to which SCH submitted its cost reports was referred to as the MAC. The terms were sometimes used interchangeably during the trial.

the instant case, SCH contracted with CMI, the home office, to provide certain administrative services for which SCH pays a fee to CMI. The home office is not a Medicare provider and cannot, therefore, directly receive Medicare reimbursements. See 42 U.S.C. §1395cc. The provider, however, may obtain reimbursement for what it has paid to the home office for these administrative services.

In order for SCH to obtain reimbursement from Medicare for the cost of these services, CMI, as the home office, must also submit a cost report to the FI or the MAC. The home office cost statement must identify the allowable home office costs and how they are allocated among each of its subsidiary companies.

## The Defendants

### Ted Cain

Ted Cain was the sole owner of SCH, a Critical Access Hospital (CAH) located in Wiggins, Mississippi. A Critical Access Hospital, so designated because it is located in an underserved area, is authorized to bill Medicare for allowable costs plus 1%. This is an advantageous billing practice that is unique to Critical Access Hospitals and is generally unavailable to other kinds of hospitals. 1/16/20 Rough Tr. 15:17-20:18 (Tisdale); 1/28/20 Rough Tr. 5:5-9 (LaRocca); 2/6/20 Rough Tr. 101:8-102:1 (Llewellyn).

When applying for Critical Access Hospital status in 2001, as above stated, Ted Cain certified that he was familiar with, and agreed to abide by, the applicable Medicare laws, regulations, and program instructions. He also certified that he "understood that payment of a claim by Medicare was *conditioned* on the claim and the underlying transaction *complying with such laws, regulations, and program instructions*." *Id.* (emphasis added). These laws, regulations, and program instructions are found in the Medicare Provider Reimbursement

4

Manual (PRM).   1/16/20 Rough Tr. 7:14-21 (Tisdale).  Ted Cain additionally certified that he would not "knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare or submit claims *with deliberate ignorance or reckless disregard of their truth or falsity*." PRM at P 304 (emphasis added).

Ted Cain was also the sole owner of CMI, which was the management company that provided administrative services for Stone County Hospital and several other businesses owned by Ted Cain.  The evidence at trial showed that Defendants, Ted Cain, Tommy Kuluz, CMI and SCH,  sought Medicare reimbursement for Ted Cain's million-dollar plus salary, despite the absence of any significant work performed by Ted Cain related to patient care. Defendants, by the jury's verdict, made no effort to ensure the reasonableness of Ted Cain's compensation, or otherwise comply with the Medicare Provider Reimbursement Manual (PRM).

Julie Cain

Julie Cain, the wife of Ted Cain, was the administrator of SCH for several of the years at issue, and for other years served on the Board of Directors, or as a paid consultant to the hospital. The evidence convinced the jury that Julie Cain  did very little work as administrator of Stone County Hospital.  She did  virtually no work for the hospital during some years.  Testimony showed she was primarily staying at home with her children.  At trial, she could not provide any evidence of work done as a member of the board of directors, or as a consultant. Yet, her unadjusted, un-modified salary, compensation as a board member, and her pay as a consultant were all included in the cost reports submitted to Medicare and reimbursed by Medicare.

Tommy Kuluz

Tommy Kuluz was the Chief Financial Officer of CMI, the company that served as the "home office" for SCH for Medicare purposes, providing administrative services to SCH and other companies owned by Ted Cain. Kuluz was primarily responsible for submission of the annual cost reports by SCH to Medicare. He allegedly obtained his information from SCH personnel, and allegedly coordinated with the cost report preparers.

The jury was not impressed with Kuluz's honesty, finding that he had assisted Ted Cain's fraud, causing the submission of false claims and the making of false records and documents. The jury found he also had falsely certified all but one of the CMI home office statements.

His conduct, found the jury, violated Medicare's conditions of payment because he falsely attested to the truth and accuracy of the information, in order for SCH to bill Medicare. Kuluz also caused SCH officials to sign the SCH cost reports, thereby "causing the making" of false certifications. Testimony by Manuel Pilgrim at trial was that Kuluz billed Medicare for expenses Kuluz knew were not reimbursable, as evidenced by Kuluz's disallowance of those very same expenses in the 2012 and 2013 *Medicaid* home office reports.

CMI (Corporate Management Incorporated)

The jury found that CMI had submitted, or caused to be submitted, from 2004 to 2015, twelve (12) false claims related to cost reports. The jury also found that CMI had been

unjustly enriched by $381,866 for the years 2012 and 2013, years for which certain expenses were self-disallowed[2] for Medicaid but were submitted for reimbursement to Medicare.

SCH (Stone County Hospital)

The jury found SCH liable for submitting, or causing to be submitted, twelve (12) false cost reports for the years 2004 through 2015. The jury also found that Medicare paid SCH based on a "mistake of fact."

### The Alleged Fraudulent Scheme

The fact that Stone County Hospital was a Critical Access Hospital, reimbursed at 101% of allowable costs, played a major role in the Defendants' ability to perpetrate the years-long fraud that gave birth to this litigation. Also critical to Defendants' ability to carry out the fraudulent scheme was the fact that SCH was under the management of CMI, and that CMI also managed quite a few other companies owned by Ted Cain, both health provider companies and non-health related entities.

During the twelve-year period covered by this litigation, Ted Cain owned numerous other companies, some of which were bought and sold, opened or closed across the relevant time span. Sherla Harville testified that during the period she worked for CMI, Ted Cain owned two critical access hospitals, three nursing homes and three out-patient clinics with which she dealt. The also owned a pharmacy, and a durable medical equipment company, she said. Craig Steen testified by deposition that he was aware of the following companies

---

[2] According to the testimony of Manuel Pilgrim, a Government expert, self-disallowance occurs when a health care provider, in preparing the cost report to be submitted to either Medicare or Medicaid, has determined that certain costs listed on its cost report were not allowable and should not have been included for reimbursement; therefore, the provider, on its own, shows that cost item as self- disallowed, and does not seek reimbursement for that item.

owned by Cain: Woodland Village Nursing Center; Stone County Nursing and Rehab; Leakesville Rehab Nursing Center; Stone County Hospital; Stone County Family Medical Clinic; Poplarville Medical Clinic; Quest Rehab (at some time in the past); and Quest Medical Services. Among the non-provider companies owned by Cain and managed by CMI were Cain Cattle, Quest Aviation, the Focus Group, and Legacy Landscaping. CMI managed all of these various businesses, and some were housed in the CMI offices. James Williams testified that Ted Cain started an ambulance service while he was at SCH.

A home office is allowed to provide support functions for several providers and it may also serve as the management company for non-provider companies. The Provider Reimbursement Manual ("PRM"), however, includes special regulatory provisions however, regarding related party transactions – regulations seemingly ignored by these Defendants.

The evidence showed that Ted Cain's compensation, totaling millions of dollars, did not meet the criteria to be reimbursed by Medicaid. An owner's salary and compensation is subject to special provisions under Medicare. As will be later discussed, it must be reasonable and necessary, and the services performed must be related to patient care. The services alleged to have been performed by Ted Cain were not related to patient care, and the salary amount was not reasonable nor necessary. There was ample evidence that Ted Cain actually performed virtually no services for SCH, and certainly no reimbursable services.

In addition to providing unreasonable compensation to the owners, these Defendants were able to indirectly shift some of the operating costs of their other companies to SCH and ultimately to Medicare. They did this primarily through the submission of fraudulent claims for Ted Cain's salary and by disproportionately allocating Ted Cain's compensation to SCH relative to his other CMI-managed companies. For most years, CMI and Tommy Kuluz

chose the 'direct allocation' method for Ted Cain's salary at CMI, and allocated 80 - 82% of Cain's compensation to SCH, without any substantiation or documentation. This changed to the "pooled" method of allocation after CMI received the Government's letter informing it of this lawsuit.

Additionally, CMI charged SCH higher management fees as compared to the lower fees charged to other Ted Cain entities; thus, SCH and Medicare indirectly subsidized the management fees of the other Cain companies under CMI management.

Julie Cain was also paid an unreasonable and excessive salary as administrator of SCH, especially in light of her lesser qualifications as compared to the other Chief Operating Officers (COO's) and administrators of SCH and similar hospitals, and because she treated the position as a part-time job, at best. Submission of cost reports seeking Medicare reimbursement for her director's fees and for her consultant services were fraudulent because she was shown not to have performed any work in these roles.

Moreover, as later discussed in this opinion, Julie Cain's position as administrator of SCH enabled the other Defendants to submit false cost reports, to charge higher management fees to SCH, and enforce requirements that SCH purchase its supplies from a Cain-owned company.

The Plaintiffs, Relator and the Government, were able to prove to the satisfaction of the jury, that Defendants had committed cost-report fraud by falsely certifying that the services identified in their annual cost reports had been provided in compliance with applicable laws and regulations, while knowingly including costs that were not reimbursable under the Medicare program. This resulted in Medicare reimbursing these Defendants in amounts much higher than that to which they were legally entitled.

This court tried this case for almost nine weeks. Over 200 exhibits, consisting of thousands of pages were admitted into evidence, and an equal number were not admitted or withdrawn. The jury heard the testimony of 24 witnesses, and each of the six defendants testified at least twice. Numerous contentious motions and evidentiary arguments were heard and resolved. The matter was finally placed in the hands of the jury.

The duly constituted jury found five of the six defendants liable for varying amounts totaling over $10 million dollars. These five defendants are jointly and severally liable, up to the limits of their respective liability as found by the jury. Starann Lamier, originally the sixth defendant in this case, was found not liable on all of the claims brought against her; consequently, this court dismissed all claims against her.

It is significant to note that all of the jury instructions were agreed upon by the parties. In accordance with Jury Instruction no. 16, The United States' suit against these Defendants alleged three different False Claims Act causes of action: (1) that Defendants knowingly presented or caused the presentment of false claims (here the Stone County Hospital Medicare cost reports from 2004 through 2015) to the federal Medicare program; 2) that Defendants knowingly made or used, or caused to be made or used, false records or statements to the federal Medicare program; 3) that Defendants knowingly failed to return to the federal Medicare program the overpayments from Medicare to Stone County Hospital resulting from Defendants' false claims, records, and statements.

The jury was further instructed that the first two False Claims Act causes of action relate to whether Defendants' misconduct resulted in improper payments by the United States to Stone County Hospital, and the third False Claims Act cause of action concerns

whether Defendants' misconduct resulted in the failure to refund money to Medicare when a refund payment is obligated. This instruction is taken directly from Title 31 U.S.C. §§ 3729(a)(1)(A)(B) & (G), and as earlier stated, was agreed-upon by all parties.

Jury Instructions 17 informed the jury that to find any Defendant liable under the False Claims Act for knowingly presenting or causing to be presented *false or fraudulent claims* for payment or approval to the Government, the United States must show by the preponderance of the evidence the following: First, the Defendant presented or caused to be presented a false or fraudulent claim for payment to the government; Second, the Defendant presented the claim knowing of its falsity or fraudulence; Third, the falsity was material to a decision to pay the claim; and Fourth, the claim caused the United States to pay out money.

Jury Instructions 18 informed the jury that to find any Defendant liable under the False Claims Act for knowingly making, using, or causing to be made or used, *a false record or statement* material to a false or fraudulent claim, the United States must show by the preponderance of the evidence the following: First, the Defendant made or used or caused to be made or used a false or fraudulent statement or record; Second, the Defendant made or used or caused to be made or used the statement or record knowing of its falsity or fraudulence; Third, the statement or record was material to a decision to pay a false or fraudulent claim; and Fourth, the statement or record caused the United States to pay out money.

Jury Instruction 19 apprised the jury that a Defendant that did not present a false claim or make or use a false record or statement may still be found liable if that Defendant *caused* the presentment of a false claim or *caused* a false record or statement to be made or

used. Jury Instruction 20 instructed the jury that even if a Defendant did not make or use a false record or statement, the Defendant may still be liable for *causing* a false record or statement to be made or used *to decrease an obligation to pay money to the United States*.

The above-mentioned instructions – instructions numbers 16, 17, 18, 19 and 20 – are part of the package of instructions, 43 in all, approved by the parties, and given, without objections, to the jury.

After deliberating over several days, the jury returned its verdict [ecf doc. no. 383], finding as follows:

Defendant Ted Cain submitted or caused to be submitted to Medicare twelve (12) false claims from 2004 through 2015, totaling $10,855,382. The jury also found that Ted Cain had been unjustly enriched in the amount of $10,473,516.

Defendant Julie Cain submitted or caused to be submitted to Medicare twelve (12) false claims from 2004 through 2015, totaling $9,137,212. The jury also found that Julie Cain had been unjustly enriched in the amount of $10,473,516.

Defendant Tommy Kuluz submitted or caused to be submitted to Medicare eleven (11) false claims from 2004 through 2007 and 2009 through 2015, totaling $9,853,117.

Defendant Corporate Management, Inc. (CMI)  submitted or caused to be submitted to Medicare twelve (12) false claims from 2004 through 2015, totaling $10,855,382. The jury also found that Corporate Management, Inc., (CMI)  had been unjustly enriched in the amount of $381,866.

 Defendant Stone County Hospital submitted or caused to be submitted to Medicare twelve (12) false claims from 2004 through 2015, totaling $10,473,516. The jury also found

that Medicare paid Stone County Hospital (SCH) based on a mistake of fact for the years 2004 through 2015, in the amount of $10,473,516.

Consistent with the jury's verdict and the mandates of the FCA, this court entered its judgment imposing treble damages and civil penalties as follows:

Defendant Ted Cain is liable to the United States in the amount of $32,566,146 in damages and $71,681 in penalties under the False Claims Act.

Defendant Julie Cain is liable to the United States in the amount of $27,411,636 in damages and $71,681 in penalties under the False Claims Act.

Defendant Thomas Kuluz is liable to the United States in the amount of $29,559,351 in damages and $66,181 in penalties under the False Claims Act.

Defendant Corporate Management, Inc. is liable to the United States in the amount of $32,566,146 in damages and $71,681 in penalties under the False Claims Act.

Defendant Stone County Hospital is liable to the United States in the amount of $31,420,548 in damages and $71,681 in penalties under the False Claims Act.

This court ordered that each defendant shall be jointly and severally liable for the amounts above up to their respective liability, and for post-judgment interest at the legal rate set by 28 U.S.C. § 1961 until the above amounts are paid in full.

The United States, with the court's permission, filed a combined Response to Defendants' Motion for Judgment on the Pleadings and Motion for New Trial. The Defendants filed a combined Reply, as well. Therefore, this court will combine its consideration of the two motions in this one Opinion.

## STANDARD OF REVIEW

### Rule 50(b) Motion for Judgment as a Matter of Law

A motion for judgment as a matter of law following a jury verdict is "a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 365 (5th Cir. 2002). As such, the court is "especially deferential" to the jury's verdict. *Vetter v. McAtee,* 850 F.3d 178, 185 (5th Cir. 2017). The court does not weigh the evidence or make credibility determinations, which are the province of the jury. *Id.* Instead, in reviewing the evidence, the court "must draw all inferences in favor of the nonmoving party." *Id*. And "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 151 (2000) (emphasis added). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id.* (citation omitted). The court can only grant a motion for judgment as a matter of law "if the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable people could not arrive at a contrary verdict." *Vetter,* 850 F.3d at 185.

### Rule 59 Motion for New Trial

A trial court may order a new trial after a jury verdict "on all or some of the issues." The abuse of discretion standard applies. *See Kennett v. USAA General Indemnity Co.*, 2020 WL 1933950 *2 (5th Cir. Apr. 21, 2020). Rule 59 does not set forth any specific grounds for a new trial, but this Rule "confirms the trial court's historic power to grant a new trial based

on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Briggs v. State Farm Fire and Casualty Co.*, 2016 WL 347018 *2 (S.D. Miss. Jan. 26, 2016) (quotation omitted).

