# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# SOUTHERN DIVISION

JAMES ALDRIDGE, RELATOR,
on behalf of the
UNITED STATES OF AMERICA                                                              PLAINTIFF

v.                                                   Civil Action No. 1:16-CV-00369 HTW-LRA

CORPORATE MANAGEMENT INC.,
et al                                                                                 DEFENDANTS

## ORDER

Before this court is the Defendants' Response **[doc. no. 463]** to this court's previous order **[doc. no. 458**] on Defendants' Motion for Approval to Pay Attorneys' Fees and Expenses. The United States has filed a Reply **[doc. no. 465]** in opposition, and Defendants have filed a "Limited Reply" **[doc. no. 466]** in Response to the United States' memorandum brief.

Under ordinary circumstances, courts hesitate to dive into the waters of contracted fees in civil cases between competent consenting lawyers and their clients. The circumstance here is far from an ordinary circumstance. This order's backdrop is a *qui tam* case. After years of contentious litigation, this *qui tam* case was tried before a jury for almost nine weeks, beginning January 13, 2020, in Gulfport, Mississippi. Two corporate defendants and four individual defendants were accused of violating the False Claims Act by submitting false or fraudulent reports for the purpose of receiving Medicare reimbursements. Ted Cain was the sole owner of the companies involved. The jury returned its verdict in favor of the Plaintiffs, the Relator and the United States, and against all but one of the defendants.

During the trial, this court became aware that Ted Cain had recently listed several of his properties for sale with real estate agents. The information was not voluntarily disclosed, but Plaintiffs were able to learn of this development. Over the course of the trial, the court was also told by Defendants that Ted Cain had transferred the assets of Ted Cain, Julie Cain and the Cain-owned companies into trusts for the benefit of the Cain children. These trusts, the court would learn, had been established within the year leading up to the trial of this case.

As this court noted in its previous opinion, Ted Cain's business empire was vast and complicated. It was comprised of numerous businesses that were interconnected, with some of Cain's non-defendant businesses even benefitting from the Medicare fraud for which the jury found Defendants liable. Based on the testimony of both Ted Cain and Tommy Kuluz, Chief Financial Officer for Corporate Management, Inc., (CMI), as well as arguments of Defendants' counsel, the lines between Cain's personal funds and the companies' funds and between Ted Cain and his companies, was often blurred.

Cain first transferred all of the assets into HTC Elite, another company wholly owned by him, then transferred ownership of HTC Elite to the trusts. Companies transferred into the trust included: Woodland Village Nursing, Diamondhead Nursing, Wiggins Nursing, Stone County Hospital Nursing, Leakesville Rehab and Nursing, Quest Pharmacy, the Focus Group, Melody Manor Convalescence, Harrison Co. Commercial Lot LLC, and Cain Cattle Corporation. This information was derived from the testimony of Tommy Kuluz, the Chief Financial Officer for CMI, and also a Defendant in the case. According to Kuluz, only Stone County Hospital and CMI, the two corporate defendants in this litigation, were not transferred to the trusts.

Ted Cain testified that Stone County Hospital was no longer in existence, and the facility where Stone County Hospital had been located was now being leased by Memorial Hospital. The lease payments, Cain said, were being made to Wiggins Acute Care, which was the facility that owned the property where Stone County Hospital had been operating. Ted Cain, himself, claimed to have little to no remaining assets.

Because of Cain's alleged attempt to transfer, shield, hide or otherwise dissipate assets, the Government filed a motion for prejudgment relief under the FDCPA (Federal Debt Collection Procedures Act). This court, concerned with Defendants' actions in moving and transferring assets on the eve of trial, conducted several hearings on the issue of prejudgment relief. Memorial Hospital was paying a monthly lease amount to Wiggins Acute Care, a Ted Cain company. The Government sought to attach those proceeds.

Defendants, though, claimed that the prospect of a writ of attachment or garnishment could jeopardize the continued operation of Memorial Hospital. Memorial Hospital, as Stone County Hospital had been, was the only hospital located in Stone County, Mississippi at that time.

Defendants' attorneys represented to the court that the former Stone County Hospital property was owned by Wiggins Acute Care. There was a mortgage on the property, Defendants said, that could only be paid with the proceeds from the lease payments from Memorial Hospital to Wiggins Acute Care. Without that monthly lease payment, Defendants claimed, there were no other sources from which the monthly mortgage note could be paid. This was concerning to the court, because it raised the prospect that the property could be foreclosed, causing Memorial Hospital to close.

Defendants resisted the court's attempts to identify the underlying facts concerning the ownership of the property, the lease agreement between Memorial and the owner (alleged to be Wiggins Acute Care), the mortgage agreement and the amount of the mortgage payments. Defendants did provide some of this information over the course of several hearings.

This court feared that an attachment of the property or the lease payments flowing from Memorial to Wiggins Acute Care could jeopardize the continued operation of the hospital, which was currently being operated by Memorial. This court did not want to take steps that would have such a drastic consequence, especially since the Defendants had not yet been found liable for the fraud of which they were accused.