As the Fifth Circuit explained in *Shows v. Jamison Bedding, Inc.*,

[w]hen the trial judge has refused to disturb a jury verdict, all the factors that govern our review of his decision favor affirmance. Deference to the trial judge, who has had an opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record, operates in harmony with deference to the jury's determination of the weight of the evidence and the constitutional allocation to the jury of questions of fact. When the trial judge sets aside a jury verdict and orders a new trial, however, our deference to him is in opposition to the deference due the jury. Consequently, in this circuit as in several others, we apply broader review to orders granting new trials than to orders denying them.

*Id.*, 671 F.2d 927, 930 (5th Cir. 1982).

Granting a new trial based on the weight of the evidence receives "particularly close scrutiny" from the appellate court "to protect the litigants' right to a jury trial." *Id.* (citations omitted); *see also Stelluti Kerr, LLC v. Mapei Corp.*, 703 Fed. App'x. 214, 232 (5th Cir. 2017) (reversing district court's conditional grant of a new trial based on the weight of the evidence as an abuse of discretion). A trial court should not grant a new trial "unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Id.* at 232 (quoting *Shows*, 671 F.2d at 930). On the other hand, "[t]he district court abuses its discretion by denying a new trial only when there is an absolute absence of evidence to support the jury's verdict." *Wellogix, Inc. v. Accenture, LLP,* 716 F.3d 867, 881 (5th Cir. 2013) (quotation and citations omitted) (denying Rule 50 and 59 motions); *Whitehead ex rel. Whitehead v. K Mart Corp.,* 173 F. Supp.2d 553, 557 (S.D. Miss. 2000) (J. Wingate) (same).

In examining the weight of the evidence under Rule 59, both the trial and appellate

courts "view the evidence in the light most favorable to the jury verdict." *Kennett v. USAA General Indemnity Co.,* 2020 WL 1933950 *2 (citing *Wellogix,* 716 F.3d at 881) (standard for appellate court review); *Whitehead*, 173 F. Supp.2d at 557 (standard for trial court review).

## ANALYSIS

The FCA is very broad.  It is a major tool of the government to combat all types of fraud that would result in financial loss to the government. See *U.S. ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 184 (5th Cir. 2009) (quotation omitted*);  Cook County v. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quotation omitted); see *also U.S. v. Neifert-White Co.*, 390 U.S. 228, 233 (1968) (The FCA "reaches . . . all fraudulent attempts to cause the Government to pay out sums of money.").

The False Claims Act, 31 U.S.C. § 3729 *et seq.,* "imposes significant penalties on those who defraud the Government." *Universal Health Services v. United States ex rel. Escobar*, 136 S.Ct. 1989, 1995 (2016).  Four elements must be proven in a False Claims Act claim: namely,  (1) "there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due. *Id.; Lemon v. Nurses to Go, Inc.,* 924 F.3d 155 (5th Cir 2019); *Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 387 (5th Cir. 2017) (citing *United States ex rel. Longhi v. United States, 575* F.3d 458, 467 (5th Cir. 2009)).

Without citing any authority, Defendants make a general argument that the False Claims Act, as applied here, has been stretched beyond its intended purpose.  Defendants contend that the FI or the MAC, the entities to which Ted Cain's companies submitted their annual cost reports, did not detect the fraud nor stop it in years past, so Medicare has no right

16

to do so now under the FCA. The only remedy the government has against them, Defendants say, lies with the administrative process – audits through the FI or the MAC –which would limit the remedy to recouping any overpayments the Government made to Defendants.

Defendants make much of the fact that administrative procedures are in place for routine, minor regulatory compliance issues, for failure to achieve perfect compliance. Defendants rely heavily on the case of *United States ex rel. Janssen v. Lawrence Memorial Hospital,* 949 F.3d 533 (10th Cir. 2020). Defendants claim that bringing a lawsuit against them under the FCA creates a danger of turning the FCA into a tool for policing minor regulatory compliance – the very thing that the *Escobar* Court warned against.

Defendants here were not accused of routine, minor regulatory noncompliance, however. Defendants here were accused of and found liable for a multi-million-dollar fraud spanning over a decade.

The Government did not transform a regulatory matter into a False Claims violation. Defendants committed serious violations under the False Claims Act, which can only be addressed by its provisions.

The jury here disagreed with Defendants' position that the Government was overreaching and that only administrative remedies should have been used to cure the problem of exorbitant, unearned, non-reimbursable salaries. Having been clearly and properly instructed on the requirements that the false claims must be *knowingly* made and *material* to the Government's payment decision, the jury found liability for twelve years of false cost report submissions as to four of the six defendants and false cost report submissions for eleven years by Tommy Kuluz. Defendants' argument that this litigation exceeds the purpose of the FCA is short-sighted. The elaborate fraudulent scheme

perpetrated by these Defendants represents precisely the kind of fraud the FCA is meant to prevent and to penalize when it occurs.

Merely allowing an offender to pay back the funds fraudulently received would not deter fraud against the Government. Attempting to defraud the Government would almost always prove to be worth the risk if the only consequence was having to pay the money back, if caught.

## Materiality

The first issue Defendants raise in support of their Motion for Judgment as a Matter of Law and their Motion for New Trial is that of materiality. Defendants claim that the statements found to be false by the jury, are not 'material', and thus not actionable under the FCA because, they say, the United States continued to pay the claims despite the false statements. Medicare, Defendants say, frequently continues to pay Critical Access Hospitals even when their claims are fraudulent or improper. They reference the testimony of William Tisdale, a Government expert in support of this point. [ecf doc. no. 432-1].

William Tisdale's testimony was that the Government sometimes operates pursuant to a "pay and chase" policy when it comes to Critical Access Hospitals, out of a desire not to shut down the hospitals while the Government investigates and attempts to recoup funds. Defendants argue that pursuant to this "pay and chase" policy, under which the Government admittedly operates, any fraudulent statements on SCH's Medicare cost reports would have to be considered immaterial to the Government's payment decision, since the Government pays the claims anyway.

The Government counters that to discontinue Medicare reimbursements would be tantamount to shutting down the hospital. Ted Cain acknowledged that the hospital could

not continue to operate without Medicare funds. It is not the Government's goal, it says, to deprive a community of its only source of hospital care, but to stop the fraud. Rather than pursue what it called a draconian alternative, CMS (Center for Medicare and Medicaid Services) and the Department of Justice did not bring a halt to SCH's funding, but at the same time, tried to preserve Medicare's scarce resources by filing this lawsuit.

This court previously has rejected the Defendants' materiality arguments. More importantly, the properly instructed jury also rejected these arguments. Jury Instruction 17 informed the jury that to find any Defendant liable for knowingly presenting or causing to be presented false or fraudulent claims for payment, the United States must show … "the falsity was **material** to a decision to pay the claim." Jury Instruction 18 informed the jury that to find any Defendant liable for knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim, the United States must show ... the statement or record was **material** to a decision to pay a false or fraudulent claim. The jury was clearly and correctly instructed.

The Defendants' position is also belied by the very existence of this litigation.

Both sides rely heavily upon the United States Supreme Court case of *Universal Health Services v. United States ex rel Escobar*, 136 S.Ct. 1989 (2016). In *Escobar*, the Supreme Court said, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property". *Id.,* at 2002. The *Escobar* Court continued, "[t]he False Claims Act is not "an all-purpose antifraud statute," or a vehicle for punishing garden-variety breaches of contract or regulatory violations."

The multi-million-dollar deception at play in the case *sub judice,* perpetuated by means of an elaborate scheme over a long period of time, hardly falls under the category of a

"garden-variety breach"; nor would the fraud here qualify as the "minor or insubstantial" noncompliance that the Supreme Court said in *Escobar,* is not sufficient for a finding of materiality.

In the instant case, the Government acknowledges that its policy, in the face of possible improper claims by a Critical Access Hospital, is to "pay and chase," to pay the claims then seek repayment, in order to keep a hospital open where the community would otherwise not have accessible hospital care. After all, this was the very purpose for the creation of Critical Access Hospitals.

Defendants quote the following section from *Escobar*:

> If the Government pays a particular claim in full despite its *actual* knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or if the Government regularly pays a particular type of claim in full despite *actual* knowledge that certain requirements were violated, *and* has signaled no change in position, that is strong evidence that the requirements were not material.

*Id*. at 2003-04. (quoting Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 672 (2008)) (emphasis added).

Important to the discussion is that the *Escobar* Court starts from a point of *actual* knowledge on the part of the Government, not suspicion nor mere allegations, as first existed here. Further, the Government in this case, has shown a change of position. It notified Defendants of the litigation and the accusations against them in 2010, filed its Complaint in Intervention in 2015, and continued to prosecute this case through to its conclusion in 2020.

The Fifth Circuit also emphasized that continued payment by the federal government after it learns of alleged fraud substantially increases the burden on establishing materiality. In that case, the Mississippi Division of Medicaid continued to make payments to the

employer and renewed its contract with the employer several times after being informed about the alleged fraud. The district court had dismissed the Relator's claims because it could not find that Magnolia's staffing of care manager and case manager positions by licensed practical nurses, as opposed to registered nurses, was material to its contracts with the State of Mississippi.  The Fifth Circuit agreed. In that case, obviously it was immaterial to the Government's payment decision whether registered nurses or practical nurses performed certain tasks.

The same cannot be said here.  It was obviously material to the Medicare program whether Ted and Julie Cain were performing any services for Medicare patients for which they were being extravagantly compensated with federal monies. In spite of continuing to pay SCH, the Government had only the suspicion or knowledge that the salaries being charged to Medicare seemed out of line, not that the salaries were in fact, fraudulent because the work was not being performed as represented in the cost reports.

It is also true, however, that a violation is not material just because "the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id.* at 2004. In other words, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* at 2003. To use the Court's example, just because the government might require contractors to use American-made staplers does not mean that it would be a *material* misrepresentation under the FCA to knowingly use foreign-made ones. *See id.* at 2004. *United States ex rel. Patel v. Cath. Health Initiatives*, 792 F. App'x 296, 301 (5th Cir. 2019).

Again, we are not here dealing with a minor regulatory violation, such as the origin of an inexpensive product..

*Lemon v. Nurses to Go*

In *Lemon v. Nurses To Go, Inc.,* 924 F. 3d 155 (2019), the Fifth Circuit decided the case on the sole ground of whether the Medicare fraud, as alleged, was material under the False Claims Act. Under the FCA, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.,* at 159; 31 U.S.C. § 3729(b)(4); *United States ex rel. Longhi v. Lithium Power Techs., Inc.,* 575 F.3d 458, 468 (5th Cir. 2009) (citing *Neder v. United States,* 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)).  In deciding whether the violations alleged against the hospice care providers in that case were material, the Fifth Circuit relied upon the three factors outlined in *Escobar:* : (1) "the Government's decision to expressly identify a provision as a condition of payment"; and (2) "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Escobar,* at 2003.  Additionally,  (3) materiality "cannot be found where noncompliance is minor or insubstantial." *Id.*

In *Escobar*, the Supreme Court had remanded the case to the First Circuit to reconsider materiality in light of these factors.  On remand, the First Circuit Court reversed the district court's grant of Defendant's motion to dismiss.  The defendants argued that the Government continued to pay the claims despite knowledge that defendants were not in compliance with the applicable regulations.  The First Circuit Court said that even assuming that various state regulators had notice of complaints against Defendants during the time the claims were being paid, "mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance.  *United States ex rel. Escobar v. Universal Health Servs., Inc.,* 842 F.3d 103, 112 (1st Cir. 2016)."  The First

Circuit Court continued, "there is no evidence in the complaint that MassHealth, the entity paying Medicaid claims, had actual knowledge of any of these allegations (much less their veracity) as it paid [defendant's] claims. Id., at 112.

The *Lemon* Court, citing *Escobar*, recognized that no one factor is dispositive, that the inquiry is a holistic one. *United States ex rel. Lemon v. Nurses to Go, Inc.,* 924 at 160. This court, as the Fifth Circuit in *Lemon* did, undertakes to review each of these components.

First, we examine whether the jury-found violations were conditions of payment. The answer is in the affirmative. The PRM requires that the parties certify as to the truth of the matters submitted and payment is conditioned on that representation. The Government's claims here are based on Defendant's false certifications that salaries paid were reasonable, necessary and reasonably related to patient care, as required by the PRM. These Defendants' fraudulent certifications, then, constituted violations of conditions of payment, which according to the United States Supreme Court in *Escobar,* can constitute violations of the FCA. Violation of conditions of payment, alone, does not conclusively establish that a violation is material, but it is probative evidence of materiality.

Secondly, this court examines whether the Government would deny Defendants' reimbursement payments had it known of the violations.

Thirdly, this court looks at whether the noncompliance was minor or insubstantial. As stated in *Escobar* and *Lemon*, if a reasonable person would attach importance to the violation in determining his choice of action in the transaction, it is material. Even if a reasonable person might not attach importance to the representation, it is still material if the defendant had reason to know that the recipient of the falsity would attach importance to it. *Lemon* at 163 (citing *Escobar* at 2002-2003). A reasonable person would attach significance

to an annual salary in excess of a million dollars for an executive of a small 25-bed hospital, especially when the payee did not perform eligible work for the hospital to receive that salary. A reasonable person would also attach significance to a hospital administrator's salary that approached twice what was a reasonable amount for a small 25-bed hospital, when little work was done that qualified as a Medicare-reimbursable expense. A reasonable person would certainly attach significance to these monies when being paid to the owner of the hospital and his wife. The violations here alleged, are not minor.

Looking at the nature of the violations with this holistic approach, one simply cannot say that these violations were not material. The jury found the violations to be material, and nothing presented here gives this court any basis for disturbing that finding.

At the heart of Defendants' arguments regarding materiality is that Defendants say the Government continued to pay the claims despite thirteen years of investigation and litigation and, that Defendants were not notified that the costs they were claiming were potentially improper. Shortly after the Government made its decision to intervene, however, it notified Defendants of the litigation and the allegations. Yet while the Government was still peeling back the layers of deception, the Defendants not only continued to perpetrate their ongoing fraud, but fought fervently to prevent disclosing information to the Government, to the point of being held in contempt by this court for failing to respond to Investigative Demands served on them by the United States and filing to comply with the orders of this court. While the Defendants knew of the falsities of the statements and reports they were submitting to Medicare, the Government was still discovering the extent and the manner of perpetration of the fraud.

In the cases relied upon by Defendants to show the immateriality of the false claims, either the allegations, themselves, were minor, inconsequential, or immaterial, without regard to whether they were material to the Government's payment decision, or the Government had not taken any action such as the Government's action here to intervene in the Relator's lawsuit and vigorously prosecute.

Attempts to Conceal

Attempts to conceal false reports or false statements have a bearing on both scienter and materiality. Concealment is evidence of a defendant's subjective knowledge of the importance of that information to the Government. See *United States ex rel. Badr v. Triple Canopy,* 857 F.3d 174, 175-78 (4th Cir. 2017).

Sandra Rose worked for a contracted intermediary, a MAC, described by her as a company contracted by Medicare to perform audits and handle the reimbursement issues. These companies were formerly called Fiscal Intermediaries (FI) and are currently referred to as Medicare Administrative Contractors, or MAC's. In 2009, Sandra Rose, a contract auditor, conducted a "desk audit" of CMI's 2007 cost statement. This is not a full audit, as explained by Sandra Rose in her testimony, but a limited review. The "desk audit" did not involve going to CMI to conduct the review, but was done from her desk. She said they take the information provided to them. They calculate variances to see where they should spend their time to investigate anything that appears unusual.