This court opted for an approach that would not be as far-reaching as the procedures allowed under the FDCPA, but would maintain the status quo. That approach was this: the Defendants were ordered not to transfer, sell or dispose of any funds or assets without permission of the court. Accommodations were made for Defendants to pay "those recurring bills and payroll obligations that were part of the normal course of business." Any bills over $50,000 were to be submitted to the court and to the Government. If appropriate, the court would approve them for payment.

After five of the Defendants had been found liable for FCA violations, including Ted Cain, this court, troubled by the actions of Defendants in transferring assets, as well as Defendants' conduct over the course of the proceedings, included the provision against dissipating assets in the judgment entered in this cause.

During this time, Defendants' attorneys submitted to Defendants a bill for the attorneys' litigation services. That bill required this court's approval pursuant to the

provisions of the judgment, which provided as follows: "The Court continues its Order forbidding the defendants from transferring, dissipating, selling or disposing of any of their assets." Judgment [doc. no. 409 p. 3]

Defendants subsequently filed a Motion for Approval to Pay Attorneys' Fees and Expenses" [doc. no. 410], which this court granted in part and denied in part. This court stated:

> This court, while sympathetic to defendant's attorneys' desire to be paid, has serious questions about the source of funds from which the Carr Allison attorneys are to be compensated. This court is persuaded that payment of the attorneys' fees to Carr Allison cannot be made until Defendants provide clarification on the source of funds.

*Order* [doc. no. 458 p. 10].

This court concluded by requiring three things of Defendants in order for the court to authorize this payment to their attorneys:

> 1) a satisfactory and clear explanation of the source of funds from which the fees at issue will be paid; 2) *a thorough explanation of the contradiction in defense counsel's representation to this court that the Defendants had no funds available to satisfy the note on the hospital property other than the lease payments from Memorial*; and 3) a detailed itemized statement of the attorneys' fees earned and expenses incurred for which counsel is seeking payment.

*Order* [doc. no. 458 p. 10].

In partial obedience to the above, Defendants' attorneys have provided a detailed itemized statement of their fees and expenses; but, they have not provided for the court an explanation for the source of the funds from which Defendants will pay the fees. Nor have Defendants provided an explanation of the inconsistent positions represented to the court relative to Cain's ability to pay the mortgage on the hospital property.

All of the matters above discussed cause this court to pause before authorizing release of these funds. See *U.S. v. Compassionate Home Care Servs., Inc.,* 2017 WL 9535169 **1-2 (E.D.N.C. Sept. 8, 2017 and *U.S. v. Teevens*, 862 F. Supp. 1200, 1225 & n.46 (D.Del. 1992).

Other matters intrude into this analysis, matters which may affect the need for affirmative measures to preserve the assets, including: 1) defendants claim Stone County Hospital is now defunct, that it is non-existent, yet Ted Cain testified that it is Stone County Hospital that is paying the legal fees for all defendants; 2) bank statements from Wiggins Acute Care showing that Ted Cain writes a check to himself for the amounts by which the lease payments from Memorial Hospital exceed the mortgage payment amount, around $25,000 to $29,000 monthly (despite his contention that these funds had to be used for equipment leases and other obligations regarding the hospital; 3) the acknowledgment by Ted Cain and his lawyers that Ted Cain has control over the trusts he said were created for the benefit of his children; 4) the historical fraud record of these Defendants who already have been found to have committed fraud against the United States in the amount of millions of dollars, such that this court must be skeptical about their representations concerning finances and assets; 5) the re-enlistment of Ted Cain's Ocean Springs residence for sale even after this court ordered that no assets should be sold or transferred; 6) the seeming contradiction here between the Defendants' alleged inability to pay the mortgage without the lease payment, on the one hand, and the ability to pay a quarter of a million dollars in legal fees on the other.

In their response objecting to payment of these attorneys' fees, the United States reminds the court that it is a creditor with a $30 plus million-dollar judgment against these

Defendants.  This court must, therefore, be mindful that the payment to these attorneys will be made from funds that that might otherwise be available to satisfy the judgment.

This court also notes that Defendants Ted and Julie Cain are defendants in another, related lawsuit pending before this court, *Aldridge v. Cain,* et al, 1:20-CV-321 HTW-MTP.  That lawsuit, filed in 2020, has been brought by James Aldridge (Relator in the instant case), against Ted Cain; Julie Cain; HTC Enterprises, LLC; HTC Elite, L.P.; Evan Trace Cain GST Trust; Logan Patrick Cain GST Trust; and Lucinda K. Sloan.  Plaintiff there alleges that Ted and Julie Cain fraudulently transferred assets with actual intent to hinder, delay or defraud the judgment creditors in this case, namely the United States and James Aldridge.

This court, based on Defendants' incomplete response to the courts' inquiry, and for all of the reasons above, remains reluctant to authorize payment of the attorneys' fees at issue.  This court, therefore, will conduct a hearing on these issues on July 13, 2021, at 9:30 a.m.

SO ORDERED AND ADJUDGED, this the 18th day of June, 2021.

s/ HENRY T. WINGATE_____  
UNITED STATES DISTRICT JUDGE