Rose questioned a huge increase in the salaries of officers and the salaries of others for the year 2007. In response, Defendants informed Rose that CMI had undertaken management of three new health providers, Green County RHC, Green County Hospital, and Poplarville Family Medical Clinic. This had led to more management salaries, they said.

This seemed a reasonable explanation and was accepted by Sandra Rose as justification for the increase in executive compensation. Sandra Rose testified that she had no recollection of reviewing anything concerning Stone County Hospital and the documents she reviewed related to her desk audit did not indicate she had looked at the Stone County Hospital cost report.

While it may have been true that CMI was managing additional companies, it was not true that this was in any way responsible for the huge increase in officer compensation. What Sandra Rose did not realize was that it was Ted Cain's salary that had increased by over one million dollars between 2005 and 2007, and that 82% of that salary was being allotted to SCH.  Rose said she did not notice the 2.27 million of Ted Cain's salary being allocated to Stone County Hospital when she was doing her desk audit.   She also would not have known, looking at schedule B,[3] that SCH was a critical access hospital, because there were no provider numbers next to the entities. Had she been aware that this particular entity, as a critical access hospital, was allocated over $2 million dollars for salaries, she would have notified a supervisor and requested they go further with potential fraud and abuse.

Rose testified that two million dollars for administrative purposes for a critical access hospital is not reasonable.  Under the regulations, reasonable compensation for physicians is $300,000 or below, and these are the people actually treating the patients. Over $2 million dollars for administrative purposes is not reasonable.   Rose thought the figures for CMI officers' compensation  related to more than one CMI officer. Officers other than Ted Cain were listed on the CMI home office statements, she noted. Also, her letter to Suzanne

_____

[3] According to George Saitta, the Government's expert, Schedule B is the trial balance of expenses on the office cost statement.

Epperson at CMI, referred to "officers" in the plural. *Rose Letter* P-213 [ecf doc. no.436- 9]. Defendants concealed that information, however, by misleading or false statements.

Sandra Rose was distraught that she did not detect the true facts concerning Ted Cain's salary.  On cross examination she admitted that Ted Cain's salary amount was contained in another document submitted to MAC, but she did not put all of the information together in a way to understand the true salary.

It was George Saitta's testimony that a review of Schedule B, particularly line 11 for salaries of officers contained nothing that would alert Sandra Rose that there was only one officer there and it does not mention Ted Cain.  Saitta also testified that the information about the additional health care providers being managed by CMI, as contained in Sandra Rose's letter of  April 7, 2009 to Suzanne Epperson, could only have come from CMI.  Only CMI could have provided the names of the providers and the dates they were acquired.

Despite not realizing the full implication of the salary information, Sandra Rose was concerned enough to flag the issue for future auditors, suggesting that they look closely at costs going between entities that are related parties. Trial Exhibit D-34.  Rose testified that CMI had provided some information to her, but she did not get information that she could tie back to understand those high salaries and whether they were really applicable to patient care.  1/24/20 Tr. pp. 58-60 (Sandra Rose).  She had also recommended that the allocation bases be reviewed in future years.  She further explained that for compensation of officers, the basis is generally a time study. The time study would explain the actual hours someone worked, what they did for those hours, what entity was benefitted by that work, and what was being done that benefitted patient care.  1/24/20 Tr. 59:6- 61:25 (Sandra Rose).

The Government's expert, George Saitta, testified that his review of the relevant documents indicated that CMI misinformed Sandra Rose about the reason for the increase in CMI office compensation. 2/5/20 Rough Tr. 182:4-185:5 (George Saitta).

The response provided by the Defendants was untrue. The three additional small health providers did not cause the huge increase in compensation. Defendants then, were clearly aware that the salary amount for Ted Cain would be material to the Government's pay decision. Otherwise, there would have been no reason to fabricate or mislead.

This episode provided the jury with additional evidence on which to base its finding of materiality.

### False Certification Theory and Implied False Certification Theory

The Court of Appeals of the Eleventh Circuit recently tackled the issue of when violation of a condition of payment constituted a False Claims Act violation. In *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1103–04 (11th Cir. 2020), relying on *Escobar,* the Court said "[t]he FCA is designed to protect the Government from fraud by imposing civil liability and penalties upon those who seek federal funds under false pretenses." *Id.* at 1103-03 (citing *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist*., 739 F.3d 598, 600 (11th Cir. 2014)). "Liability under the [FCA] arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Urquilla-Diaz v. Kaplan Univ.,* 780 F.3d 1039, 1045 (11th Cir. 2015) (quoting *Corsello v. Lincare,* Inc., 428 F.3d 1008, 1012 (11th Cir. 2005)); see also *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.,* 423 F.3d 1256, 1259 (11th Cir. 2005) ("The [FCA] does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the

provider knowingly asks the Government to pay amounts it does not owe.") (quoting *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002)). "Simply put, the 'sine qua non of [an FCA] violation' is the submission of a false claim to the government." *Urquilla-Diaz*, 780 F.3d at 1045 (quoting *Corsello,* 428 F.3d at 1012).

The Eleventh Circuit has adopted a false certification theory of liability under the FCA. Under this theory, a defendant may be found liable for falsely certifying its compliance with applicable laws and regulations. To prevail under this theory, the relator or the Government must prove the following: (1) a false statement or fraudulent course of conduct; (2) made with scienter; (3) that was material; (4) and caused the government to pay out money or forfeit moneys due. *Ruckh v. Salus Rehabilitation, LLC* at 1103 (quoting *United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1174 (9th Cir. 2006)).

The First Circuit Court of Appeals described what became known as the "implied false certification theory", as follows. Submission of claims for reimbursement does implicitly represent compliance [with the applicable laws and regulations] and an undisclosed violation of a precondition of payment makes a claim false. On appeal, the United States Supreme Court, resolving a split among the circuits concerning implied certification liability, confirmed that failure to disclose a violation could be the basis for an FCA claim, but the failure to disclose the violation must be in fact or likely, material to the decision to pay the claim.

The Supreme Court, in *Escobar*, upheld the implied false certification theory, stating that in at least some circumstance, it can provide a basis for liability under the FCA. *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. ——, 136 S.Ct. 1989 (2016). The Court first held that "the implied false certification theory can, at least in

some circumstances, provide a basis for [FCA] liability." *Escobar,* 136 S. Ct. at 1999. The Court explained that the FCA's prohibition against the submission of "false or fraudulent claims" is broad enough to "encompass[ ] claims that make fraudulent misrepresentations, which include certain misleading omissions." Id. "When ... a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Id.*

Accordingly, the Court held that the implied certification theory can serve as a basis for FCA liability where at least two conditions are satisfied: (1) "the claim does not merely request payment, but also makes specific representations about the goods or services provided" and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id*. at 2001.

The Fifth Circuit, in *United States ex rel. Porter v. Magnolia Health Plan, Inc*., invoked the Supreme Court's recent holding in *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, in emphasizing the FCA's "demanding" and "rigorous" materiality requirement. In that case, however, the Fifth Circuit noted that no violation had occurred. Contrary to the Relator's allegations, the employer's contracts with the State of Mississippi did not require that "licensed registered nurses" do the jobs the Relator claimed were being done by "licensed practical nurses." The Fifth Circuit also echoed *Escobar* in saying the mere fact that contracts contain language requiring the employer to comply with "all applicable laws" does not establish the requisite materiality for FCA liability. "[B]road boilerplate language generally requiring a contractor to follow all laws . . . [is] too general to support a FCA

30

claim." *Id.* at * 11-12. Thus, even if the employer had violated Mississippi law, the Fifth Circuit reiterated that was not sufficient to establish the requisite materiality for a FCA case.

An unreported case from the District Court of the District of Columbia is elucidatory. In *U.S. ex rel. Scutellaro v. Capitol Supply, Inc.,* 2017 WL 1422364 (D.D.C. April 19, 2017), the relator alleged that the defendant falsely certified that the products it sold to United States Government agencies were manufactured in compliance with the federal statutes that required that products sold to the government come only from certain countries. The materiality of the misrepresentation was at issue, since the defendant had apparently been given mixed messages about its compliance or non-compliance with these laws and regulations. Capitol Supply Inc. was repeatedly awarded contracts by the regional office of the Government Services Administration (GSA) and receiving excellent ratings from that office; but it was also receiving regular notices for contract breaches for non-compliant products from GSA's New York office. It had received at least seventeen such notices of non-compliance while receiving high marks from the regional office. The notices stressed the importance of complying with these laws and the seriousness of the consequences, including the possibility of a lawsuit under the FCA. At one point a Cure Notification Letter was sent to the company, declaring its level of performance to be unacceptable. *Id.*

Reviewing this evidence on a motion for summary judgment, the judge in *Scutellaro* stated: "Given GSA's mixed signals, issues of material fact remain as to whether the impliedly false certifications were material, i.e., whether TAA [Trade Agreements Act] compliance had the "natural tendency to influence ... the payment or receipt of money or property." *United States ex rel. Scutellaro v. Capitol Supply, Inc.,* 2017 WL 1422364, at

*21 (D.D.C. Apr. 19, 2017) (citing *Escobar,* 136 S. Ct. at 2002). There, as in the instant case, the issue of materiality was a fact question for the jury.

In the case *sub judice* Defendant attempts to characterize the processing of the annual cost reports by the FI or MAC as some sort of approval or legitimization of its efforts. It is clear from the evidence, however, that the MAC was unaware of what the large salary figure on the cost reports and on the home office cost statements represented. Sandra Rose, a MAC employee, testified that she had not been able to discern from the documents that the salary figure represented *only* Ted Cain's salary or that the entire salary amount was allocated to Stone County Hospital. Had she realized that, she would have prompted additional action, she testified.

Ted Cain, it must be remembered, owned several health-related enterprises. The logical assumption in viewing the cost reports and cost statements would be that this salary figure represented salaries for executives over several of the health care providers managed by CMI, and that the allocation was spread across all of these entities. After the "desk audit" conducted on the 2007 cost reports, Defendants perpetuated this misconception by how they responded to the inquiry.

Certainly by 2010, when the Government informed the Defendants of the Relator's FCA lawsuit, Defendants knew that there were serious compliance issues. These Defendants knew that compliance with regulations regarding owner compensation had the natural tendency to influence the government's payment decisions.

*Escobar* made it clear that no one factor was dispositive in deciding the issue of materiality.  Materiality, the court said, cannot rest on a  "single fact or occurrence as always determinative." *Id*. at 2001 (quoting *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 39, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011)). Several circuits, including the Fifth Circuit describe this test as "holistic."  See *United State ex rel. Harman v. Trinity Indus. Inc.,* 872 F.3d 645, 661 (5th Cir. 2017); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016) ( *Escobar II*); *United States v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 831 (6th Cir. 2018), *cert. denied sub nom. Brookdale Senior Living Cmtys., Inc. v. United States ex rel. Prather*, 139 S. Ct. 1323 (2019); *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 541 (10th Cir. 2020), *cert. denied sub nom. United States, ex rel. Janssen v. Lawrence Mem'l Hosp.*, 141 S.Ct. 376 (2020).

As stated in *Bibby v. Mortgage Investors Corporation,* " the significance of continued payment may vary depending on the circumstances." *Bibby v. Mortgage Investors Corporattion,* 987 F.3d 1340, 1350 (11th Cir. 2021) (citing *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 906 (9th Cir. 2017) (cautioning that "to read too much into the [agency's] continued approval –and its effect on the government's payment decision – would be a mistake" where there were other reasons for that approval).  In Bibby,  the Court said, there were reasons for the VA's continued payment other than the violations being immaterial.  In that case, the VA was required by law to honor the guarantees and to pay holders in due course, even in the face of fraud by the original lender.

In the case before this court, a cessation of Medicare payments would have, in all likelihood, closed the hospital and foreclosed accessible emergency care for residents of

Stone County, Mississippi. The United States chose to seek redress by intervening in the Relators' suit. As the *Bibby* Court said, courts must cast their materiality inquiry more broadly to consider "the full array of tools" at the [agency's] disposal "for detecting, deterring, and punishing false statements..." *United States ex rel. Bibby v. Mortg. Invs. Corp.,* 987 F.3d 1340, 1350 (11th Cir. 2021), cert. denied sub nom. *Mortg. Invs. Corp. v. U.S. ex rel. Bibby,* No. 20-1463, 2021 WL 1951877 (U.S. May 17, 2021).

The jury's finding that falsity on the cost reports as to this issue was material, is consistent with the law and the evidence, and the jury's verdict should not be disturbed.

### Unjust Enrichment and Payment by Mistake of Fact

At trial, the jury found Ted Cain, Julie Cain, and CMI to be liable for unjust enrichment. SCH was found to be liable for payment by mistake of fact.

Defendants contend, in their Motion for Judgment as a Matter of Law, that the Government's claims against these Defendants for unjust enrichment and payment by mistake of fact should be dismissed. Defendants further claim, in their Motion for a New Trial, that the findings on these issues were against the clear weight of the evidence.

The *Academy Health* case, cited by both Plaintiff and Defendants, lists three elements of a common law unjust enrichment claim: (1) the Government confers a benefit upon a defendant; (2) the defendant retains the benefit; and (3) any one of the following three alternatives applies: (a) the Government had a reasonable expectation defendant would repay the benefit, (b) defendant should reasonably have expected to repay the benefit to the Government, *or* (c) society's reasonable expectations would be defeated if defendant did not do so. *U.S. ex rel. Academy Health Ctr., Inc. v. Hyperion Foundation, Inc.,* 2014 WL

3385189 *46 (S.D. Miss. July 9, 2014); *U.S. ex rel. Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp.2d 810, 819-821 (W.D. La. Feb. 16, 2007).

Agreed Jury Instruction No. 30 tracked the language of *Academy Health* exactly, but substituted "the federal Medicare program" wherever "the Government" appeared. The jury was properly instructed according to the law and this jury instruction, as stated several times above, was agreed upon by both sides. All three elements of unjust enrichment are met. The Government conferred a benefit; defendants kept the benefit; and society's expectations were defeated since Defendants did not make proper repayment under the circumstances here. The jury's findings clearly were not against the weight of the evidence.

The evidence at trial showed that despite being paid over a million dollars in salary most years, as President of CMI, Ted Cain performed almost no work for Stone County Hospital. On those rare occasions when he was present, he did not perform work that was reasonably related to patient care, as required by the PRM. Ted Cain was thoroughly questioned on this point during the trial, but failed to testify as to any meaningful work he had done for Stone County Hospital. The jury found he had not performed any significant work.

The evidence showed that Julie Cain, though receiving a full-time salary as administrator of the hospital, was present on a part-time basis only; and, in other years, she performed little or no work as a paid member of the board of directors. Additionally, neither Julie Cain nor any of the other witnesses could tell the jury of any work she performed as a paid consultant to the hospital. The jury though, credited Julie Cain for the limited work she did as administrator of the hospital, and reduced the amount of her liability downward, accordingly.

Ted Cain was the president of CMI, which served as the home office for SCH, as well as the administrator for other Ted Cain companies. In addition to receiving reimbursement for Ted Cain's unearned salary, CMI was reimbursed by Medicaid for the rent it paid, which included rent for other Ted Cain companies that were housed in that same building, or for which CMI was also performing administrative duties. Ted Cain, Julie Cain and CMI were all unjustly enriched by the Government's payment/reimbursement to them for the exorbitant and unearned salaries paid to Ted and Julie Cain and additional expenses associated with CMI that were incurred by Ted Cain's other businesses. Neither judgment as a matter of law, nor a new trial is appropriate as to this issue. Even if it were, however, the jury also found these Defendants liable for submitting or causing fraudulent cost reports to be submitted in violation of the FCA.

To prevail on a claim for payment by mistake of fact, say Defendants, the Government must show: 1) the Government made payments to a defendant under an erroneous belief; and (2) the erroneous belief was material to the Government's decision to pay a defendant. *U.S. v. Wurts,* 303 U.S. 414, 415-416 (1938); *United States ex rel. Academy Health Ctr., Inc. v. Hyperion Foundation, Inc.,* No. 3:10-cv-552-CWR-LRA, 2014 WL 3385189 at *46 (S.D. Miss. July 9, 2014) (quoting *United States v. Mead,* 426 F.2d 118, 124 (9th Cir. 1970)); *U.S. ex rel. Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp.2d 810, 821 (W.D. La. Feb. 16, 2007). Whereas "materiality" is not an element of unjust enrichment, see *Academy Health*, 2014 WL 3385189 *46; *Roberts,* 474 F. Supp.2d at 820, it is at issue in our discussion of payment by mistake of fact.

Defendants say that the testimony of William Tisdale established that the United States did not pay Defendants in error, but, instead, made a deliberate choice to pay. Thus, say Defendants, the premise for payment was not erroneous.

Defendants again rely on their arguments on materiality to say that the erroneous belief had to be one that was material to the decision-making. This court has earlier resolved the issue of materiality in favor of the Government and against Defendants. This court notes that the Government, through the Department of Justice, investigated the *qui tam* complaints and filed this FCA lawsuit, but with an eye toward protecting Medicare beneficiaries by ensuring that accessible hospital care remained available in Stone County.

## Julie Cain's Liability

Defendants contend that Julie Cain had no liability under the FCA because she did not prepare or sign the cost reports. Under the FCA, however, liability is not limited to those who submit the false reports. Those who "cause" false reports to be submitted are also liable. The jury found her liable for portions of her compensation and for all of Ted Cain's compensation during the years that she was the administrator of SCH and for all of her compensation for the consulting work and the director's fees she was paid that evidence showed she did not earn.

Ted Cain, the owner, appointed her, his wife, as administrator of the SCH, despite that she had no experience running a hospital. Her salary was approximately twice that paid to prior and subsequent administrators or Chief Operating Officers who performed the hospital administrator role. It was Julie Cain, as administrator of the hospital, who signed the management agreement with CMI, which allowed the fraudulent scheme to take place. She then turned a blind eye to the costs charged by CMI, including her husband's extravagant

salary. Her testimony was that she never tried to see if the costs were reasonable or in compliance with the management agreement. In her testimony she said it was because she knew and trusted the people at CMI. Julie Cain looked the other way when it came to costs from CMI, including her husband's extravagant salary. She admitted that she was unfamiliar with what kind of records were kept of CMI's services rendered to the hospital or the amounts being charged. 2/3/2020 Tr. Deliberate indifference does not remove a defendant from exposure to liability under the FCA.

Julie Cain also collected compensation every year as the hospital administrator that was reimbursed by Medicare, yet testimony showed she was not present very often and did very little work. Lenora Bayes Ramstad, a nurse practitioner formerly employed at SCH, said she saw Julie Cain maybe once a month or every few weeks. She did not know if Julie Cain had an office at the hospital. Sherla Harville, Director of Clinical Operations, testified that she was present five days a week at SCH. She saw Julie Cain sometimes one or two days a week, and sometimes there were weeks where she didn't see her at all.

According to Harville, when Julie Cain was there, she did not stay all day. Harville also stated that Starann Lamier had told her she [Starann Lamier] knew Julie Cain was not there all the time, but if she was there, Harville should include her. 2/4/2020 Tr. 113:20-25, 119:3-7 (Sherla Harville). An email chain was introduced into evidence between Chief Operating Officer ("COO") Don Kannady, and Starann Lamier, dated June 26, 2007, in which Kannady informed Lamier that he had waited for Julie Cain to come in to the office for the last 2 weeks to discuss an issue and Julie Cain had "not been available for me to communicate with since Monday, June 11, 2007, when she was on site at SCH for just a couple of minutes, and I had not seen nor heard from her since then." Trial Exhibit P-296

[doc. no. 436-20]. Kannady testified that Julie Cian was hardly there that much, roughly 25% of the time. He said he was hired to run the hospital and he did everything he could, so she wouldn't have to worry about it.

Defendants also offered witnesses to show that Julie Cain did perform reimbursable work. Julie Cain, Starann Lamier, Tammy Harrell and Telecia Welborn testified that Julie Cain did the work of a hospital administrator, which included running the day-to-day operations of the hospital, making personnel decisions, involvement in employee evaluations and raises, updating hospital procedures, organizing activities to improve the hospital's public image, and attending at least some weekly meetings. Tammy Harrell. See Defendants' Ex. 1 to the Motion [doc. no. 432-1 pp. 25-37, 80-93, 94-101,102-29].

For most of the time that Julie Cain held the title of Hospital Administrator, this small hospital also had a Chief Operating Officer (COO) on the payroll. This 25-bed hospital, according to Julie Cain, only had an occupancy rate of between three and twenty patients. Vicky Garrettson estimated it was around ten to fifteen per day. Yet, SCH employed a hospital administrator, a COO and a Chief Financial Officer (COO), in addition to having CMI under contract to provide administrative services. Darlene Odom, SCH's former Business Office Director, testified that the practice of having both an administrator and a COO was put in place only after Ted Cain became owner of the hospital. Prior to Ted Cain's purchase of it, SCH only had an administrator and a CFO (Chief Financial Officer), and no COO. *Id.* at 97:16-98:9

Multiple witnesses, including Donald Kannady, Vicky Garrettson, Jennifer Barringer, and Julie Cornelson, testified that the hospital was not run by Julie Cain but by the COO or by Starann Lamier. Vicky Garretson said the COO ran the quality team meetings most of the

time, that Julie Cain only attended about 25% of the time, but she did run some of the meetings if she was there. Lenora Bayes Ramstad testified that she did not know if Julie Cain had an office at SCH, but she knew that Allen Gamble, the COO, had an office there; and whereas she rarely saw Julie Cain, she saw Allen Gamble almost daily. Sherla Harville also testified it was the "little administrators" (as she referred to the COO's) from whom she received follow-up on her reports, and not Julie Cain, although she had provided copies of the reports to Julie Cain. Former COO Don Kannady referred to Julie Cain in his testimony as an "administrator in absentia." 1/31/2020 Tr. 103:13-18 (Kannady).

When pressed to explain the duties of the COO, Julie Cain listed many of the same duties that she claimed to perform. 2/3/2020 Rough Tr. 25:11-26:18. Mrs. Cain also admitted to not being very computer savvy. Rough Tr. 24:13-25. She did not use email very much she said, preferring to use the telephone or talk to people on the floor. Her own testimony evinced she was not familiar with very much concerning the operation of the hospital, and had virtually no knowledge of the services CMI performed for SCH. 2/3/2020 Rough Tr.30:1- 33:23.

Julie Cain, incredibly, also testified that she did not know how much her salary was, did not know who set her salary, and did not keep up with what went into her checking account. As incredulous as that seems, even if true, she is still held accountable to Medicare for expenditure of hospital funds that Medicare reimburses. She had a duty to ensure that her compensation was reasonable and necessary and that it complied with the rules and regulations of Medicare and the PRM.

Owners of Medicare-reimbursed providers are subject to special provisions under the PRM. Chapter 9 of the Provider Reimbursement manual provides, "A reasonable allowance

of compensation for services of owners is an allowable cost, provided the services are actually performed in a necessary function (42 CFR 413.102)." PRM § 900. Exhibit P-168 [ecf doc. no. 436-5 p. 3]. Compensation paid to spouses of owners is also reviewable under the test of reasonableness. Id. at §902.5.

The PRM defines "reasonableness" and "necessary" in the context of owners' salaries, as follows:

> 902.3 Reasonableness.--Reasonableness requires that the compensation allowance be such an amount as would ordinarily be paid for comparable services by comparable institutions depending upon the facts and circumstances of each case. Reasonable compensation is limited to the fair market value of services rendered by the owner in connection with patient care. Fair market value is the value determined by the supply and demand factors of the open market.
> 902.4 Necessary.--Necessary means that had the owner not furnished the services, the institution would have had to employ another person to perform those services. The services must be pertinent to the sound conduct and operation of the institution.

PRM § 900. Exhibit P-168 [ecf doc. no. 436-5 p. 3].

Julie Cain's compensation while at SCH ranged from a low of $198,917 annually in 2004, to a high of $279,000 in 2011. P-271B [ecf doc. no. 436-16 p.1]. Her compensation in 2012 was even higher, $297,470, but she was the Hospital Administrator for only part of that year, and was paid by CMI for part of that year. The jury heard testimony from some witnesses who related work that Julie Cain did, and from others who testified that they rarely, if ever, saw her in the building and often could not reach her for hospital business. There was sufficient evidence presented for the jury to find that she received compensation that she did not earn. The jury apparently found that Julie Cain did some reimbursable work

for the hospital, however, since the jury did not find her liable for the full amount that the Government argued she was liable for.

After she resigned as the hospital administrator in 2012, Julie Cain continued to receive compensation as a member of the board of directors for SCH as a consultant. In 2012 she was paid over $20,000 as a director's fee. Defendants cite to Julie Cain's own testimony as evidence of her work in these roles. Julie Cain's testimony was that everything she did was reasonable and necessary. Julie Cain's testimony, however, also showed that she was unclear about what director's fees were, she kept no records of any work that she did as a consultant, and despite acknowledging that she had been paid at least $111,000 in 2013 for consulting, she could not recall any matters on which she had worked. [ecf doc. no. 432-1 pp. 62-67].

For the years 2013 through 2015, Julie Cain was paid over $100,00 each year, a portion of which was billed to Medicare,; but when questioned about her work on the board of directors or as a consultant, Julie Cain could not identify what she did to earn these funds.

There was sufficient evidence from which the jury could find that Julie Cain's compensation was not reasonable or necessary and mostly unearned. The jury's finding against her has a strong legal basis. Julie Cain assisted with the fraud committed by Ted Cain and the others, causing the submission of false claims and the making of false records and documents. Additionally, in her role as hospital administrator, she signed the management agreement with CMI, then (even if she is to be believed) looked the other way, with reckless disregard of its misdeeds. Of course, the jury could reasonably have disbelieved her entire incredible testimony.

The jury correctly found that she was liable under the FCA;  she also certainly was unjustly enriched, as the jury ably found, since she had received compensation above and beyond any work she said she performed.

## Tommy Kuluz

Tommy Kuluz was the Chief Financial Officer (CFO) of CMI.  He assisted Ted Cain in the initial application for Critical Access Hospital status for SCH in 2001, allowing for the hospital to bill for allowable costs plus 1%.   Kuluz handled all the financials, and signed all but one of CMI's home office cost statements.  The fraud would not have been possible without his participation. Kuluz also executed the CMI management agreement with SCH. This enabled CMI to route Ted Cain's compensation *through* SCH's cost reports by permitting CMI to charge SCH up to 15% of net patient revenue. P-278 [ecf doc. no. 436-19].

According to Tommy Kuluz's testimony, he was the one who received the data gathered by SCH employees for the cost report and it was he who communicated with, and provided information for, the cost report preparers. Craig Steen, a cost report preparer, testified by deposition that the cost reporting firm would send Kuluz a blank workbook that he [Kuluz] would fill out.  Tommy Kuluz owned the cost reporting software and could open the report and change things if wanted, before submitting it to Medicare.  *Steen Dep.* 83:15-84:1,  On at least one occasion, Steen said, Kuluz did just that, changing the report regarding physician compensation.  *Id.* at 25:25-27:1. Tommy Kuluz would then submit the final version of the report, without the preparer seeing it again.

A.V. LaRocca was the cost report preparer for CMI for most of the period at issue here. He testified that he was under the impression that Ted Cain's salary was *not* being charged to the government, and only found out differently during his deposition in 2014. He was under this impression based on the numerous nursing home cost reports he had done where the related party transactions were brought down to fair market value. Related parties are organizations related to the provider by common ownership or control. 42 C.F.R. § 413.17. Ted Cain owns and controls CMI, the management company that pays his salary, and the health care provider, SCH.

Contracts between related parties are not negotiated at arms' length, so the regulations and the PRM have special provisions for dealing with related parties. As Sandra Rose testified, this includes owners' compensation. The compensation for owners and their spouses also has limiting provisions under the regulations and the PRM, as discussed elsewhere in this Opinion.

A.V. LaRocca had actually erroneously testified at his prior deposition, that Ted Cain's salary was not being charged to the Government, based on that mistaken assumption. He testified that he thought most of Ted Cain's salary was being eliminated through the related party step. It was pointed out to him at that time that the salary was not being eliminated; "it was flowing right through to the direct costs reimbursed." 1/28/20 Tr. 20:18-24 (LaRocca). He later confirmed that for himself, he testified. 1/28/20 Tr. 19:14-20:25 (LaRocca). LaRocca added that he thought the salary was unreasonable because of the amount involved and given the size of the facility.

While being questioned by Attorney Morris about Ted Cain's $1.89 million-dollar salary for 2008, LaRocca said the $1.544 million-dollar figure "represents the amount of Ted

Cain's salary, that's allocated directly to Stone County Hospital. Asked who did that direct allocation to Stone County Hospital, LaRocca answered, "[t]hat would have been Tommy Kuluz." *Id.* 19:11-13.

Tommy Kuluz directly allocated a portion of Ted Cain's salary to SCH to be reimbursed by Medicare. On questioning by Attorney Morris about Government's Exhibit 8 (P-8) the 2005 cost report statement, A.V. LaRocca testified as follows:

> Q. Do you see there's the same language here, "Per Tommy
> Kuluz at the facility, the following costs are to be directly
> allocated to Stone County Hospital." And the direct allocation
> is 80 percent?
> A. Yes, I see that.
> Q. And again, did your firm have anything to do with
> determining that direct allocation?
> A. We did not.
> Q. Do you know how Mr. Kuluz determined it?
> A. I do not.
> Q. Did you get any backup or supporting documents for that?
> A. We did not.

1/28/20 Tr. 18:14-25 (A.V. LaRocca).

Tommy Kuluz was a major player in this fraudulent scheme. The jury was presented with sufficient evidence that Tommy Kuluz made or caused to be made false reports to Medicare. Factual and legal liability was unmistakably established.

**Claims Regarding Ted Cain's Salary**

Defendants next contend that all claims regarding Ted Cain's salary should be dismissed. They cite two reasons for this. Defendants say there is no evidence that (1) Defendants presented a knowingly false claim concerning Ted Cain's salary or (2) the amount of Ted Cain's salary was material to the government's payment decision.

*Did Defendants submit a knowingly false claim?*

As previously discussed, liability under the FCA requires presentment of a "knowingly" false claim. 31 U.S.C. §3729(a).  Defendants seemingly contend that the claim was not "false", since Ted Cain's salary was listed on each cost report submitted for 2004-2009[4], and the amount was the true and accurate amount of his salary.  Furthermore, say Defendants, the FI or MAC never made any adjustment to the Medicare Reimbursement sought for Ted Cain's salary, even after an audit of the salaries of officers for the 2007 cost reporting year, which took place in 2009.  Therefore, say the  Defendants, they could not have known the salary amount was unreasonable.

The False Claims Act defines "knowing" and "knowingly" as follows:

(1) the terms "knowing" and "knowingly" –
    (A) mean that a person, with respect to information--
        (i) has actual knowledge of the information;
        (ii) acts in deliberate ignorance of the truth or falsity of the information; or
        (iii) acts in reckless disregard of the truth or falsity of the information; and
    (B) require no proof of specific intent to defraud;

Title 31 U.S.C. § 3729(b)(1).

The United States responds that unlike the FI or the MAC, Ted Cain *knew* he was not doing anything to earn his salary and he *knew* that was in violation of the specific requirements for owners' compensation under the PRM.  Ted Cain knew, then, that his claims submissions were false.  Also, Ted Cain's compensation was difficult to discern from the home office cost statements and *not* disclosed to the FI or the MAC as Defendants

---

[4]After the Department of Justice had sent a letter to CMI in 2010, informing Defendants of the litigation and the claims against them, Defendants changed the methodology for allocation of Ted Cain's salary from a direct allocation to a "pooled" allocation.

maintain.  Sandra Rose, a MAC auditor who reviewed the home office cost statements of

CMI, was under the impression that Ted Cain's salary amount represented salarie**s** (plural) --

that it represented compensation for executives for several of his health provider companies,

as she testified, and as shown by her use of the plural "salaries" in her correspondence with

CMI of April 7, 2009 [doc. no. 436-9].  Additionally, since she was not the one reviewing the

SCH cost reports, she was not aware that Ted Cain's salary was being allocated primarily to

a Critical Access Hospital.  That would have raised a red flag, she testified, and she would

have alerted her supervisor to the possibility of fraud or abuse.   Limits are placed on other

kinds of hospitals, Rose said, that would have curtailed the amount of compensation Ted

Cain could have received.  Only Critical Access Hospitals are reimbursed at 100% of

allowable costs, plus 1 percent.

Since the MAC was not aware of the amount of Ted Cain's salary, the MAC was not

reviewing the reasonableness of Ted Cain's salary amount.  The MAC also would not have

been aware that Ted Cain was not actually performing any services for SCH, so it certainly

was not passing on whether his services were performed in a necessary function or were

related to patient care.

Arguably, even if the amount of Ted Cain's compensation could be considered

reasonable for a non-related party, Chapter 9 of the PRM provides additional requirements

for owners of a health provider company being paid for services to that provider.  The PRM

states that: "[a] *reasonable* allowance of compensation for services of owners is an allowable

cost, provided the services are *actually performed* in a *necessary* function." *PRM*  at §§ 900,

903.4 [ecf doc. no. 436-5 p. 3];  42 C.F.R.413:102. Ted Cain acknowledged in his testimony

that he was familiar with this requirement.  Therefore, he "knew" that he was submitting a false claim, because he knew that he had not *actually performed t*he work.

Under the FCA, "knowing" does not required proof of intent to defraud.  "Knowing" also includes acting in deliberate ignorance and acting with reckless disregard of the truth or falsity of the information.  31 U.S.C. §3729(b)(1).  Defendants knew that Ted Cain's compensation in the amount of millions of dollars was unreasonable, or acted in deliberate ignorance by avoiding conducting any studies or comparisons that would have documented what constitutes a reasonable salary for a person in his position at an institution comparable to SCH.  At the very least, Ted Cain and his cohorts acted with reckless disregard of  the truth or falsity of that fact.

Further, services performed by an owner, in order to be compensable under Medicare regulations, must be related to patient care.  See PRM  §§ 902.2 and 902.3, [doc. no. 436-5 p. 3].  The PRM provides as follows:

> Compensation may be included in allowable provider cost only to the extent that it represents reasonable remuneration for managerial, administrative, professional, and other services related to the operation of the facility and furnished *in connection with patient care*. Services furnished in connection with patient care include *both direct and indirect activities in the provision and supervision of patient care*, such as administration, management, and supervision of the overall institution. Costs of activities not related to either direct or indirect patient care, e.g., *those primarily for the purpose of managing or improving the owner's financial investment, are not recognized as an allowable cost. . . .*

PRM § 902.2  [doc. no. 436-5 p. 3].

Of the few work related activities Ted Cain allegedly performed, none was related to patient care.  They were strictly for the purpose of protecting his investment interest in SCH and/or his other enterprises.

The PRM also required that the provider maintain adequate books and records of cost information, capable of being audited. Section 2304 provides as follows:

ADEQUACY OF COST INFORMATION
Cost information as developed by the provider must be current, accurate, and in sufficient detail to support payments made for services rendered to beneficiaries. This includes all ledgers, books, records and original evidences of cost (purchase requisitions, purchase orders, vouchers, requisitions for materials, inventories, labor time cards, payrolls, bases for apportioning costs, etc.), which pertain to the determination of reasonable cost, capable of being audited.

PRM §§ 2304.

According to all of the testimony received, neither Ted Cain, CMI or SCH maintained any auditable documents or records pertaining to Ted Cain's work or the allocation to SCH of Ted Cain's compensation -- no time studies, no description of duties, no records of work performed – nothing to verify the work done for Stone County Hospital.

Ted Cain's compensation was for work not performed at all, for work not performed in relation to patient care, for work that was not necessary, and/or work not performed in compliance with Medicare's record-keeping mandates. Therefore, his compensation was not an allowable cost; and when Defendants submitted claims for reimbursement of Ted Cain's compensation as an allowable cost, that was a false or fraudulent claim.

Ted Cain's work – not reasonable, not necessary and nonexistent

Most, if not all, of Ted Cain's deposition from 2014 was read to the jury over the course of his examination. That deposition testimony revealed that Ted Cain did not have an office at SCH, did not have a file cabinet or keep records and files in his office at CMI, did not keep timesheets or a calendar, did not regularly communicate with Mr. Williams, SCH's hospital administrator, and could only describe in very general terms what CMI did for SCH, or what he, himself, did for SCH. He claimed to visit SCH three or four times a month.

Asked what he did when he went there, Cain responded that he just looked around. Asked if there was anything else, Cain said that occasionally, he would sit in on meetings that they would have, but he did not direct any meetings. Asked if he had any direct input into purchasing decisions for supplies for SCH, he answered "If it was a day-to-day operation, no, I didn't do that, no." 1/17/2020 Tr. 48:20-49:19 (Ted Cain).

Ted Cain said he made some staffing determinations at the administrative level but was not involved with any other hiring. He said when issues came to him, he discussed them with whomever was going to deal with it. At various times he described his work as "everything in general" and " a lot of things. Cain also said at his 2014 deposition that he did not use the computer until recently, and did not send emails. He could not produce any memoranda, emails, or documents written or generated by him as part of his work activities for SCH.

In his deposition (most of which was read to the jury during his testimony), Cain was unable to describe much at all that he did for the hospital. Likewise, when called as an adverse witness in the Plaintiffs' case, Cain could not describe much that he did for the hospital. When called late in the trial as a witness in the defense case, Cain testified as to some work he said he performed. He said he was involved in approving budgets, reviewed financial reports daily, worked to improve the hospital's public image in the community, recruited physicians, was involved in all of the big contracts. He said he would go through and observe maintenance issues and he might mention it to Starann Lamier or to the maintenance people to make sure those were taken care of, and that he took steps to get the roof replaced. Cain said that he signed checks, but there was also evidence presented that a signature stamp was also used by others to sign the checks.

On cross  Cain could not provide specifics relating to his work and could not point to any documents that would substantiate any of the work he claimed to have done other than some checks and some signed contracts. Ted Cain was on the stand over several days, but in all of that time could not describe in any detail, the work he performed for SCH, and much of the work he claimed to do was not related to patient care.

In his testimony during the trial, Ted Cain said he was at the hospital all the time, that he spent most of his time at the hospital.   The jury heard from numerous witnesses who had worked with CMI and SCH, who testified that Ted Cain was rarely present at the hospital, did not conduct any meetings, and did not confer with them.  They could not describe anything that Ted Cain did for the hospital.

Tammy Harrell, former Chief Financial Officer (CFO) for SCH, testified that it would be typical to see Ted Cain twice a year at SCH. Lenora Bayes Ramstad, a former nurse practitioner, said she only saw Ted Cain in the cafeteria.  It was usually at lunch time, most Fridays, the day they had fish.  He would come in the side door, she said, usually wearing his ranch clothes, then leave by the same side door.  Sherla Harville, formerly director of clinical operations for CMI, used SCH as her home base.  She too, said she would usually see Ted Cain in the cafeteria or in the hallway as he was coming or going.  He was usually there at lunch time, she said, on Wednesdays for fried chicken and Fridays for catfish.  Harville said she never worked with him or communicated with him on anything related to patient care or the hospital.  If Ted Cain had been doing work related to patient care at SCH she would have known about it, Harville testified.

Vicky Garretson, a former director of medical records for SCH, was asked if she ever saw Ted Cain at the hospital.  She saw him in the mornings in the cafeteria, she testified.

She, too, said he would typically leave through the door coming out of the cafeteria into the parking lot. She did not know what his role was at SCH other than being the owner, and never worked with him on anything related to SCH. He did not attend the department head meetings, according to Garretson.

Several other witnesses who had worked at SCH and CMI confirmed Ted Cain's lack of work for SCH, including Don Kannady, Darlene Odom and James Williams. Even his wife, Julie Cain, could not state what Ted Cain did at SCH or relating to SCH. Kannady, a former COO, said he saw Ted Cain very little during the time he was there, from around November 2006 to April 2008. When he did see Ted Cain it was in the cafeteria. Kannady, when he was new to SCH, saw Ted Cain in the cafeteria and asked him where his [Cain's] office was. Cain answered, "right here", referring to the cafeteria. Kannady testified that he never saw Ted Cain do any work at the hospital other than once when they had bought a new ambulance for Ted Cain's ambulance service and once when he was in Julie Cain's office meeting with Julie and Starann Lamier. 1/31/2020 Tr. 89-90. Kannady also testified that they were required to buy supplies for the hospital through Quest Medical, which was also owned by Ted Cain. 1/31/2020 Tr.103:22 -104:14.

James Williams worked for CMI from 2008 until 2012, and became CEO of Stone County Hospital and Nursing Home in 2013, at a salary of $110,000-$115,000 per year. He succeeded Julie Cain who was being paid approximately twice that amount before she left. Williams also had a COO working with him at SCH. Williams said the daily inpatient bed count was around 11 inpatients per day. At the time of his trial testimony in 2020, Williams was the CEO administrator of Pearl River Critical Access Hospital, a 22-bed critical access

hospital, at a salary of $146,000 annually (whereas Julie Cain was being paid $250,000 to $270,000 per year).

Williams testified that CMI's management fees seemed high in comparison to fees charged by other management companies for other facilities where he had worked, including a 115-bed nursing home facility and a 95-bed nursing home facility. It must be acknowledged, though, that as testimony showed, operating a hospital is more complicated than operating a nursing home. Nonetheless, Williams, who had worked at both, said he was concerned about the high management fees charged to SCH by CMI, calling them one of the "big ticket items," "one of the biggest hits we took monthly," and one of the "eye catchers." Williams also testified that Tommy Kuluz called him over to sign the cost report for 2012 and he did not have a chance to review or study it, but was told he needed to sign it so they could get it filed. The same thing happened with the 2013 report. 1/29/2020 Tr. 191-200 (J. Williams).

Williams said they had operational meetings weekly and financial meetings monthly during his tenure. Notably, by this time, the Defendants were aware of this litigation. The Department of Justice had sent a letter to CMI. At the operational meetings, day- to- day operations were discussed, projects, and revenue streams. Starann Lamier would usually chair the operational meetings. Also present were the COO of the hospital, Ted Cain and Tommy Kuluz. The monthly financial meetings were also run by Starann Lamier. In addition to the attendees at the operational meeting, the CFO of the hospital was present. Instructions for any information needed for the meeting would come through Starann Lamier or Tammy, he testified. These were financial meetings.

Other than attending these meetings, Williams said, Ted Cain would occasionally do walk-throughs (once or twice a month), and let him know if cosmetic changes needed to be made. Anything Cain saw he put it on James Williams' list to be done. He could not recall any other interactions with Ted Cain regarding hospital operations or related to patient care.

SCH bought its durable medical equipment from Quest Medical, Williams testified, another company owned by Ted Cain. He was directed to use them (he thinks by Starann Lamier), but it was more expensive than other companies, maybe two or three times more. Williams brought up in one of the meetings that he could save money if allowed to purchase from other vendors, but he got no response, and nothing changed. 1/29/2020 Tr. 209:15-210:12. Williams also testified that SCH used one particular company for its rehabilitation services, Quest Rehab, another Ted Cain-owned company.

Additionally, the nursing home facility attached to SCH was not allowed to call 911 in case of emergency. They called the number for Stone County Ambulance, a company owned by Ted Cain. 1/29/2020 Tr. 205:19-208:22. The nursing home was attached to the hospital. When called, the ambulance then traveled from the other side of the same building to pick up the patient and transport them to the hospital in another area of the same building. Previously (before Ted Cain started his ambulance company), the patient was simply rolled through from the nursing home through the double doors into the hospital. Medicare reimburses ambulance transportation costs.

Ted Cain failed over the course of many days of testimony to explain what he did at SCH, much less what he did worth millions of dollars. Ted Cain said he was familiar with PRM § 900 which provides that compensation for an owner's services is only an allowable cost if performed in a *necessary* function. He clearly knew that he was not performing any

necessary work related to Stone County Hospital, and virtually no work at all. When he submitted a cost report he was certifying that the costs on that statement, including his salary, were reasonable and *necessary*. He also knew that when submitting these cost reports, they were certifying that they were in compliance with Medicare laws and regulations, including the PRM; but these certifications were false.

The jury had ample evidence, and apparently did find, that Ted Cain was not performing *any* reimbursable work for SCH, and that Ted Cain *knew* he was not performing any reimbursable work for SCH because he was not performing any work at all. Yet by submitting cost reports in an effort to get reimbursement, the Defendants falsely claimed that he was performing reimbursable work. There is no factual or legal basis for disturbing the jury's verdict on this issue.

Unreasonable compensation

The United States presented two bases for Ted Cian's salary violating the FCA. The first, as discussed previously, is that Ted Cain "did not perform work that was necessary and related to patient care to justify the compensation." Secondly, as this court now undertakes to discuss, is that the compensation amount was unreasonable. Not only must the work performed by an owner be necessary, the compensation amount must be reasonable. Had a FI or MAC had actual knowledge of the amount of Ted Cain's compensation, which, based on Sandra Rose's testimony, they did not, they would not have had knowledge that Ted Cain was doing nothing to earn that compensation other than signing or stamping checks ( and possibly boosting hospital revenue by eating consistently in the cafeteria, especially on Wednesdays and Fridays .

The PRM defines reasonableness relative to owners' compensation, as follows:

Reasonableness requires that the compensation allowance be such an amount as would ordinarily be paid for comparable services by comparable institutions depending upon the facts and circumstances of each case. Reasonable compensation is limited to the fair market value of services rendered by the owner in connection with patient care. Fair market value is the value determined by the supply and demand factors of the open market.

PRM §902.3 [doc. no. 436-5 p.3 ]

Defendants argue that because there was no cap on owner compensation they cannot be expected to know what constitutes a reasonable salary. Additionally, Defendants attempt to shift the responsibility for deciding what constitutes reasonable compensation for Ted Cain onto the MAC. All of the expert witnesses, however, including Defendants' expert, Ralph Llewellyn, testified that it is the provider's responsibility to comply with sections 900 and 902.3. Defendants rely on § 905 .1 to negate their obligation to decide on a reasonable salary amount. The regulations do not allow a provider to seek a salary that far exceeds what anyone would consider reasonable, then wait to see if the MAC catches the fraud. Providers have a duty to comply with sections 900 to 903 *before* the provider submits costs to the Government. Therefore, by merely submitting the false cost report, Defendants have violated the FCA, even before the MAC even receives it. Each year that Ted Cain did not get caught on falsifying his allowable salary, he became bolder, and increased his compensation over the years.

The experts who testified called Ted Cain's compensation unreasonable. The PRM provides a lot of guidance about what is reasonable, despite defendants' assertions to the contrary. First, the amount should be the same as what is paid for comparable services in comparable institutions. None of the Defendants made any attempt to identify any comparable institutions or make any comparisons whatever. Ted Cain said SCH was the

second critical access hospital in the state. There were other small hospitals and rural hospitals in this state and other critical access hospitals in other states. Closely comparable institutions could have and should have been identified, but seemingly Defendants wanted to be able to charge to Medicare as much as they could get away with.

Next, the compensation amount for an owner is limited to "fair market value." The Defendants' own expert, Ralph Llewellyn, testified at his prior deposition that that he advises his clients on direct allocations to conduct time studies. Defendants' cost report preparer, Craig Steen, who testified by deposition, stated that a provider must have time studies.

> Q. What type of recordkeeping is required to do direct allocation?
> A. Well, you would have to be able to directly identify that you have costs on your books that pertain solely to this facility.
> Q. And how would you go about doing that in the case of compensation?
> A. In the case of compensation, that would be if –you could do it a couple of different ways. If you have a person who is on your home office trial balance in your home office costs that works only at one facility, that's fairly easy. But sometimes you will have someone who will work at two or three facilities and then keep time records or time studies so you can split their compensation up.
> Q: Is it fair to say that if you're doing direct allocation to Stone County Hospital, you would need to have supporting documentation for that allocation?
> A. Yes
> Q. Can it be based on estimates?
> A. It's not supposed to be based on estimates, a time – although theoretically, a time study is an estimate because you're not doing a time study over the entire twelve months of the year. But no, you can't just say I think I do 50 percent of my time at this hospital at this facility.
> Q. Can you say oh, I believe this person works 50 percent of their time at this office because I just know how they work?
> A. You're not supposed to use that.

Steen Dep. 30:14-31:13, Ex. 1.

Even Defendants' own expert and Defendants' cost report preparer testified that Defendants were required to determine reasonableness—fair market value—before billing

the Government.  Experts for the United States, George Saitta and Manuel Pilgrim, similarly testified that it is the provider that must ensure reasonableness.

Ted Cain acknowledged that he was familiar with time studies, but he had not done any such studies relative to his position and the allocation to SCH.  He acknowledged that he did not keep time sheets or make any attempt to determine if his salary was reasonable for a hospital of the size of SCH. He said he couldn't ask about the salaries for other Critical Access Hospitals for purposes of comparison, because SCH was only the second Critical Access Hospital in the State of Mississippi.  Asked about what he had done to determine reasonableness, Ted Cain consistently said it was up to the MAC to correct or adjust the amount. He testified as follows:

> A. The MAC makes the determination on reasonability. I could
> have put down there -- like Eric Shell said, I could have put 5
> million. It made no difference. It doesn't matter what I put
> on there. It only matters what they allow. If they allowed
> it, it's fine. If they didn't, they would adjust it.

1/17/2020 Tr. 74:9-15 (Ted Cain)

This sounds very much like saying that any amount you can get away with is reasonable.  The jury would be informed, through the testimony of Sandra Rose and others, that the MAC was not even aware of the amount of Ted Cain's salary or that it was allocated largely to Stone County Hospital, and that it was difficult to discern that fact from the documents submitted with the CMI home office cost statements.

## Ted Cain's Salary and Materiality

Defendants again raise the specter of the Government's continuing to pay without taking any action against Defendants.  The materiality question has already been thoroughly discussed.

## Medicaid Self-Disallowances

SCH served Medicaid and Medicare patients and received reimbursements from both programs. At trial, Manuel Pilgrim, a Medicaid auditor, testified as an expert for the United States. Pilgrim explained that in 2012 and 2013 (the years for which Pilgrim conducted Medicaid audits on CMI and SCH) Defendants had submitted certain costs to Medicare for reimbursement that they "self-disallowed" on their Medicaid home office cost statements.

"Self-disallowed," Pilgrim stated in his testimony, means that a health care provider, in preparing the cost statement or cost report to be submitted to either Medicare or Medicaid, determined that certain costs were not allowable and should not have been included for reimbursement. The provider itself, then makes the adjustment, removing those expenses from the costs in their general ledger expenses.

Self-disallowing these costs on the Medicaid cost statements meant they should have been self-disallowed on the Medicare cost reports, as well. Except as it relates to owners' compensation, the PRM regulations apply equally to Medicaid and Medicare, according to Pilgrim's unrefuted testimony on this point. Therefore, for Medicare home office cost statement purposes, Defendants should have self-disallowed the same costs as were self-disallowed for Medicaid. The jury found that CMI was unjustly enriched in the amount of $381,866 for these self-disallowances for 2012 and 2013. [ecf doc. no. 381 p. 25].

Defendants make two main arguments in their motions concerning these Medicaid self-disallowances. First, Defendants say, neither Pilgrim's testimony nor any other evidence established that Medicare actually paid these costs. The Government responds that it is evident from numerous witnesses and exhibits that reimbursement for the administrative costs of CMI were paid, and that at least some of those funds were allocated to SCH.

Defendant Tommy Kuluz's own testimony established that these costs were reimbursed. Kuluz testified that Medicare reimbursed SCH for CMI's management fees (which included the pooled costs from the home office cost statements).

Secondly, say the Defendants, the costs listed on the self-disallowance exhibit (P-228), were costs of CMI,[5] and not SCH; only a percentage of CMI's costs were allocated to SCH and only a percentage of SCH's costs were reimbursed by Medicare. The jury found that CMI was unjustly enriched in the amount of $381,866 for "self-disallowances made by CMI to Medicaid but not to Medicare." *Verdict* [ecf doc. no. 381 p. 25]. This court, like Defendants, questions how the jury arrived at this figure, which, as Plaintiff agrees, is not in line with the evidence presented.

Both Manuel Pilgrim and George Saitta, another expert who testified for the Government, presented formulas for calculating the amount of disallowed fees claimed by CMI that were allotted to SCH. They calculated this amount based on the percentage of costs that should be allocated to SCH as compared to the percentage of costs to be allocated to the other health related entities that operated under CMI's administrative umbrella. All of this is complicated by the fact that CMI served as the home office for several of Ted Cain's other health related enterprises, as well as some of his non-health related enterprises.

---

[5] CMI charged administrative fees to SCH and to the other health care providers that it managed. These providers then sought reimbursement from Medicare for these administrative costs based on the allotment of CMI's fees attributable to each provider. These computations are complicated by the fact that CMI served as the home office for several of Ted Cain's other health-related companies, and additionally served as the management company for some of Ted Cain's non-health related enterprises. The proportionate amount of fees that should have been charged to Medicare for SCH, as opposed to the various other companies managed by CMI, would prove to be difficult to analyze, separate and assess by those who were not insiders to the Ted Cain enterprises.

The jury reasonably found, based on the evidence presented, that CMI committed fraud in the submission of its home office cost statements by claiming items for reimbursement by Medicare that they knew were not allowable, as demonstrated by the fact that they self-disallowed these same items on the Medicaid cost statements. However, this court is in agreement with both Plaintiffs and Defendants that the amount of monies for which the jury found Defendants liable in this category of damages is too high, and not borne out by the evidence. The jury award exceeded the amounts Manuel Pilgrim calculated for the two years at issue, as well as the amounts George Saitta determined to be the damages amount for Medicaid disallowances. The Government suggests a remittitur as the only appropriate remedy. Defendants seek a new trial or a judgment dismissing this claim.

The jury's finding that CMI was unjustly enriched by claiming costs that should have been disallowed, was not against the greater weight of the evidence. Only the *amount* of damages found is unsupported by the evidence presented. Therefore, remittitur is the appropriate remedy to address the issue. Therefore, remittitur is the appropriate remedy to address the issue. This court will conduct a hearing to determine the amount of remittitur.

## STATUTE OF LIMITATIONS

Defendants next argue that the United States' claims arising out of Defendant's claims for payments submitted before September 18, 2009, should be dismissed because they fall outside the statute of limitations. The limitations period for the FCA is as follows:

A civil action under section 3730 may not be brought--
(1) more than 6 years after the date on which the violation of section 3729 is committed, or
(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United

States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

31 U.S.C. §3731(b).

The Fifth Circuit has said that the statute of limitations begins to run from the "filing of the false claim." *Smith v. United States,* 287 F.2d 299, 304 (5th Cir. 1961). The basic limitations period is six years from the date of the violation. That period is extended however under two circumstances. First, if the suit is filed within three years "after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, the limitations period is extended to ten years from the date of the violation. Secondly, when the United States intervenes in a False Claim Act suit brought by a Relator, the Government's pleading shall relate back to the filing date of the complaint of the relator, to the extent that the Government's claim "arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the [relator's] complaint. 31 U.S.C. §3731(c).

Defendants claim that the bases for extending the statute of limitations are not present and, therefore, the six-year statute of limitations applies. The United States, they say, can only litigate those claims from 2009 and later, the claims that occurred within six years of the United States' Complaint in Intervention.

Relation back

The 2009 amendment to the FCA clarified a split between the circuits as to when the statute of limitations begins to run for the Government to file its complaint-in-intervention.

Section 3731(c) permits the Government's complaint to relate back to the date of the Relator's complaint, allowing more time for the Government properly to conduct its investigation and make its decision on intervention. See 31 U.S.C. §3731(c).

The United States says that the claims it brought in this litigation relate back to the Relator's Complaint; so, it can litigate claims up to six years prior to the date of the Relator's Complaint filed in 2007. The Government then, says it was within the limitations period in litigating claims from 2004.

Defendants, on the other hand, argue that the claims brought by the Government do not arise out of the same conduct, transactions or occurrences as the Relator's Complaint, and, thus, do not relate back. "[A] new claim or pleading will not relate back when it 'asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.' Rather, to relate back, a new claim must be 'tied to a common core of operative facts . . . .'" *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 382 (5th Cir. 2017) (quoting *Mayle v. Felix*, 545 U.S. 644, 650 & 664 (2005) (internal citations omitted)).

Defendants say the Relator's initial Complaint, filed in 2007, alleged such things as: Defendants required SCH and a related hospital to purchase medical supplies from a company owned by Ted Cain, inappropriately transferred patients between SCH and a nursing facility owned by Ted Cain to maximize Medicare and Medicaid reimbursement, and failed to collect Medicare copays and deductibles. The United States' Complaint and Amended Complaint, filed in 2015, Defendants say, alleged that SCH and CMI improperly received Medicare reimbursement for the salaries of Ted and Julie Cain and for the 1997 and 2007 BMWs, that CMI performed duplicative and/or unnecessary services for SCH, and

related-party expenses were improperly included on the SCH and CMI cost reports.

Defendants conclude that the Government's Complaint was different from the Relator's

Complaint and cannot relate back.

The Relator's Complaint, however, also alleged cost report fraud, including that SCH

cost reports fraudulently included "costs that are not reimbursable under the Medicare

program and unallowable costs, resulting in Medicare reimbursements to them that were

much higher than that to which they were entitled. The Relator's Complaint, like that of the

Government, also alleged "that the services identified in annual cost reports were not

provided in compliance with Medicare laws and regulations." [doc. nos. 2 at ¶33] [doc. no. 6

at ¶¶ 31-33].

The FCA, itself, provides:

[t]he Government may file its own complaint or amend the complaint of a
person who has brought an action under section 3730(b) *to clarify or add detail*
to the claims in which the Government is intervening *and to add any additional*
*claims* with respect to which the Government contends it is entitled to relief. For
statute of limitations purposes, *any such Government pleading shall relate back*
to the filing date of the complaint of the person who originally brought the
action, to the extent that the claim of the Government arises out of the conduct,
transactions, or occurrences set forth, or attempted to be set forth, in the prior
complaint of that person.

31 U.S.C. § 3731(c) (emphasis added); See *United States ex rel. Vavra v. Kellogg Brown &*

*Root, Inc.,* 848 F.3d 366 (5th Cir. 2017).

The above provision of the FCA allows the Government to add detail or clarify the

claims on which it is intervening; and it does not require perfection or identically worded

claims. It allows relation back even when the claim of the Government arises out of conduct

the Relator "attempted to set forth."

Defendants cite cases from other jurisdictions; however, the Fifth Circuit, in *Vavra,* attached a broad meaning to §3731(c), even stating that additional claims other than FCA claims can relate back to the original Complaint. The new claim, however, will not relate back, when it "asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Vavra* at 382 (citing *Mayle v. Felix,* 545 U.S. 644, 650 (2005). The new claim must be "tied to a common core of operative facts.…" *Id.,* at 382 (citing *Mayle v. Felix at* 664).

Under the plain language of 31 U.S.C. §3731(c), as interpreted by the Fifth Circuit Court of Appeals in *Vavra,* the claims brought by the Government in the instant case, relate back to the claims of the Relator's original and amended Complaints.

Statute of Repose

The FCA's statute of limitations has a second provision. The Government may bring its lawsuit up to ten years after the date of the violation, *if* it is also brought within 3 years of the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act. In the case *sub judice,* it is not necessary to rely on the ten-year statue of repose, since this court has already determined that the United States' Complaint in Intervention related back to the date of the Relator's Compliant. However, the court is persuaded that at a minimum, the Government had ten years from the date of the violation within which to bring its Complaint.

Defendants contend that the six-year limitations period applies in this instance. They say the Government did not file its Complaint in Intervention within three years of the date on which it knew or should have known the facts material to its claims, as required by 31

U.S.C. § 3731(b).  Therefore, the United States, say Defendants, cannot avail itself of the ten-year statute of repose.

Defendants cite two reasons for this. First, they say the cost reports were submitted annually to the FI or the MAC, contractors for the government, to be processed and reviewed; thus, the Government should have known the material facts when the reports were processed each year.  Defendants cite an Eleventh Circuit case for the proposition that a FI's knowledge is tantamount to the government's knowledge, preventing the tolling of the statute of limitations.  *United States v. Kass*, 740 F.2d 1493 (11th Cir. 1984). The court there found that Blue Shield, the FI, was aware of the required facts by September 4, 1974, and stated: "At least as early as September 4, 1974, the government, through its agent Blue Shield, had the facts making up the 'very essence of the right of action.'" Id. at 1498.   The Eleventh Circuit also stated that the FI or the MAC,  in that case Blue Shield, was the official charged with the responsibility to act.

In the instant case, Sandra Rose, an auditor for the MAC, testified that she did not realize the amount of  "salaries of officials" on the home office cost statement was actually Ted Cain's salary, and it would not have been easy to detect, since she did not process the reports for SCH, but only for CMI and evidence showed that the information tying the salary amount to Ted Cain was buried deep within the voluminous records for SCH.  Even if she had realized this fact and the fact that SCH was a critical access hospital, she still could not have determined, from the documents submitted, that Ted Cain was not actually performing any substantive work.  Arguably, if this court accepted the Eleventh Circuit's view that the MAC was the responsible official, in this case, the MAC was not aware of the facts material to the fraud.

It is telling that despite Defendants' contention that the Government knew of Ted Cain's and Julie Cain's salary issues prior to 2013, Defendants claimed not to know the amount of these salaries reimbursed by Medicare as late as November 30, 2016, when it responded to interrogatories propounded by the United States.

Interrogatory No. 4: Identify H. Ted Cain's annual compensation relating to Stone County Hospital and the amount of such annual compensation reimbursed by Medicare.

Answer: … Objection is also made that this interrogatory calls for the making of an expert opinion as to the amount of compensation "reimbursed by Medicare,"

Without waiving these objections, Defendants respond as follows: Defendants currently are without knowledge as to the exact amounts that Medicare reimbursed SCH for Ted Cain's salary each year. To the extent the Defendants determine the amount of that "annual compensation" that was reimbursed by Medicare, Defendants will supplement this response.
Further, Plaintiff is referred to Defendants' business records which have been produced or will be produced. Defendants will supplement this response as appropriate,

Interrogatory No. 10: Identify Julie Cain's annual compensation relating to Stone County Hospital and the amount of such annual compensation reimbursed by Medicare.

Answer: …. Objection is also made that this interrogatory calls for the making of an expert opinion as to the amount of compensation "reimbursed by Medicare."

Without waiving these objections, Defendants respond as follows: Defendants currently are without knowledge as to the exact amounts that Medicare reimbursed SCH for Julie Cain's salary each year. To the extent the Defendants determine the amount of that "annual compensation" that was reimbursed by Medicare, Defendants will supplement this response.

Further, Plaintiff is referred to Defendants' business records which have been produced or will be produced. Defendants will supplement this response as appropriate.

*Exhibit 3 to United States' Response in Opposition.* [doc. no. 436-3 pp. 16-17 and pp. 28-29]

Defendants answered in November of 2016, that it would require an expert opinion for them to determine the amount of Ted Cain's and Julie Cain's salary that was reimbursed by Medicare. Moreover, Defendants provided no answer to the questions on the amount of annual compensation either received related to SCH. The Defendants were either untruthful or unable to calculate the exact salary and reimbursement amounts. If the Defendants themselves, who were in possession of the business records, employed in-house CFO's, had access to their accountants and cost preparers, and included the salary recipients, could not figure out this information, it would certainly be difficult for an outsider to do so.

The Government says December 20, 2013, is the time when the Department of Justice learned the amounts of Ted Cain's CMI compensation and the amounts Medicare reimbursed to SCH for his compensation. This is borne out by the evidence, Defendants' contentions, notwithstanding. Additionally, it was not until October 8, 2014, after the United States was finally able to depose Ted Cain, that it learned Ted Cain had not performed any qualifying work eligible for reimbursement by Medicare.

These time periods establish that the United States brought its lawsuit within three years of the date it knew or should have known of the violations; thus, the ten-year statue of repose would apply. Despite the Relator's broad allegations, it would take much investigation and discovery to unravel the true nature and extent of the fraud for which Defendants were ultimately found liable.

This court has previously determined that because the Government's Complaint relates back to the Relator's filing, it is not necessary for the Government to resort to the statute of repose; but it is an option that the court accepts.

### Federal Common Law Claims

The United States, in addition to its claims under the FCA, brought common law claims of unjust enrichment and payment by mistake of fact against some of the defendants. Defendants argue that these claims, too, are all barred by the statute of limitations for years prior to 2009. The same arguments that establish the FCA claims are not barred by the statute of limitations for those years apply to these common law claims. The six-year statute of limitations in 28 U.S.C. § 2415(a) governs these federal common law claims. *See In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 358-359 (D. Conn. 2004); *U.S. v. Intrados/Int'l Mgmt. Group*, 265 F. Supp.2d 1, 12-13 (D.D.C. 2002) (numerous citations, including *U.S. v. P/B STCO 213*, 756 F.2d 364 (5th Cir. 1985)). The relation back doctrine also applies to these claims. See *In re Cardiac Devices,* 221 F.R.D. at 359.

Similarly, a tolling provision also exists for any federal common law claims that do not relate back to the original complaint. 28 U.S.C. § 2416(c) provides: "For the purpose of computing the limitations periods established in section 2415, there shall be excluded all periods during which-- . . . (c) facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances"). Therefore, the common law claims before 2009 are also not barred.

## CLAIMS AFTER DECEMBER 4, 2015

Defendants next contend that claims submitted after December 4, 2015 should be dismissed because they are not alleged in the Government's Amended Complaint. Defendants devote four sentences of their brief to this argument.

The Government filed its Amended Complaint on December 4, 2015. At that time, the last cost reports filed by CMI and SCH were for 2014. At trial, claims concerning Defendants' 2015 cost reports were presented. Defendants say those claims were not ripe at the time of Plaintiffs' Amended Complaint, since the cost reports were not submitted for payment until May 2016. Defendants cite *United States v. ITT Educ. Servs.,* 284 F. Supp. 2d 487, 495 (S.D. Tex. 2003).

The Government responds that its Amended Complaint alleged that the fraud was ongoing, and Defendants did not object at trial to testimony concerning the 2015 cost reports or introduction into evidence of the 2015 SCH cost report or the CMI 2015 home office cost statement. Defendants do not deny that they failed to object. This court sees no reason to upset the jury's verdict pertaining to the 2015 time period or the 2015 cost report fraud.

## Evidentiary Rulings

Defendants, in their Motion for New Trial, take exception to several rulings made by the court during the trial, on evidentiary matters. Defendants allege that: 1) evidence concerning Bill King was improperly excluded; 2) Evidence concerning the termination of James Aldridge was improperly excluded; 3) Evidence concerning money Ted Cain put into Stone County Hospital was improperly excluded; 4) Evidence concerning Medicaid Cost Reports and Audits of Defendants was improperly admitted; 5) Evidence concerning payment of Defendants' legal expenses was improperly admitted; 6) summary exhibits by

70

George Saitta were improperly admitted; and 7) Plaintiff's Exhibit 167 was improperly redacted.

"Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial*." Jordan v. Maxfield & Oberton Holdings, L.L.C.,* 977 F.3d 412, 417 (5th Cir. 2020) (quoting *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999)). See *Del Rio Distrib., Inc. v. Adolph Coors Co*., 589 F.2d 176, 179 n.3 (5th Cir. 1979). Generally, any error in admitting or excluding evidence is not grounds for a new trial. Fed.R.Civ.P. 61. The admission or exclusion of evidence is reviewed for abuse of discretion. *Tompkins v. Cyr,* 202 F.3d 770, 779 (5th Cir.2000). Should a district court abuse its discretion, the error is reviewed under the harmless error doctrine. The ruling will be affirmed unless it "affected substantial rights of the complaining party." *Baisden v. I'm Ready Prods., Inc.,* 693 F.3d 491, 508 (5th Cir. 2012) (quoting *Bocanegra v. Vicmar Servs., Inc.,* 320 F.3d 581, 584 (5th Cir.2003).

Evidence concerning Bill King's statements

During the testimony of Tommy Kuluz, Defendants attempted to introduce statements that Kuluz said had been made to him by William King of King & Associates. King & Associates was the company that prepared the cost reports for SCH and CMI. Kuluz's proffered testimony, heard outside the presence of the jury, was that Bill King, recommended to Kuluz in early 2005 that CMI consider directly allocating a portion of Ted Cain's salary to SCH. Kuluz's proffered testimony was that Bill King informed him that without the direct allocation, Ted Cain's salary would be allocated as part of a pooled allocation, and the

pooled percentage would understate the portion of time the Ted Cain spent working on matters related to SCH.

This court denied admission of the testimony. Defendants say this was relevant to Tommy Kuluz's scienter/state of mind, and it should have been admitted. Bill King, deceased, was not available to confirm or refute the statements attributed to him.

This evidence, say Defendants, helps to show Kuluz's state of mind when he made the decision to directly allocate a portion of Ted Cain's salary to SCH. Defendants aimed to show that this allocation was done on the recommendation of King, a person with expertise in the area of cost reporting, who had prepared the cost reports of CMI and SCH. Acting on advice of someone with Bill King's expertise, Defendants say, suggests that Kuluz did not knowingly, deliberately, or recklessly submit a false claim. (Kuluz additionally intended to testify that no one advised him that he needed to have time studies to directly allocate Ted Cain's compensation.)

Plaintiffs challenged the statements and this court heard the testimony outside the presence of the jury. In making it's ruling this court noted that no testimony was proffered regarding whether Bill King had any knowledge of the portion of time Ted Cain allegedly spent working on SCH matters, but the jury might perceive that Bill King made this recommendation based on hours he knew Ted Cain was actually working. Plaintiffs argued that this was the very purpose for which Defendants were attempting to offer these statements – to plant in the minds of the jury that Bill King knew Ted Cain spent a lot of time on SCH matters and that was the reason for his recommending the use of direct allocation.

This court banned King's alleged statement, convinced that introduction of this statement attributed to Bill King would engender confusion in the minds of the jurors.

Additionally, Defendants had not disclosed this statement in disclosure or discovery or prior to trial, or in the pre-trial order. Plaintiffs had no notice of Defendants' reliance on this statement until well into the trial. In fact, during his deposition, Kuluz had contradicted his proffered testimony. During his deposition he stated he did not remember why he chose direct allocation for Ted Cain's salary. Add to this, Bill King is deceased, thus unable to be examined. In sum, this proffered testimony is unreliable, fraught with confusion, and of little or no benefit to Defendant Kuluz in regarding scienter. This court examined whether the statement would be relevant, reliable and admissible and found it would not meet any of these criteria.

If not allowing this testimony to be admitted was error, it was certainly harmless. It was evident, based on extensive testimony and evidence presented, that Ted Cain's services were not properly allocated under either method (direct or pooled), since, as the jury found, Ted Cain wasn't doing work at all. The jury found Kuluz liable for years where he used direct allocation and years where he used pooled allocation, so providing a reason for using the direct allocation method would not have changed the outcome. A recommendation from Bill King would not have absolved Kuluz of his knowing and deliberate choice to submit cost reports to Medicare for reimbursement for Ted Cain's services, with the knowledge that Ted Cain was not performing any services for SCH that qualified for reimbursement by Medicare.

### Termination of James Aldridge

The Relator, James Aldridge did not testify at trial. In FCA cases where the relator does not testify, evidence concerning his motivation for bringing suit, character and alleged employment-related deficiencies and misconduct are not relevant and should be excluded.

*U.S. ex rel. Landis v. Tailwind Sports Corp*., 292 F. Supp. 3d 212, 215 (D.D.C., 2017).

Defendants here are aggrieved at the court's denial of the admission of testimony by Julie

Cain concerning James Aldridge's  separation from employment. Defendants contend they

offered this evidence to show that Julie Cain was doing hospital work, that included

managing executive-level employees such as relator.  This court did allow testimony

concerning Julie Cain's management of high level employees and she was able to testify that

she is the one who terminated Aldridge.  (ECF No. 433) at 18.

Since Aldridge did not testify, his character believability and credibility were not in

issue.  Yet, Defense attorney Musgrove, in arguing why the testimony surrounding

Aldridge's alleged misconduct and termination would be relevant, argued exactly that point –

that the testimony was relevant to Aldridge's credibility and reasons for bringing this lawsuit.

In her proffer, Julie Cain related several incidents of misfeasance, accused him of shouting

and yelling and of telling her she would be sorry if she terminated him.  She indicated she

was afraid of him.  These things are clearly not allowable under well-settled law.

Defendants rely on *U.S. ex rel. Feldman v. van Gorp*, 2010 U.S. Dist. LEXIS 73633, 14-15

(S.D.N.Y., 2010), but that case does not support their position.  In that case, the court first

reiterated the principles that a relator's character or misconduct should not come into

evidence if the relator does not testify; however, the court later found that the relator's reason

for leaving his fellowship program early to be relevant, since the relator there was claiming

that there were program misrepresentations and deficiencies.  In that case, the relator's

reasons for leaving were related to the substance of the false claims he was alleging.

Those facts are very different from the case *sub judice*.  This Court ruled that those

matters concerning the Relator's alleged misconduct were  clearly irrelevant to the claims

and defenses in this case, and even if there were some slight probative value to those issues, it is clearly outweighed by the prejudicial effect of presenting such evidence to the jury. Fed. R. Civ. P. 401-403.

Money Ted Cain put into Stone County Hospital

This court disallowed Kuluz's testimony regarding cash infusions, loans and guarantees that Ted Cain allegedly put into SCH. Again, Defendants did not produce or disclose these matters during discovery. When Ted Cain was asked to identify the source of the financial transactions on the balance sheet, he could not. Kuluz in his proffered testimony could not state the specific amounts or dates on which these transactions supposedly occurred. Kuluz also could not produce the checks or documents to authenticate these transactions. Defendants say they were not relying on documentary evidence, but upon Kuluz's own personal knowledge.

This court recognizes that financial transactions are evidenced by some kind of document. In particular, a guarantee is always in writing. Unless there is a writing signed by Cain, there is no guarantee of a loan. Therefore, the Best Evidence Rule would certainly apply to guarantees. Kuluz couldn't testify when the alleged contributions were made, how much the contributions were, whether they were in cash form or check form. Kuluz said documents existed, such as checks or deposits, but without those documents the Government would not be able to explore the veracity of Kuluz's testimony. The court had numerous grounds for not allowing the evidence, not the least of which is relevance. It really does not matter what Ted Cain "invested" into his businesses by check loan or guarantee. What he expended does not matter to an FCA case. What matters is what claims he submitted to Medicare for reimbursement and what he was reimbursed by Medicare.

What Cain invested into his business is not relevant to this lawsuit; however, it had the the potential to confuse the jury, who might have thought Ted Cain was entitled to an offset or credit, because of funds he allegedly put into the business.

## Medicaid Cost Reports and Audits of Defendants

This issue is discussed earlier in this opinion. The Government sought to show, through Manuel Pilgrim, that the Defendants knowingly committed fraud, when they self-disallowed certain items on the Medicaid costs reports that they did not self-disallow on the Medicare cost reports. Defendants' only argument seems to be that the information is irrelevant.

It is not. It demonstrates that the Defendants acted knowingly, because if they knew not to include these items on the Medicaid cost report, they knew not to include them on the Medicare cost report. The requirements are identical. The only difference is that Medicaid has a set cap on owner compensation and Medicare does not have a set cap.

The testimony also demonstrated that the self-disallowed Medicaid amounts were fraudulently submitted to Medicare. This testimony was properly allowed.

## Payment of Defendants' legal expenses

Defendants say that the Court improperly permitted questioning of the Defendants about who was paying their legal fees. Defendants do not cite any authority but simply state it was irrelevant. Payment of one's legal fees by one party creates an alignment and could show bias or motivation to protect the interest of the one paying the fees. See *U.S. v. Slough*, 22 F. Supp. 3d 29, 33 (D.D.C. 2014) (citing *U.S. v. Abel*, 469 U.S. 45, 56 (1984); *U.S. v. Lindemann*, 85 F.3d 1232 (7th Cir. 1996). In *Abel*, the United States Supreme Court stated the following.

Bias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.

*U.S. v. Abel*, 469 U.S. at 52.

## Summary Exhibits of George Saitta

The court has discretion regarding whether to admit summary exhibits. Once admitted, they are part of the evidence available to the jury for their review in the jury room. *See U.S. v. Hudson*, 550 Fed. App'x. 207, 213 (5th Cir. 2013); *U.S. v. Bishop*, 264 F.3d, 535, 547 (5th Cir. 2001). Rule 1006 is "broadly interpreted" in favor of admissibility. *Shell Offshore, Inc. v. Tesla Offshore, LLC*, 2016 WL 541445 *3 (E.D. La. Feb. 11, 2016) (citing *Bishop*); *see also Irons v. Aircraft Service Int'l, Inc*., 392 Fed. App. 305, 314-15 (5th 2010) (emphasizing a district court's "broad discretion" to admit summary exhibits).

This was a complex case with voluminous documents. The Government's expert, George Saitta, created summary exhibits from the cost reports, home office statements, tax returns and records of work time and compensation to help the jury understand his testimony. To help illustrate his testimony for the jury. Saitta explained his calculations and methodology. Kuluz acknowledged that Saitta's figures seemed to be fairly stated. Defendants certainly had the opportunity to cross-examine Saitta and did so. This court admitted the summary exhibits.

The plain language of Rule 1006 of the Federal Rules of Civil Procedure and case law permit experts to make calculations as part of summary exhibits. *See, e.g., U.S. v. Fisher*, 236

Fed. App'x. 54, 61 (5th Cir. 2007) (affirming admission in jury trial of summary exhibit calculating damages based on figures taken from a 248-page exhibit); *Sumitomo Bank of California v. Product Promotions, Inc.*, 717 F.2d 215, 217-19 (5th Cir. 1983) (reversing trial court's [jury trial] retroactive striking of summary exhibits that court previously had admitted and stating "[w]e perceive no error in the trial court's initial decision to admit [two summary exhibits] into evidence" "summarizing inventory accounting calculations based on shipping and receiving records…")

Defendants have not identified any errors or discrepancies in the summary exhibits. *See Irons*, 392 Fed. App'x. at 314-15 (citing *Donovan v. Janitorial Servs., Inc.*, 672 F.2d 528, 531 (5th Cir. 1982) for the proposition that "admission of summaries proper where appellants failed to identify any discrepanc[ies] . . .").

The evidence was helpful to the jury's understanding and was properly admitted. If admission was in error, Defendants have shown no harm that resulted.

## Redacted Exhibit 167

It is well-settled that the offering of evidence advising the jury that the damages will be trebled is not relevant. *U.S. ex rel. Laymon v. Bombardier Transp. (Holdings) USA, Inc.*, 656 F. Supp. 2d 540, 547 (W.D. Pa. 2009) (collecting cases and discussing) (granting Plaintiff's motion to exclude evidence of treble damages and penalties for lack of relevance). *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425, 433 (3d Cir. 1993) (treble damages in an antitrust case); *Pollock & Riley, Inc. v. Pearl Brewing Co.,* 498 F.2d 1240, 1242 (5th Cir. 1974) (same); *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1308 n. 7 (7th Cir. 1987) (statutory penalties in a RICO case); *Brooks v. Cook,* 938 F.2d 1048 (9th Cir. 1991) (attorney fees under 42 U.S.C. § 1988)).

Particularly in regard to FCA cases, "[T]he United States Supreme Court has strongly implied that a jury in FCA cases is generally not to be instructed on the possibility of treble and civil penalties" because it would be tempted to increase or decrease damages when "its instruction is to return a verdict for actual damages, for which the court alone then determines any multiplier." *U.S. ex rel. Laymon v. Bombardier Transp. (Holdings) USA, Inc.*, 656 F. Supp. 2d 540, 547-48 (W.D. Pa. 2009. at 547-48 (quoting *Cook County v. U.S. ex rel. Chandler,* 538 U.S. 119, 131-32 (2003)).

Government's Exhibit 167 was referenced several times and published to witnesses and to the jury during witnesses' testimony. Neither the court nor the Government realized that a portion of the document contained the language that damages would be trebled. The language regarding treble damages was not contained in the portion of the document that was highlighted or being discussed by the witnesses. When the Government realized the language had not been redacted on that particular document, the court instructed that it should be redacted and the document relabeled. Plaintiff's Exhibit 167 became Plaintiff's Exhibit 304, and was sent into the jury room with the other exhibits.

Defendants say they had wanted to reference this provision and explain it during closing argument, to insure that the jury knew not to treble the damage award. Defendants did not object during the trial on that basis, however. Defendants only objected on the basis that the document should not be revised after the close of the evidence. In their motion for a new trial, Defendants contend that redacting the document without allowing them an opportunity to explain it to the jury, was error. Again, Defendants do not cite legal authority for their position.

This court pointed out that the treble damages provision was never discussed when the document was used previously *and* discussion of that point later would conflict with the Court's instruction on how to calculate damages, an instruction on which the parties had agreed. Attempted explanation by the Defendants could have led to jury confusion and could have collided with the instructions this court provided to the jury on the issue of damages.

The redaction and changing the number of the exhibit was appropriate and supported by authority. *See, e.g., U.S. ex rel. Laymon v. Bombardier Transp. (Holdings) USA, Inc.*, 656 F. Supp. 2d 540, 547. Even if in error, however, it was also harmless. The jury did not treble damages, as is obvious from their verdict, broken down by each cost report year.

### Sealed Records

Defendants again take issue with the court allowing certain documents in the case to remain under seal. They argue that the records remaining sealed is cause for dismissal of this lawsuit. This court has considered and rejected this argument previously. Defendants had filed a motion to unseal all documents in the case prior to the trial of this lawsuit. The False Claims Act permits, and in fact mandates, *in camera* submissions, but the Act, itself, is silent as to whether the documents are to remain unsealed after the intervention decision is made. This court unsealed the other documents in the case, but maintained the seal on the United States' memoranda in support of its motions for additional time.

This court was informed by the decision in *United States ex rel. Mikes v. Straus,* from the Southern District of New York, which has been cited and followed by many other courts. The court there said, "[t]he *Qui Tam* statute evinces no specific intent to permit or deny disclosure of *in camera* material as a case proceeds" and "the statute necessarily invests the court with authority to preserve secrecy of such items or make them available to the parties".

*United States ex rel. Mikes v. Straus,* 846 F.Supp. 21, 23 (S.D.N.Y.1994). The court in that

case exercised its discretion by balancing the need for the disclosures against the harm risked

by the access sought by the Defendant. *Mikes,* 846 F.Supp. at 23 as cited in *U.S. ex rel.*

*Coughlin v. Int'l Bus. Machines Corp.,* 992 F. Supp. 137, 140–41 (N.D.N.Y. 1998).  After an

*in camera* review of the documents at issue, this court determined that the Government had

made a compelling showing that the documents at issue contain information, which if

disclosed, would reveal confidential investigative methods, thought processes, or jeopardize

an ongoing *or future* investigation.

Although Defendants said the documents were pertinent to their statute of limitations

defense, this court could not see how disclosure of the information would assist a statute of

limitations defense; nor did this court discern any prejudice that would result to Defendants if

the information was not disclosed.  Additionally, Defendants had discovery available to them

to obtain any discoverable information.  Information that was not discoverable because of

privilege, also should not be disclosed by unsealing the records.  After balancing the need for

the disclosures against the harm risked by the access sought by the Defendants, this court

denied Defendant's motion to unseal the Government's memoranda.

Defendants also rehash their good cause argument and complaints about the time the

Government took to complete its investigation, and the fact that the investigation could be

conducted in secret.  The period of sealing provided for by the FCA allows the Government

to investigate the Relator's allegations and coordinate any other law enforcement efforts

prior to deciding whether to intervene in the litigation.  See, *United States ex re. Coughlin v.*

*International Bus. Machines Corp*., 992 u  . 137, 140 (N.D.N.Y. 1998).   As this court stated

in its Order of May 4, 2018 [doc. no. 214], denying Defendants' Motion to Dismiss,  "[t]he

Government was not required to reveal its investigative efforts to Defendants. The Government was only required to provide information about its investigation to the court, in camera, each time an extension was requested. This court reviewed each motion and accompanying documents and determined that there was good cause to grant the extension; thus, this court was satisfied that the Government was appropriately engaging in the conduct of its investigation." *Id.* at p. 15.

Defendants repeatedly refer to the government's sealed investigation lasting eight years. This court has found, however, in at least three earlier rulings in this case, that the Government did not abuse the process. In its Order on Defendants' Motion to Dismiss, this court developed a complete chronology of events in the case. The Relator's first Complaint was filed on May 31, 2007. The Government was investigating, requesting extensions of time and reporting to the Court on its investigation. On January 20, 2010, after investigating a little over two and a half years, the Government requested a partial lifting of the seal [doc. no. 7] in order to share limited information with Defendants for the purpose of discussing the allegations and pursuit of possible settlement. The Department of Justice, on March 9, 2010, sent a letter to all of the Defendants notifying them that they were named as Defendants in a qui tam lawsuit, informing them of the allegations, and asking for voluntary production of certain documents.

Defendants complain about the length of time the Government took before making its intervention decision, but much of the cause for the dealy is laid at the feet of the Defendants in this cause. In October of 2011, the Government sent Civil Investigative Demands to the Defendants. Defendants' fight to avoid answering the CID's accounted for almost all of the time between November 3, 2011 (the date the Government filed its motion to enforce the

CID's) and October 15, 2014 (the date this court entered its order setting the dates on which Defendants had to submit to being deposed). As to be expected, the Government sought extensions of time to continue its investigation during this time. Defendants' recalcitrance had reached the point that they were held in contempt by this court [doc. no. 93], and this court was forced to seriously consider holding Defendants' attorneys in contempt, as well. Ten months after the court's order, the United States filed its Notice of Election to Intervene in Part and Decline to Intervene is part. This seems a reasonable period of time in which to conduct depositions, analyze the information obtained, and continue the investigation.

The parties conducted extensive discovery, and the case was tried to a jury for almost nine weeks. After the trial concluded, the Relator filed his motion for attorneys' fees and submitted an itemized statement of fees and costs that included time sheets of the Relator's expert consultant, Robert Church. ("Church"). Defendants then pointed to a perceived discrepancy about when the Government first became aware of the Cains' salary issues. According to Defendants, those time sheets and the accompanying declaration provide different information about when the Government first became aware of the Cains' salary issues. Therefore, they claim they should be able to examine the Government's memoranda for extensions of time, in which the Government reported to the Court on the status of its investigation.

The Relator's expert says he discussed matters concerning the Cains' salaries with the Government attorneys in 2011 and 2012. Government counsel, Tom Morris, in an interrogatory response says he first became aware of Ted Cain's salary amount in December of 2013. This court thoroughly examined this issue in connection with Defendants' motion to re-open discovery, and concluded there was no real discrepancy. There is no new

information that would justify re-opening discovery or unsealing the Government's memoranda.

Defendants claim that now that the trial is concluded, the Government's need to keep the memoranda secret from Defendants is lessened. They also contend they should be allowed to examine the information for purposes of appeal, just as they said they needed the information for purposes of trial preparation previously. This court has done at least two very thorough analyses of this issue. In this court's Opinion and Order entered prior to trial, [doc. no. 216 at 16], this court observed that it could not discern any harm to the Defendants if the memoranda remained under seal – that Defendants would have had ample opportunity to develop the pertinent facts through discovery and to call witnesses and cross-examine witnesses. The Government, on the other hand, said disclosure of the information would be very detrimental, since it could jeopardize not only this investigation, but future investigations, as well. Although the trial has concluded, the balance has not changed in favor of Defendants. The documents will remain sealed.

### Revision of the Verdict Form

Defendants make the statement in their brief that revising the jury verdict form after closing arguments was in error, but Defendants did not brief this issue. Their brief cites no authority in support of their position, and does not state how the revision of the verdict form caused any prejudice to them. Additionally, Defendants did not object during the trial, and in, fact, seemed to advocate for revising the verdict form. Ultimately, the revised form created by the Court included some components of the form proposed by the Plaintiffs, but was more consistent with the form proposed by Defendants.

Defendants have waived this issue for failure to brief it; see e.g., *Emerald Coast Finest Prod. Co.*, 2016 WL 1718386, *2; *Simms*, 2010 WL 5184845, *2 n.3, but this court also finds this argument to be without merit.

## Speaking with Counsel During Testimony Breaks

Each Defendant was called as an adverse witness during the Plaintiff's case in chief. At the breaks the court instructed the witnesses not to discuss their testimony with anyone. During Cain's testimony, when the court broke for lunch, Defense counsel asked if Cain could speak with counsel during the lunch recess. The request was denied at that time. Defense counsel provided this court with a copy of the Fifth Circuit case of *Potashnick v. Port City Constr. Co.,* 609 F.2d 1101 (5th Cir. 1980), which this court reviewed. At the afternoon break the counsel for Defendants asked if Cain could speak with his attorneys during the break. This court denied the request.

Potashnick involved a three day weekend during which the witness was deprived of counsel. This court determined that the United States Supreme Court case of *Perry v. Leeke* controlled. *Id.*, 488 U.S. 272 (1989). Based on that case, this court allowed Cain to consult with his lawyer over the weekend, but said there was no denial of the right to counsel for lunch breaks and short breaks. This court also cited *Geders v. U.S.*, 425 U.S. 80 (1976), and *U.S. v. Johnson*, 267 F.3d 376 (5th Cir. 2001), and stated the parties could argue the matter further if need be. The trial reconvened the following week and Defendants did not raise the issue except at the end of the day, when defense counsel asked if they could speak with their client overnight. The court allowed it. During the first fifteen-minute recess during the testimony of Kuluz, defense counsel raised the issue of speaking with him during breaks in his testimony to preserve the issue for appeal. 1/27/20 Tr. (Kuluz).

Defendants also cite to *United States v. Conway*, 632 F.2d 641 (5th Cir. 1980), but both this Fifth Circuit case and *Potashnick* predate the U.S. Supreme Court case of *Perry v. Leeke*. *Perry* holds that when a defendant assumes the role of witness, he has no constitutional right to consult his lawyer while he is testifying.

Perry's fundamental pronouncements cannot be ignored. They confirm that this Court's decisions in this case were proper and not a basis for a new trial. *Reynolds v. Ala. Dept. of Transp.,* 4 F. Supp. 2d 1055, 1064-1066 (M.D. Ala. 1998) recognized the limitations that *Perry* placed on *Geders* and *Potashnick*. The *Reynolds* court stated*,* "[a] civil party does not have a right to consult with his counsel at any time about any matter during the course of his or her testimony" and "the trial court['s] broad power to control the progress of testimony before it" is limited only "by a testifying party's right to engage in such non-testimonial matters . . . [that] arise most often during extended recesses—in particular over evenings and weekends.").

## CONCLUSION

This court, drawing all inferences in favor of the non-movant,  as we must when considering a Rule 50(b) motion, concludes that the evidence at trial permitted a reasonable jury to find that the defendants committed Medicare-related fraud in violation of the FCA.

Under Rule 59, viewing the evidence in a light most favorable to the jury verdict, this court observes that the trial was fair and the jury's verdict reliable.

This court recognizes, however, that there is one aspect of damages that needs to be corrected by remittitur. The jury found in favor of the United States on the matter of Medicaid disallowances that were not self-disallowed on Medicare for two years.  However,

the amount of damages found by the jury exceeds the damages established by the proof. Therefore, this court will conduct a hearing on this issue on July 13, 2021 at 9:30 a.m.

For all of the reasons stated herein, Defendants' Motion for Judgment as a Matter of Law **[ecf doc. no. 430] is denied**. For all of the reasons stated herein, Defendants' Motion for New Trial **[ecf doc. no. 432] is denied.**

Defendants also had filed an earlier "Renewed Motion for Judgment as a Matter of Law" [ecf doc. no. 377] at the conclusion of the trial, which the parties agreed would be incorporated into the Motion for Judgment as a Matter of Law here under consideration. [ecf doc. no. 430]. As all issues raised in **[ecf doc. no. 377]** have been resolved, it is **dismissed as moot.**

Defendants also previously had filed a "Motion to Unseal Documents" [ecf doc. no. 397]. As all issues pertaining to the unsealing of documents have been addressed in this Opinion, the request for unsealing having been denied for all of the reasons stated herein, the Motion to Unseal documents **[ecf doc. no. 397**] is **denied.**

A hearing on the issue of remittitur regarding damages for Medicaid self-disallowances made by Defendants that were not disallowed for Medicare will be conducted on July 13, 2021 at 9:30 a.m.

SO ORDERED AND ADJUDGED, this the 18th day of June, 2021.

_____s/ HENRY T. WINGATE_____
UNITED STATES DISTRICT JUDGE