# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**JAMES ALDRIDGE, RELATOR,**
**on behalf of the**
**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

**v.**                                                      **Civil Action No. 1:16-CV-00369 HTW-LRA**

**CORPORATE MANAGEMENT INC.,**
**et al**                                                                          **DEFENDANTS**

## ORDER

Before this court is the motion of the Relator, James Aldridge, for Attorney's Fees in this case [**Doc. no. 388**].  The Relator seeks a total of $643,250.78 in fees and expenses. The motion is granted in part and denied in part.

## INTRODUCTION

The backdrop to this motion is a *qui tam* case brought by the Relator James Aldridge on behalf of himself and the United States of America under the False Claims Act ("FCA").  Title 31 U.S.C. §3729 *et seq.*  The Relator filed his initial Complaint with this court on May 31, 2007, and filed an Amended Complaint on November 12, 2009.  The FCA imposes liability on persons who make false claims for payment to the federal Government.  The FCA enables private individuals (Relators) to bring suits for violations of the FCA in the United States' name and to receive a portion of any recovery from the Defendants.[1] The Act also provides that, after a period of investigation, the United States may choose to intervene in the case and take over the litigation.   On September 18, 2015, the United States filed its original Intervenor Complaint,

---

[1] (b) Actions by private persons.--(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.
31 U.S.C. § 3730(b).

followed by an Amended Complaint on December 4, 2015.  The Relator, through his attorneys, remained an active participant in the litigation.

After years of contentious litigation, this *qui tam* case was tried before a jury for almost nine weeks, beginning January 13, 2020, in Gulfport, Mississippi.  The Government accused two corporate defendants and four individual defendants of violating the False Claims Act by submitting false or fraudulent reports for the purpose of receiving Medicare reimbursements. The jury returned its verdict in favor of the Plaintiffs (the Relator, and the United States) and against all but one of the Defendants, in the amount of $10,855,382.00.  After this court tripled the damages amount and added penalties, as required by 31 U.S.C. §3729,[2] the total damages award exceeded $32,000,000.00.

## I. THE RELATOR AS PREVAILING PARTY

In addition to the right to receive a percentage of the recovery, a Relator in a successful *qui tam* action is entitled to receive an amount for expenses, fees, and costs.  Section 3730 provides that if the Government proceeds with an action brought by a *qui tam* plaintiff such person "***shall*** also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, ***plus*** reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the Defendant." 31 U.S.C. § 3730(d)(1) [3](emphasis added).

---

[2] Title 31 U.S.C. § 3729 provides that any person who commits a violation of the Act under §3729(a)(1) "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.
31 U.S.C. §3729(a)(1).

[3] 31 U.S.C. § 3730(d)(1) provides as follows:
**(d) Award to qui tam plaintiff.--(1)** If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. . . . Any such person shall also receive an amount for reasonable expenses which the court finds to

James Aldridge, the Relator here, together with the Government, obtained a verdict of over $10,000.000.00 (ten million dollars) and a total judgment in excess of $30 million dollars ($30,000,000.00) after the court tripled the damages award and imposed penalties as required by § 3729(a)(1) of the FCA.  Therefore, says Aldridge, he is undeniably a prevailing party in this litigation, and he is entitled to an award under the FCA for expenses, attorneys' fees, and costs.

The Defendants herein, Corporate Management, Inc. ("CMI"), Harold Ted Cain ("Ted Cain"), Julie Cain, Thomas Kuluz, and Stone County Hospital ("SCH"), counter that the claims advanced by the Relator were based on different facts and legal theories than the claims pursued by the Government on which the Government prevailed.  Aldridge, then, the Defendants say, is not a prevailing party because the United States did not prevail on *any* claim that had been advanced by the Relator.

Defendants state the following in their Memorandum Brief [doc. no. 394]:

> The relator's complaint and amended complaint allege that Defendants required Stone County Hospital [SCH] and a related hospital to purchase medical supplies from a company owned by Ted Cain, transferred patients between SCH and a nursing facility owned by Ted Cain in such a way as to maximize Medicare and Medicaid reimbursement, and failed to collect copays and deductibles from Medicare beneficiaries.

The jury's verdict, say Defendants, found the Defendants liable only for matters concerning Ted Cain's and Julie Cain's salaries and the 2012 and 2013 self-disallowances CMI made from Medicaid cost reports, but not Medicare cost reports.   Therefore, Defendants claim that the United States did not prevail on any claim championed by the Relator.

---

have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.
31 U.S.C. § 3730.

Defendants cite the Fifth Circuit case of *United States ex rel. Longhi v. Lithium Power Techs, Inc.,* for the proposition that the "work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved."  *Longhi,* 575 F.3d 458, 476 (5th Cir, 2009) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)).

The Relator disagrees with Defendants' assessment.  The Relator, too, relies on *Longhi* and *Hensley,* but says they support his position.  In *Longhi*, the Fifth Circuit Court of Appeals defined the question under consideration as "whether [the Relator's] attorneys' fee award should be segregated because he was not "successful" in proving a violation of the FCA with regards to all twenty-one contracts, as he initially had alleged.  In contemplating that issue, the *Longhi* Court found the United States Supreme Court case of *Hensley v. Eckerhart*, *supra*, to be instructive.

In *Hensley,* the District Court determined that the plaintiffs were prevailing parties under the Civil Rights Attorneys' Fees Awards Act [4] even though they had not succeeded on every claim. The trial court did not eliminate from the award any hours spent on unsuccessful claims. *Id.* at 426.  In reviewing the case, the United States Supreme Court said,  "plaintiffs may be considered prevailing parties *if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit*." *Id.* at 433 (emphasis added).

Defendants' argument here omits that the Relator's Complaint also alleged cost report fraud[5], including that Stone County Hospital cost reports fraudulently included costs that are not

---

[4] Title 42 U.S.C. § 1988.

[5] 42 C.F.R. § 405.1801(b)(1) states as follows:

In order to be paid for covered services furnished to Medicare beneficiaries, a provider must file a cost report with its contractor as specified in § 413.24 of this chapter. For purposes of this subpart, the term "provider" includes a hospital (as described in part 482 of this chapter), hospice program (as described in § 418.3 of this chapter), critical access hospital (CAH), comprehensive outpatient rehabilitation facility (CORF), renal dialysis facility, Federally qualified health center (FQHC), home

reimbursable under the Medicare program and unallowable costs, resulting in Medicare reimbursements to them that were much higher than that to which they were entitled. The Relator's Complaint, like that of the Government, also alleged "that the services identified in annual cost reports were not provided in compliance with Medicare laws and regulations." [doc. nos. 2 at ¶33] [doc. no. 6 at ¶¶ 31-33].

The Relator's First Amended Complaint includes the following language:

31. As a condition of their participation in the Medicare program, defendants Stone County Hospital and Stone County Nursing and Rehabilitation Center are required to certify annual cost reports. Green County Hospital and Greene County Rural Health Center (a nursing home), both managed by defendant CMI, also certified annual costs reports. As part of those cost reports, those entities must certify that the services identified therein are provided in compliance with applicable laws and regulations governing participation in federal health care benefits programs. Defendants Stone County Hospital and Stone County Nursing and Rehabilitation Center, as well as Greene County Hospital and Greene County Rural Health Center, falsely certified that the services identified in their annual cost reports were provided in compliance with these laws and regulations.

*Relator's First Amended Complaint* [doc. no. 6 ¶ 31].

33. Ted Cain knowingly included in the cost reports of Stone County Hospital, Stone County Nursing and rehabilitation Center, Greene County Hospital, and Greene County Rural Health Center costs that are not reimbursable under the Medicare and Medicaid programs. In addition, defendant Cain conspired with the other defendants named herein to include and conceal these unallowable costs. As a result of this conduct by Defendants, Medicare and Medicaid reimbursed Defendants in an amount much higher than that to which they were legally entitled.

*Relator's First Amended Complaint* [doc. no. 6 ¶ 33].

46. By virtue of the acts described herein, Defendants knowingly presented, or caused to be presented, to the United States government false or fraudulent claims for Medicare and/or Medicaid reimbursement, in violation of 31 U.S.C. §3729. The precise number of false claims shall be determined through discovery and established at trial.

---

health agency (HHA), rural health clinic (RHC), skilled nursing facility (SNF), and any other entity included under the Act.
42 C.F.R. § 405.1801

*Relator's First Amended Complaint* [doc. no. 6 ¶ 46].

> 50.  By virtue of the acts described herein, Defendants made, used, and caused to be made and used, false records, statements, and explicit and implicit certifications to get false claims paid, in violation of 31 U.S.C. §3729(a)(2), as amended.

*Relator's First Amended Complaint* [doc. no. 6 ¶ 50].

> 54.  By virtue of the acts described herein, Defendants conspired together to defraud the government in order to get false or fraudulent claims paid by Medicare and Medicaid, in violation of 31 U.S.C. § 3729(a)(3), as amended.  In furtherance of the conspiracy, Defendants acted to affect the objects of the conspiracy alleged herein.  The precise number of false claims shall be determined through discovery and established at trial.

*Relator's First Amended Complaint* [doc. no. 6 ¶ 54].

In addition to alleging cost report fraud in the Complaint, the Relator says that prior to the Government's intervention, he was alleging that the Defendants had committed cost report fraud by *inter alia*, falsely certifying on its Medicare cost reports that Stone County Hospital was in compliance with Medicare laws restricting "allowable costs" to costs reasonably incurred and related to qualified services provided for the benefit of Medicare patients.  Also prior to the Government's intervention decision, the Relator's attorneys say they provided information to the United States regarding the excessive salaries of Ted Cain and Julie Cain based on information developed by their expert consultant Robert Church.

Once the Government learned from Ted Cain, through his deposition, that he had not performed work for the hospital that would qualify for reimbursement under the Medicare laws and regulations, this became a core component of the Government's case. The Relator contends that it was the analysis made on behalf of the Relator by his attorneys and the expert consultant they retained that enabled the United States and the Relator to prevail at the jury trial.

Even if, arguendo, the accusations brought by Aldridge in his Amended Complaint were different from the claims on which the Government prevailed, these accusations and claims were based on related legal theories, thus meeting the *Longhi* standard set by the Fifth Circuit.

Moreover, the significance of the overall relief can hardly be overstated, as the Plaintiffs in the instant case won a jury verdict of over ten million dollars and a judgment (after imposition of treble damages and penalties) of over thirty million dollars.  Even if it were possible to do so, this court is not willing to require the Relator to separate attorneys' hours expended on individual claims.

In *Longhi,* the district court observed the standards set out by *Hensley* in expressly determining that the claims regarding the performance on the contracts and the claims alleging fraudulent inducement were not factually distinct.  In *Longhi* the district court determined that the successful claims regarding the four contracts at issue arose from the "same set of contracts, same actors and the same illegal intent to defraud the government of money in violation of the FCA[]"  as the unsuccessful claims. *Longhi,* at 476.

This court similarly determines that the cost reporting fraud for which Defendants were found liable by a jury arose from the same set of cost reports, the same actors, and the same illegal intent to defraud the government of money in violation of the FCA as originally alleged by the Relator.[6]

The Fifth Circuit in *Longhi,* held that the district court did not abuse its discretion in finding that the level of success on the four contract claims alone was sufficient to merit entitlement to a full attorneys' fees award.  *Longhi* at 476.

---

[6] The Relator's initial Complaint did name other Defendants that were subsequently dismissed from the litigation, and one Defendant was found not liable by the jury; but the Defendants that remained in the lawsuit were the primary actors.

Defendants have previously raised the argument that the claims brought by the Government against these Defendants arose out of different conduct, transactions, or occurrences than the Relator's Complaint.[7] In arguing that some of the Government's claims were precluded by the FCA's six-year statute of limitations,[8] Defendants contended that the Government's claims were different from and did not "relate back" to the earlier Complaint filed by the Relator. Therefore, Defendants said, the statute of limitations prevented the Government from pursuing claims that occurred six years prior to the date the Relator filed his Compliant in 2007. Instead, they said, the Government was limited to six years prior to the date it filed its Complaint in 2015.

Defendants argue again here that the claims brought by the Government are not tied to a common core of operative facts as required by *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.,* 848 F.3d 366, 382 (5th Cir. 2017) (quoting *Mayle v. Felix,* 545 U.S. 644, 650 & 664 (2005) (internal citations omitted).

This court stated in its Opinion that the Relator's Complaint also alleged cost report fraud, including the allegation that SCH cost reports fraudulently included:

> costs that are not reimbursable under the Medicare program and unallowable costs, resulting in Medicare reimbursements to them that were much higher than that to which they were entitled. The Relator's Complaint, like that of the

---

[7] See *Aldridge on Behalf of United States v. Corp. Mgmt., Inc.*, No. 1:16-CV-369 HTW-LGI, 2021 WL.2518221, at *30 (S.D. Miss. June 18, 2021) (opinion on motion for a new trial and motion for judgment as a matter of law) *appeal docketed,* No. 21-60568 (5th Cir. Mar. 17, 2022).

[8] Title 31 U.S.C. § 3731(b) provides:
A civil action under section 3730 may not be brought--
(1) more than 6 years after the date on which the violation of section 3729 is committed, or
(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.
31 U.S.C. § 3731.

Government, also alleged "that the services identified in annual cost reports were not provided in compliance with Medicare laws and regulations.

[doc. nos. 2 at ¶33] [doc. no. 6 at ¶¶ 31-33]. *Aldridge on Behalf of United States v. Corp. Mgmt., Inc.,* No. 1:16-CV-369 HTW-LGI, 2021 WL).2518221, at *31 (S.D. Miss. June 18, 2021) (opinion on motion for a new trial and motion for judgment as a matter of law) appeal docketed, No. 21-60568 (5th Cir. Mar. 17, 2022).

This court previously concluded that the claims pursued by the United States are grounded in the claims of the Relator, and this court is not now dissuaded from that position. The primary claims pursued by the Government were based on 'cost report fraud,' which was one of the claims alleged in the Relator's Complaint.

The Supreme Court has explained that where a plaintiff's claims for relief involve a common core of facts, **or** are based on related legal theories, it can be difficult to separate the hours expended on each claim, and much of counsel's time is devoted to the litigation as a whole.  In that event, "the district court should focus on the significance of the overall relief obtained by plaintiff in relation to the hours reasonably expended on the litigation." *Id.* at 435.

This court is also persuaded by the reasoning of Judge Ozerden in  *Rigsby v. State Farm Fire and Cas. Co.,*  2014 WL 691500, Civil No. 1:06-cv-433 HSO-RHW (S.D. Miss. Feb. 21, 2014),[9] applying the *Longhi* principles. The Defendant in that case, State Farm Fire and Casualty Company, complained that the bill submitted by the Relators' attorneys included work done on all claims, regardless of whether they were the claims on which the Relators prevailed.  The Relators had voluntarily dismissed eleven of the original Defendants without any settlement, and

---

[9]  *Rigsby* was appealed to the Fifth Circuit Court of Appeals and to the United States Supreme Court, which denied certiorari.  The issue of attorneys' fees was not discussed on appeal.

the Relators had been unsuccessful on their claims for retaliatory discharge, reverse false claim, and conspiracy.

Referencing *Longhi*, Judge Ozerden stated, "[i]n this case, the claims asserted against State Farm derived from the same flood policy, the "same actors and the same illegal intent to defraud the government of money in violation of the FCA." *Rigsby* at *12 (quoting *Longhi v. Lithium Poser Technologies, Inc.,* at 476).  Judge Ozerden continued, "the Court finds that the level of success achieved by Relators on the two claims which were presented to the jury is sufficient to merit entitlement to a full attorneys' fee award.  See *id.*

Similarly, in the case *sub judice* the claims asserted against Ted Cain and the other defendants involve the "same actors and the same illegal intent to defraud the government of money in violation of the FCA."   See *Rigsby* at *12 (quoting *Longhi v. Lithium Poser Technologies, Inc.,* at 476).

This court is persuaded that the Relator is a prevailing party in this litigation and, further, is entitled to an award of reasonable expenses, fees and costs as provided for by the FCA.

## II. LODESTAR

Aldridge has provided this court with the itemized statements and declarations of the three attorneys who represented him throughout this protracted litigation.

This court's decision on attorneys' fees must address the "lodestar" calculation, which requires the court to determine the reasonable number of hours expended on the litigation and the reasonable hourly rates for the participating lawyers. The district court must then multiply the reasonable hours by the reasonable hourly rates.  See *Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 552 (2010); *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983);  *La. Power & Light Co. v. Kellstrom,* 50 F.3d 319, 324 (5th Cir.1995).  See also See*, e.g., United States ex rel. Vuyyuru v.*

*Jadhav,* 555 F.3d 337, 356–57 (4th Cir.2009); *Gonter v. Hunt Valve Co.,* 510 F.3d 610, 616–17 (6th Cir.2007) (utilizing lodestar method in FCA cases).

As described in *Hensley v. Eckerhart,* supra, the court must engage in a two-step process. After making the lodestar calculation the court must examine the award in light of the *Johnson* factors to assess whether any further adjustment is necessary. See  *Johnson v. Georgia Highway Express, Inc.* 488 F.2d 714 (5th Cir.1974).

The lodestar amount is presumed to be reasonable; but it can be adjusted upward or downward by the court based on certain factors as delineated in *Johnson v. Georgia Highway Express, Inc.* 488 F.2d 714 (5th Cir.1974).  In *Johnson,* the Fifth Circuit Court of Appeals espoused twelve factors to be considered in deciding whether the lodestar should be adjusted. *Id.,* at 718. See also, *Watkins v. Fordice,* 7 F.3d 453, 459 (5th Cir.1993); *Alexander v. City of Jackson Miss.*, 456 F. App'x 397, 399 (5th Cir. 2011). The Relator, in his "Motion for Attorneys' Fees, Litigation Expenses and Costs," asks this court to make an upward adjustment of thirty percent (30%), based on the relevant *Johnson* factors.

This court will first undertake to make the lodestar calculation, and will then, using the factors set out in *Johnson*, evaluate the necessity of an upward or downward adjustment of that figure.

## A.  Hourly Rates

Over the course of this fourteen-year litigation, the Relator was represented by three attorneys.  Attorney John F. Hawkins is claiming a rate of $400 per hour.  Attorney Cliff Johnson claims $425 per hour, and Attorney Brad Pigott is claiming a rate of $450 per hour. The chart below summarizes the requested hourly rates of each of the Relator's attorneys.

**Chart 1. Requested Fees**

| Ecf Document No. for Attorney Declaration and Itemized billing. | Attorney | Pre-verdict Hours | Hourly Rate | Number of Hours times Hourly rate |
|---|---|---|---|---|
| 388-1 | John Hawkins | 500.7 | $400.00 | $200,280.00 |
| 388-2 | Cliff Johnson | 299.9 | $425.00 | $127,457.50 |
| 388-3 | Brad Pigott | 26.2 | $450.00 | $ 11,790.00 |
| **TOTAL:** | | | | **$339,527.50** |

Defendants herein contend that the Realtor is not entitled to any award of attorneys' fees, expenses, or costs, but if any fees, expenses, or costs are awarded, Defendants say they should be limited as follows:

**Chart 2. Defendants' Suggested Fees and Expenses for Relator**

| Attorney | Hours | Hourly Rate | Number of Hours times Hourly rate |
|---|---|---|---|
| John Hawkins fee | 443.05 hours at $300 plus 64 travel hours at $150 | $300.00 | $142,515.00 |
| Cliff Johnson fee | 38.1 hours at $300 | $300.00 | $ 11,430.00 |
| Brad Pigott fee | 94 hours at $300 | $300.00 | $ 28,200.00 |
| Expenses and costs | $10,444.55 for Hawkins' law firm and $3,198.20 for Pigott's law firm | | $ 13,642.75 |
| **TOTAL:** | | | **$195,787.75** |

The general rule is that reasonable hourly rates for counsel are to be calculated according to the prevailing market rates in the relevant community.  In this case that would be the Gulfport, Mississippi area or the Southern District of Mississippi. The three attorneys say that the case of *United States ex rel. Rigsby v. State Farm Fire & Cas. Co*., sets the standard in the Southern

District of Mississippi for hourly attorneys' fee rates in *qui tam* cases.  *United States ex rel. Rigsby v. State Farm Fire & Cas. Co.,* 2014 WL 691500, at *1(S.D. Miss. 2014) (unreported).

Although this is an unreported case, and thus, lacking precedential value, the analysis by Judge Ozerden of the attorney's fee issue in that *qui tam* case, is informative.  In *Rigsby*, Judge Ozerden ruled, in 2014, that $400 per hour was a reasonable hourly rate to be awarded in a *qui tam* case for legal work on the relators' behalf by an attorney with two decades of trial experience as a private practitioner.  In *Rigsby* the attorneys, collectively, were awarded $2,913,228.69 in fees and $303,078.89 for expenses, even though the jury verdict in that case was for only $250,000.00. *Id.* at **19, 23.  By comparison, the jury verdict in the case at bar was $10,855,382.00 (over 40 times as much).  *Jury Verdict* [doc. no. 383].  After trebling the damages pursuant to 31 U.S.C. §3729(a), the award in *Rigsby* totaled $750,000.00 plus $8,250.00 in civil penalties, for a total of  $758,250.00. *Id.* at **19, 23.   After trebling the damages in the instant case, the total award was $32,566,146.00 in damages and $71,681 in penalties for a total of $32,637,827.00.  *Judgment* [doc. no. 409].

Relator's attorneys say their experience compares favorably with that of the attorneys in the *Rigsby* case, justifying an hourly rate at least commensurate with that of the *Rigsby* attorneys. Additionally, say Aldridge's attorneys, the attorneys' fee award in *Rigsby* was six years earlier; and, whereas the *Rigsby* case was litigated for eight years and the trial lasted eleven days, the case sub judice, was adjudicated for thirteen years before it was tried to a jury and the trial lasted eight-and-a-half weeks.  These factors weigh in favor of an hourly rate that is at least as much as that in *Rigsby*, according to the Relator's attorneys here.

Defendants, on the other hand, point out that in *Rigsby* the government did not intervene and take over prosecution of the case.  The Relators, through their attorneys, were responsible for

conducting the litigation, including the trial.  Also, the Relators' attorneys in *Rigsby* were awarded varying hourly fees ranging from $262 per hour for junior partners to $358 per hour for senior partners.  Only one attorney was awarded $400 an hour in that case, an attorney from Washington, D.C., whose customary billing rate in the D.C. area was $600 per hour.

Judge Ozerden, in *Rigsby*, found that one of the Relators' local attorneys, C. Maison Heidelberg, had comparable years of experience to the D.C. attorney, but, although his billing rate ranged from $250/hour to $450/hour (depending on a variety of circumstances, he said), Heidelberg requested only $375 an hour in the *Rigsby* case.  Despite his years of experience, Heidelberg stated in his declaration in Rigsby, that his law office "would not have accepted the case as lead counsel.  Our firm did not possess the professional resources or expertise necessary to litigate and try this case either as lead counsel or as sole counsel for the Relators."

Heidelberg's experience, then, is in a different category than that of the Relator's attorneys in the instant case.  The Attorneys here *did* act as lead counsel for the Relator, and were preparing to take the case forward had the government not intervened.  Unlike Heidelberg, the attorneys here possessed both the "professional resources" and "expertise" necessary to litigate and try this case.  The $375 award for Heidelberg in the Rigsby case is not determinative of the hourly rate that should be awarded to any of the Relator's counsel here.

Judge Ozerden also approved a rate of $124 an hour for a paralegal and for one attorney whose work he described as resembling paralegal work.

Attorney John G. Corlew who prepared an affidavit in the case here under consideration also prepared an affidavit in *Rigsby*.  Attorney Corlew stated in *Rigsby* that "customary and reasonable rates currently charged by litigation partners in Mississippi firms and/or regional firms with offices in Mississippi are in the $400-$500 range." *Rigsby* at *14. In this case too,

14

Attorney Corlew offers that "[f]or complex high stakes or high-risk litigation in the Southern District of Mississippi, I believe that customary and reasonable rates currently charged by litigation partners in Mississippi firms and/or regional firms with offices in Mississippi are in the $400-$500 range." *Corlew Affidavit* [doc. no. 388-6].

   *Joe Bradley (Brad) Pigott*

Pigott graduated from the University of Virginia School of Law in 1980.  Upon returning to Mississippi, he specialized in civil litigation in the area of financial fraud.  He became a partner in two law firms in the Jackson, Mississippi area.  Pigott was appointed by President Bill Clinton as the United States Attorney for the Southern District of Mississippi, and he served in that capacity from November 1994 to January 2001.  The matters that he investigated and prosecuted included criminal and civil litigation involving fraud against the United States Government.

During his tenure as United States Attorney Pigott founded and chaired the Mississippi Health Care Fraud Task Force.  After ending his federal service, Pigott's practice primarily centered around FCA *qui tam* cases, such as the instant case, focusing mainly on Medicare fraud. Pigott, according to his declaration, has personally filed or served as lead counsel in over a dozen such cases in at least eleven states.  Pigott has now practiced law for four decades, far longer than the length of time any of the Relators' lawyers in *Rigsby* had been practicing.  Pigott is a past member of Inns of Court, maintains an AV rating with a long-standing attorney rating entity, and was selected as a Mississippi Bar Foundation Fellow.  As a member of his current law firm, Pigott charges and is paid $400 per hour for work in Mississippi on complex litigation matters other than *qui tam* cases.  Attorneys' fees have usually been negotiated as part of a settlement in most *qui tam* cases with which he has involved.

This court is of the opinion that $450 an hour, an amount slightly above that awarded in *Rigsby*, is a reasonable hourly rate according to the prevailing market rates in the relevant community for an attorney of Mr. Pigott's background and years of experience, given the complexities of the case and Pigott's experience directly related to the case at hand.   Pigott's experience, credentials and skill brought to this very complicated litigation validate the status accorded him by Attorney Corlew in his affidavit, as falling within the upper echelon of trial counsel in Mississippi.  Corlew Affidavit [doc. no. 38806 ¶ 11].  This amount also falls within the range of reasonable hourly rates articulated by Attorney Corlew in his affidavit.

Attorney Pigott, who expended fewer hours on this matter than the Relator's two other attorneys, is requesting payment at $450 per hour for 26.2 hours, or a total of $11,790.00 for his pre-verdict legal work.  This court awards this hourly amount.

Pigott has separately itemized his work on preparing and litigating the motion for attorney's fees, costs and expenses, requesting $450 per hour for 74.3 hours expended, or a total of $33,435.00.  This court awards this hourly amount.

*James Clifton (Cliff) Johnson*

Attorney Johnson is a 1992 graduate of the Columbia University School of Law.  Other than an academic year as a Professor of Law, and a Fulbright Scholar, Johnson has practiced law in Mississippi continually since that time.  He served as an Assistant United States Attorney in the Southern District of Mississippi, concentrating entirely in the civil and criminal prosecution of fraud against Medicare and other health care insurance programs of the United States.  He supervised and monitored numerous health care fraud investigations by federal agents. He then practiced law in Jackson, Mississippi with the firm known at that time as Pigott, Reeves, Johnson and Minor, specializing in the representation of *qui tam* relators in preparation and prosecution

of civil fraud cases under the False Claims Act ("FCA") throughout the United States.  Johnson was inducted in 2019 as a Mississippi Bar Foundation Fellow.  According to Johnson's affidavit, his law firm, then named Pigott & Johnson P.A., charged, and was paid $400.00 per hour for his work in non-*qui tam* cases.  As with Attorney Pigott, Johnson says he did not usually bill an hourly rate in *qui tam* cases because the attorneys' fees were generally part of the negotiated resolution.

This court is of the opinion that $425 an hour, an amount slightly above that awarded to senior partners in *Rigsby*, is a reasonable hourly rate according to the prevailing market rates in the relevant community for an attorney of Mr. Johnson's skill and experience, given the complexities of the case *sub judice,* and Johnson's experience litigating *qui tam* cases, specifically.  This amount also falls within the range of reasonable hourly rates for this community articulated by Attorney Corlew in his affidavit.

Attorney Johnson, who drafted the initial Complaint and did much of the preliminary work on the case before withdrawing as counsel, is requesting payment at $425 per hour for 299.9 hours, or a total of $127,457.50.  This court grants this hourly amount.

*John F. Hawkins*

Attorney Hawkins is a 1993 cum laude graduate of Tulane School of Law. He has been a litigator for over 25 years and has handled a variety of complex cases including cases involving fraud and bad faith by insurance companies and other private entities. He has tried over two dozen jury trials and numerous bench trials to verdict.  Hawkins litigated a large variety of civil cases as an associate with the law firm of Maxey, Wann and Begley, PLLC, including time as an equity partner.  He continued his practice with other firms before establishing the firm he now owns and operates, Hawkins Law, P.C.  He has an AV rating with Martindale-Hubbell and is a

fellow of the Mississippi Bar Foundation.  Attorney Hawkins does not provide to this court his customary hourly rate, but requests $400 per hour for his work on this case.

Hawkins does not have as much experience related specifically to *qui tam* cases, but has years of extensive trial experience in other complex matters, and roughly the equivalent years of experience to the attorney in the *Rigsby* case who was awarded $400 an hour.  This court observed the litigation skills exhibited by Hawkins during the trial of this case.  His active participation at trial clearly augmented presentation of the Government's case.

This court is of the opinion that $400 an hour is a reasonable hourly rate according to the prevailing market rates in the relevant community for an attorney of Mr. Hawkins' s skill and experience, given the complexities of the case. This amount falls within the hourly rates articulated by Attorney Corlew in his affidavit.

Attorney Hawkins, who was involved with this case from its inception and was an active participant in the trial, is requesting payment at $400 per hour for 500.7 hours, or a total of $200,280.00.  This court awards this hourly amount.

Prevailing *qui tam* relators are also entitled to an award of fess for time expended preparing and litigating a motion for attorneys' fees.  Attorney Pigott has submitted separately itemized fees for this work, which is summarized below.

**Chart 3. Preparation of Attorneys' Fee Motion and Application**

| Ecf Document. No. for Attorney Declaration and Itemized billing | Attorney | Hours for Attorneys' fees motion preparation | Hourly Rate | Number of Hours times Hourly rate |
|---|---|---|---|---|
| 388-4 | Brad Pigott | 74.3 | $450.00 | $ 33,435.00 |

Expense: data retrieval (disallowed) ~~$  2,284.45~~

**TOTAL:**                                            **$  29,720.00**

Pigott says that Cliff Johnson left the firm in 2018 or 2019 and the firm had to incur expenses of an Information Technology consultant to retrieve billing information relative to Cliff Johnson in support of preparation of the fee application. The invoices totaled $2,284.45. The expense for data retrieval is disallowed.  This should be reflected as an item of overhead for the law firm.

B. Reasonableness of Hours Claimed

The cumulative hours submitted by the Relators' attorneys for pre-verdict legal work on this case total  826.8 hours. The Defendants raise several objections to the number of hours claimed.   Defendants' first argument is that hours claimed for work on unsuccessful claims should be eliminated. This court has reviewed the billing statements submitted by Relator's counsel and can find no easily separable tasks with respect to claims that were not pursued by the Government.   Consistent with Fifth Circuit jurisprudence as stated in *Longhi,*  this court will not require counsel to do so.  Moreover, the Relator's  attorneys say in their brief that they have already excluded from their attorneys' fee request many hours expended by them on matters not pertaining to the cost report fraud which was the major focus of the Government's case.

As a means of separating the unsuccessful claims from claims meriting payment of attorneys' fees, Defendants suggest that this court disallow all attorneys' fees for work prior to December 2013.  This demarcation, they say would approximate the work on successful versus unsuccessful claims, since work did not begin on the successful claims until that point in time. This is not workable, however, since cost report fraud was a subject of the legal work from the inception of this case,  which included, among other things, the drafting and filing of the Complaint and Amended Complaint, hiring a consultant to analyze the cost reports, and

reviewing that analysis.  Relator is entitled to attorneys' fees for this, and other legal work performed prior to December of 2013.

Next, Defendants say the entries are vague and/or reflect block billing.  They also say that Relator's attorneys did not exercise billing judgment because they do not show on their fee application any entries written off.  "Ideally, billing judgment is reflected in the fee application, showing not only hours claimed, but also hours written off." *Walker v. United States HUD*, 99 F.3d 761, 769 n.9 (5th Cir. 1996) (quoting *Alberti v. Klevenhagen,* 896 F.2d 927, 930 (5th Cir. 1990)).

This court will now discuss billing judgment. Attorney Hawkins states in his declaration the following:

> [I]n an effort to avoid petitioning for a fee award for work that may have been duplicated or that may not have been critical to the development and litigation of the case, I am not including certain hours in the fee request for the Relator. I have conservatively included in this declaration only the hours which I performed that contributed substantial value to the development, litigation and trial of the case.  I have been careful not to include hours that might be deemed to be unnecessary or merely duplicative of the efforts of my co-counsel.

*Hawkins Declaration* [doc. no. 388-1 ¶10].

The Relator's attorneys also state in their Memorandum brief that although significant work was done on the case by paralegals, that time is not included in their fee application and compensation for that time is not requested.   Moreover, as stated earlier, the Relator's attorneys say in their brief that many hours spent on matters not pertaining to cost report fraud have been excluded from their fee claim.  This, they say, depicts billing judgment.

This court is satisfied that counsel have demonstrated sufficient billing judgment.

Defendants have singled out eighteen entries they claim to be vague, since the subject matter of the communications is not included. [doc. No. 394 pp. 7-8].  See e.g., *Louisiana*

*Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995) (Hours may be reduced for documentation that is vague or brief); *Leroy v. Houston*, 906 F.2d 1068, 1080 (5th Cir. 1990) (Hours may be reduced for documentation that is "very brief" and "not illuminating as to the subject matter").  The entries complained of include telephone conferences and emails between attorneys, between the attorneys and Aldridge, or with the consultant, Rob Church.  The Relator's lawyers reply that many of these entries arise from privileged communications between co-counsel or between attorney and client, which do not have to describe the subject matter in order to be presumed to be reasonable. These lawyers do not provide legal authority for this proposition.

The Fifth Circuit Court of Appeals has found to be vague or insufficiently documented such things as: "library research," "analyzing documents," and "phone interviews." See *Walker v. U.S. Dept. of Housing and Urban Development,* 99 F.3d 761, 773 (5th Cir. 1996).  In *Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 326 n.11 (5th Cir. 1995),  the Fifth Circuit disallowed entries like "revise memorandum," "review pleadings," and "review documents."  See also  *Leroy v. Houston*, 906 F.2d 1068, 1080 (5th Cir. 1990) (disallowing entries like "work on brief," "continue work on brief," and "review for oral argument").

As noted, Defendants only point to 18 entries as insufficiently vague.  Of those, one entry (the Cliff Johnson entry of 2/11/13 for 7.6 hours) is being eliminated by this court due to block billing.  Although the other 17 entries complained of could be more specific, they are not as vague as the examples listed in the cases above.   In each instance where a telephone conference or email is noted, the person on the other end of the communication is named by Aldridge's attorneys.   In some instances, the subject matter of the communication is also stated. This court is not convinced that the entries are so vague as to be disallowed.  The one entry discussed under

this section that the court has found to constitute block billing is being disallowed. This court will allow the other seventeen entries to which Defendant objects in this section on vagueness.

Defendants challenge another group of entries as work typically performed by paralegals, such as issuance of subpoenas and arrangements for service. [doc. No. 394 pp. 8-9]. Defendants allege this represents clerical work that should not be billed at attorneys' rates. These subpoenas duces tecum, drafted by the Relator's attorneys at the behest of the Department of Justice, concerned numerous documents and financial records, and required legal judgment. This court recalls the hard-fought battles that erupted over the subpoenaed records. This was not clerical work and will be allowed by this court.

Defendants next challenge 12 of the Relator's attorneys' billing entries as unreasonable, duplicative, unnecessary, or unrelated. [doc. No. 394 p.10]. See *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993). Defendants contend these entries include unnecessary travel, unnecessary or redundant review of deposition transcripts, excessive amounts of time spent on the listed tasks, and tasks related to other legal matters concerning the Relator. Defendants do not explain how they contend the particular entries are insufficient. Legal work concerning the Relator proved to be extremely relevant since motions were filed, objections were made, and lengthy arguments ensued concerning evidence of the Relator's alleged employment conduct and his termination by one or more Defendants. This court has reviewed the questioned entries and concludes they were all relevant to the current litigation at hand and the court does not discern excessive time spent on these items.

Defendants also single out six entries as representing block billing by Attorney Cliff Johnson. This court is persuaded that five of the six entries reflect block billing. Several tasks are listed for each entry and the hours claimed for each entry represent large blocks of time, such

that this court cannot determine how much time was spent on each task.  These entries should
have been broken down into components, so the court could have evaluated the reasonableness
of each task listed and the time claimed for it.  This court, therefore, disallows the following:

### Chart 4. Block billing disallowed

| Attorney | Date | Hours | Tasks Number of Hours times Hourly rate |
|---|---|---|---|
| Cliff Johnson | 2/11/13 | 7.6 | Prepare for Meeting with DOJ Attorneys; Emails to and from Hawkins and Church Re: Issues; Phone Conference with Rob Church |
| Cliff Johnson | 3/2/13 | 10.1 | Emails to and from James Aldridge and John Hawkins; Further Revisions of Draft Proposed Intervention Complaint for DOJ Consideration |
| Cliff Johnson | 3/7/13 | 5.8 | Further Work on Complaint in Intervention Proposed Draft; Emails to and from Aldridge, Church and Hawkins; Emails to and from Morris and Hawkins Re: DOJ Issues |
| Cliff Johnson | 3/12/13 | 8.2 | Phone Conference with DOJ's T. Morris and A.Williams; Work on Revisions to Complaint in Intervention; Emails to and from Aldridge, Church and Hawkins |
| Cliff Johnson | 3/13/13 | 7.2 | Emails to and from DOJ; work on Complaint in Intervention; Creation of Charts and Graphs for HHS/DOJ; Phone Conference with DOJ's Morris and Williams |
| Total Hours Disallowed | | **38.9** | |

See *Defendants' Memorandum Brief* [doc. no. 394 p. 11].

This court will disallow 38.9 hours of Cliff Johnson's fee application.

Except for the hours excluded for block billing, this court finds the number of hours
claimed by the Realtors' attorneys to be reasonable, and no other time is determined to be

excessive, duplicative, or inadequately documented. This court then determines the lodestar

amounts for these attorneys through trial to be as follows.

**Chart 5. Lodestar Determination**

| Ecf Document No. for Attorney Declaration and Itemized billing. | Attorney | Pre-verdict Hours | Hourly Rate | Number of Hours times Hourly rate |
|---|---|---|---|---|
| 388-1 | John Hawkins | 500.7 | $400.00 | $ 200,280.00 |
| 388-2 | Cliff Johnson | 261 (299.9 hours less 38.9 hours disallowed) | $425.00 | $ 110,925.00 |
| 388-3 | Brad Pigott | 26.2 | $450.00 | $ 11,790.00 |
| **TOTAL:** | | | | **$ 322,995.00** |

III. ADJUSTMENTS UNDER *JOHNSON*

The lodestar amount of 322,995.00 is presumed to be reasonable, but may be adjusted

upward or downward based on evaluation of specific factors. *Watkins v. Fordice*, 7 F.3d 453,

459 (5th Cir.1993). Adjustments may be made to the fee award by applying the factors

enumerated in *Johnson v .Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). See also

*Blanchard v. Bergeron,* 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989)(citing *Johnson v.*

*Georgia Highway Express, Inc., supra).* The twelve factors articulated in the *Johnson* case are:

> (1) the time and labor required, (2) the novelty and difficulty of the issues, (3) the
> skill required to perform the legal services properly, (4) the preclusion of other
> employment, (5) the customary fee, (6) whether the fee is fixed or contingent, (7)
> time limitations imposed by the client or the circumstances, (8) the amount involved
> and the results obtained, (9) the experience, reputation, and ability of the attorneys,
> (10) the undesirability of the case, (11) the nature and length of the professional
> relationship with the client, and (12) awards in similar cases.

*Giles v. General Electric Co.,* 245 F.3d 474, 490 n. 29 (5th Cr. 2001) (citing *Strong v. BellSouth*

*Telecomms., Inc.,* 137 F.3d 844, 850 n. 4 (5th Cir. 1998)); *Johnson,* 488 F.2d at 717-19.

The lodestar need not be adjusted unless there is something exceptional about the case or the representation. *City of Burlington v. Dague,* 505 U.S. 557, 562 (1992).

The Relator asks this court to grant a 30% upward adjustment to the lodestar amount. Defendants oppose the adjustment.

Defendants oppose any upward adjustment, noting that there is a strong presumption that the lodestar represents the reasonable fee, and the United States Supreme Court "has placed upon the fee applicant who seeks more than that the burden of showing that 'such an adjustment is necessary to the determination of a reasonable fee.'" *City of Burlington v. Dague*, at 562 (quoting *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546,565 (1986). Additionally, the lodestar may not be adjusted based on a *Johnson* factor that was already taken into account during the initial calculation of the lodestar. *Black v. Settlepou, P.C.,* 732 F.3d 492, 502 (5th Cir. 2013).

Defendants also claim that since this was a case in which the government intervened and took over prosecution of the case, the Relator's attorneys had a limited role.  Defendants say they were unable to find any case where the Relator received an upward Johnson adjustment when the United States had intervened in the case and the Relator has not cited to any cases where the Government intervened and an upward *Johnson* adjustment was made.

In reviewing the *Johnson* factors this court agrees with the statement below by Relator's counsel that most of the factors are inapplicable here.

> There was nothing "undesirable" about undertaking the Relator's case. That representation did not preclude other professional work.  There is nothing exceptional about a prior professional relationship between the Relator and counsel which could justify any lodestar adjustment.  No particular "time limitations" were imposed in this case (apart from the foregoing of all attorney compensation throughout a thirteen-year period).

*Relator's Memorandum* [doc. no. 389 p. 13] (footnotes omitted).

This court has already considered these *Johnson* factors in making its lodestar determination: 1)  the attorneys' professional time required; (2) the skill required for this case; (3) the customary fee charged in the relevant legal market for such services; and (4) the experience, reputation, and ability of the attorneys involved.  *Johnson* at 717-19.

The Relator's attorneys contend that there are some exceptional aspects of this litigation that should be considered relative to three of the *Johnson* factors, that would justify an upward adjustment.  These attorneys say they are entitled to the upward adjustment of 30% based on these factors: (a) the amount involved, and the results obtained; (b) novelty and difficulty of the issues; and (c) awards in similar cases.

The Relator claims that the high degree of success in this case would not have been possible but for the efforts of the Relator, his attorneys and their expert consultant, Robert Church.  The jury returned a verdict in this case of over ten million dollars ($10,000,000.00) and the judgment was over thirty million dollars ($30,000,000.00) after the court imposed treble damages and penalties as required by § 3729 of the FCA.  The Relator contends that the amount involved, and the results obtained justify the 30% adjustment sought.

The next factor, the novelty and difficulty of the issues in the case, also justifies an adjustment, according to the Relator.  The Relator notes the thirteen-year history of the litigation, the eight-and-a-half weeks required to conduct the trial of the case, and the complex verdict form that was required, as evidencing the novel and difficult nature of the case.  This too, says the Relator, is an exceptional aspect of this litigation justifying an adjustment.

Thirdly, the Relator asks this court to look at analogous awards in similar cases and cites to the court *United States ex rel. Garibaldi v. Orleans Parish Sch. Bd.*, 46 F.Supp.2d 546 (E.D. La. 1999), *vacated on other grounds*, 244 F.3d 486 (5th Cir. 2001), *cert. denied,* 534 U.S. 1078

(2002), which resulted in a final judgment of $22,899,856.00 for the False Claims Act portion of the case. *Id*. at 551-52 & 572.  The *Garibaldi* court described the legal issues in the case as novel and challenging, largely because there was very little Fifth Circuit precedent on many of the questions presented by the case.  That district court noted that very few *qui tam* lawsuits are successfully litigated beyond the early stages. *Id*. at 570.

As in the case *sub judice*, a significant monetary award was won for the public treasury in the *Garibaldi* case, *supra*.  Relying largely on the two previous *Johnson* factors discussed (amount involved and the novelty and difficulty of the issues) the *Garibaldi* court increased the Relator's attorneys' fees by 50% above the lodestar amount and awarded to them a total of $353,042.55.  That court called the case one of those "rare" and "exceptional" cases that merits an increase in the lodestar.  *Id.* at 570.  As Defendants in the instant case note in their brief, however, the United States did not intervene in the *Garibaldi* case; so, unlike the case at hand, the relators in *Garibaldi* were entirely responsible for every aspect of the litigation.

As previously stated, the court's application of the *Johnson* factors is limited to those factors that have not already been addressed through the court's calculation of the number of reasonable hours and the hourly rate of pay per attorney. *Migis v. Pearle Vision, Inc.,* 135 F.3d 1041, 1047 (5th Cir.1998), *Watkins v. Fordice,* 7 F.3d 453, 459 (5th Cir. 1993). The Fifth Circuit has warned courts that the first factor (the time and labor required) and the seventh factor (time limitations imposed by the client or the circumstances)  are especially susceptible to "double counting." *Walker v. US. Dept of Housing and Urban Development,* 99 F.3d 761, 771-72 (5th Cir. 1996).  The Fifth Circuit has also held that the novelty and complexity of the issues (factor two), the special skill and experience of counsel (factor three), the quality of representation

(factor nine), and the results obtained from the litigation (factor eight) are presumably fully reflected in the lodestar amount. *Shipes v. Trinity Industries,* 987 F.3d 311, 322 (5th Cir. 1993).

 "Although upward adjustments of the lodestar figure are still permissible, such modifications are proper only in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) (citations omitted). The question before this court, then, is whether this case is one of the rare and exceptional cases that merits an increase in the lodestar.

This court acknowledges that there were some extraordinary aspects to this litigation. FCA *qui tam* litigation normally involves complex issues; however, the complexities surrounding  the issues in the case *sub judice* were compounded by the presence of a privately-owned Critical Access Hospital, and an owner who also operated many related businesses.  A number of the issues presented were matters of first impression.  Although the novelty and difficulty of a *qui tam* case, generally, was a factor considered by this court in making its determination of reasonable hourly rates for the Relator's attorneys, the additional convolutions of this particular *qui tam* case were not factored in with that assessment. The span of time covered by the fraudulent activity, the sheer length of the trial, the hard-fought, protracted nature of the litigation, and the complicated verdict form required, attest to the extraordinary difficulty of the case.

The degree of success obtained in this litigation also cannot be overlooked.  The verdict obtained represents a significant result won for the public treasury. Very few similar awards can be found.  The Relator directs us to *Garibaldi,* supra.  In that case, the judgment as later altered by the court, was over twenty-two million dollars.  The attorneys' fee award in that case was

$353,042.55 after being adjusted by 50%, as compared to the instant case, where this court has determined the lodestar amount to be $322,995.00 before consideration of any adjustment.

This court is persuaded that this case falls into that category embracing some extraordinary aspects that entitle the Relator to an adjustment. This court recognizes that the Government took the lead in prosecuting this case once it intervened and, therefore, does not agree that these attorneys are entitled to a 30% adjustment. Despite the Government's intervention, however, this court is aware that the Relator's attorneys continued to play a significant role in the case, up to and during the trial. The Relator's attorneys were assigned certain tasks by the Department of Justice, including preparation of subpoenas duces tecum and procuring financial documents. Attorney Hawkins was an active participant in the trial, examining and cross-examining witnesses, briefing, and arguing motions and evidentiary matters. Hawkins made a meaningful contribution to the conduct of the case, and did so with consummate skill, consistent with Attorney Corlew's description, of the Relator's attorneys in his declaration, including Hawkins, as within the upper echelon of attorneys in this area.

For the reasons discussed, this court hereby makes a fifteen percent (15 %) adjustment upward to the lodestar amount for a total of $371,444.25 ($322,995.00 plus $48,449.25), broken down as follows:

**Chart 6. Johnson Factor Adjustment**

| Attorney | Pre-verdict Hours | Hourly Rate | Lodestar Amount | Plus 15% Adjustment |
|---|---|---|---|---|
| John Hawkins | 500.7 | $400.00 | $ 200,280.00 | $ 30,042.00 |
| Cliff Johnson | 261 (299.9 hours less 38.9 hours disallowed) | $425.00 | $ 110,925.00 | $ 16,638.75 |
| Brad Pigott | 26.2 | $450.00 | $ 11,790.00 | $ 1,768.50 |

| | | | | $  48,449.25 |
|---|---|---|---|---|
| **Totals** | | | **$ 322,995.00** | **$ 371,444.25** |

## IV. TRAVEL TIME

The Relator's attorneys ask for compensation for travel time at one-half their normal rate for legal work. Attorney Cliff Johnson traveled to Philadelphia, Pennsylvania in 2013 to meet with a cost report expert. Attorney John Hawkins was required to travel back and forth from Jackson, Mississippi to Gulfport, Mississippi for the trial of this case, which lasted for almost nine weeks. Defendants object generally to the attorneys' travel time as unnecessary, but do not provide specific reasons for their objections. This court notes that it was Defendants herein who filed a motion to have this case transferred from the Northern Division to the Southern Division of the United States Court for the Southern District of Mississippi. This court granted that motion, necessitating that the trial be conducted in Gulfport, Mississippi rather than in Jackson, Mississippi, thus requiring Hawkins to make the weekly one-way three-hour commute.

This court finds these travel hours to have been reasonably required, and thus compensable at one-half the attorneys' normal hourly rate for legal work. See, e.g., *Champion v. ADT Sec. Servs*., 2010 U.S. Dist. 16 LEXIS 121012, *23 (E.D.Tex. 2010); *Lewallen v. City of Beaumont,* 2009 U.S.Dist. LEXIS 62503 *29 (E.D.Tex. 2009). In the context of fee-shifting, compensating travel time at 50% of actual time is a common practice within the Fifth Circuit." *Id.* at *29, citing *In re Babcock*, 526 F.3d 824, 827-28 (5th Cir. 2008) and *Watkins v. Fordice,* 7 F.3d 453, 459 (5th Cir. 1993). This travel time and compensation are summarized below:

**Chart 7. Travel Time.**

| Ecf Document. No. for Attorney Declaration and Itemized billing. | Attorney | Travel Hours | One-half Hourly Rate | Number of Hours times Hourly rate |
|---|---|---|---|---|
| 388-1 | John Hawkins | 73 | $ 200.00 | $14,600.00 |
| 388-2 | Cliff Johnson | 13.1 | $ 212.50 | $ 2,762.50 |
| **TOTAL:** | | | | **$17,362.50** |

## V. EXPENSES FOR RELATOR'S EXPERT

The Relator is asking this court to award $134,750 for the fees of Robert D. Church, an expert consultant retained by the Relator.  Church's declaration [doc. no. 388-11] says he spent 539 hours on this matter from October of 2009 to August of 2013.  Also included with the documentation of this expert's work and credentials are: (1) a biography for Robert D. Church [doc. no. 388-12]; (2) an itemization of the work done and time expended [doc. no. 388-13]; (3) detailed list of files reviewed and analyzed [doc. no. 388-14]; and  (4) two power-point style documents prepared by Church to assist the attorneys in this case [doc. no. 388-15] [doc. no. 388-16].

Defendants say this court should not award any amount for the expenses of Church's bills.  First, Defendants say Church was not called as an expert witness at trial nor disclosed to Defendants, and his assistance was unnecessary. The Defendants do not challenge Church's credentials or his hourly rate.[10]

---

[10] Church's credentials are chronicled in his declaration filed with this court [doc. no. 388-11].  The Relator also includes the following in his Reply brief:

Mr. Church, a former Alabama Medicaid Commissioner, also brought experience as a former CFO of a major Medicare and Medicaid managed care corporation, as Vice President of a major health insurance plan, and as a health care fraud analyst whose work during over two decades "identified and caused the recovery of over $2.4 Billion in mis-spent federal and state health care

The Relator responds that prior to 2015, the United States had not decided whether to intervene in this case. Until the United States made that intervention decision, the Relator had to prepare for litigating the entire case. Therefore, it was reasonable and necessary, according to the Relator's attorneys, to engage their own cost report analyst. This court is well aware of the complex nature of the cost reporting fraud in this case for which the jury found these defendants liable. In addition to preparing to litigate the case, the Relator's attorneys say it was also necessary to gather information for the benefit of any government expert.

This court finds that retaining a cost report analyst was reasonable and necessary and that Church had more than adequate credentials.

Defendants next challenge the hours claimed to have been expended by Church on this matter as excessive and unreasonable. Defendants also allege that the nature of Church's billing entries cast doubt on the credibility of those entries.

Defendants state:

> Of Mr. Church's 64 billing entries, 20 claim that he spent more than 10 hours on this case in a day, including entries of 18.75, 16.75, 16.5, 14.8 (twice), 14.4, 14.2, and 14 hours in a single day. (See Doc. No. 388-13). Even more incredibly, the records contain two entries on September 4, 2010, and two entries on September 5, 2010, which add to exactly 24 hours for each day. Thus, Mr. Church claims to [have] worked on this case for 48 consecutive hours, in addition to 11.8 hours worked the previous day.

*Memorandum brief* [doc. no. 394 p. 14].

---

funds." … Mr. Church charged the Relator at an hourly rate of $250.00, which he affirms to be his customary rate across the country for such work, and is at the "'low end' of a typical and customary hourly rate for such analytical work by consultant(s) who have credentials and experience in health care fraud matters comparable to [Church's]." *Id.* at ¶ 6. The Defendants in their Opposition do not contest the reasonableness of that hourly rate for Church's work in this case.
*Relator's Rebuttal Memorandum* [doc. no. 413 p.14 fn. 24]

Although The Relator states in his memorandum brief that Church often worked sixteen to eighteen hours per day, the above examples give pause to this court, especially the 24-hour workdays. Church submitted a "supplementary declaration" [doc.no. 413-1] and an "amended time record" [doc. no. 413-2] correcting the two dates he had entered incorrectly that made it appear he had worked two 24-hour days. After the corrections, the time records reflect that Church did not work any more than 14.80 hours [11] on the days at issue. Such mistakes of record-keeping are nonetheless troubling.

This court, though, cannot overlook the tremendous volume of work evidenced by the very detailed index of the documents Church "read, reviewed, analyzed, investigated, detailed compared and presented…" [doc no. 388-14]. The index consists of over sixty single-spaced pages of documents in fine print. [doc. no. 388-14]. The power point-type presentations prepared by Church and filed with this court are also proof of Church's extensive analysis of these issues.

This court concludes that Church is entitled to most of the hours claimed, but the hours will be adjusted based on the instances outlined by the Defendants above. First, this court subtracts 48 hours from Church's total – the 24 hours shown on his original itemized statement for September 4, 2010 (14.80 hours plus 9.20 hours) and the 24 hours shown on his original

---

[11] In his Reply brief the Relator explains the error and the corrections concerning the 24-hour workdays as follows:

Two separate time entries appear for September 4, 2010 (one for 14.80 hours, and the other for 9.2 hours). Two separate entries also appear for September 5, 2010 (one for 9.2 hours and the other for 12.70 hours). *Ibid.* As he has now determined, the itemized 14.80 hours were devoted to this case on September 3, 2010 (rather than September 4), and the itemized 11.30 hours were devoted on September 6, 2010 (rather than September 5). The maximum number of hours Church worked during any of those four days was therefore 14.80 hours. Attached as Exhibit 1 to this Rebuttal is a Supplementary Declaration by Mr. Church, making those corrections through Exhibit A thereto.

*Relator's Reply* [doc. no. 413 p. 14 fn. 26]

itemized statement for September 5, 2010 (12.70 hours and 11.30 hours).  Next, this court reduces the hours claimed for the 3 entries where Church claims to have worked *more than* 15 hours in a single day -- 16.75 hours on June 5, 2010; 18.75 hours on July 17, 2010; and 16.5 hours on November 1, 2011 – to reflect 10 hours per day, a reduction of 22 hours.  See *Church's Time Itemization* [doc. no. 388-13].

 This court reduces the 539 hours for which the Relator seeks payment by 70 hours, to 469 hours at $250.00 per hour, or $117,250.

Defendants also criticize the block billing by Church.  Church is a consultant, not an attorney.  The cases relied upon by the Defendants discuss block billing by attorneys, not experts or consultants. There is a paucity of cases analyzing experts' fees in the context of the FCA or other fee-shifting provisions.

The analysis of expert expenses done by a  federal district court in South Dakota, provides some assistance. In *U.S. ex rel. Greendyke v. CNOS, P.C.,* an unreported FCA case, the court said the Relator did not specifically explain the services provided by his expert, though the expert's statement of services said she was retained for "Compliance Analysis" and that she was involved in reviewing documents provided by the Defendant to the Government*. U.S. ex rel. Greendyke v. CNOS, P.C.,* No. CIV 04-4105, 2007 WL 2908414 (D.S.D. Sept. 27, 2007).

The court there denied the Relator's request for expert fees, saying,  "the Relator has not provided the Court with her qualifications or the reasons for seeking her consulting services. It is reasonable that Relator's counsel would require assistance in document review in this case, but Relator has not met his burden of proof of the reasonableness of these expert expenses." Id., at *6.

34

While cases that denigrate block billing by attorneys may not directly apply to experts, the work performed by an expert must be sufficiently documented to allow the court to make an assessment whether the expenses claimed are reasonable. The party seeking the expert expenses has the burden to prove the reasonableness of the expert expenses claimed.  See also *Neal v. Honeywell,* 191 F.3d 827, 833–834 (7th Cir.1999) (equating attorneys' fees and costs provisions of the Act to those of 42 U.S.C. § 1988)); *United States ex rel. Garibaldi v. Orleans Parish School Bd.,* 46 F.Supp.2d 546, 567 (E.D.La.1999), *vacated on other grounds,* 224 F.2d 486 (5th Cir.2001), *cert. denied,* 534 U.S. 1078 (2002) (Expenses under the Act includes such things as "expert fees, attorney travel costs, and copies of charts used at trial").

In  *U.S., ex rel. Abbott-Burdick v. Univ. Med. Assocs.,* the Sixth Circuit Court of Appeals said: "The relators, by and through the deposition testimony of counsel, fully explained the services rendered by these expert witnesses to the satisfaction of the undersigned." *U.S., ex rel. Abbott-Burdick v. Univ. Med. Assocs.,* No. 2:96-1676-12, 2002 WL 34236885, at \*24 (D.S.C. May 23, 2002).  That court awarded the full amount requested by the relators for the expert witness fees. The court awarded to the relators total costs and expenses in the amount of $242,608.4 plus attorneys' fees in the amount of $2,057,701.60.  *Id.* at \*24.

This court is persuaded that the Relator here has shown that Church has sufficient credentials and has explained to the court the nature of the work performed by Church.  The billing entries, as corrected, together with the index of documents examined and analyzed, and the power point type documents, prove the reasonableness of the amount requested, except as already reduced by the court.  Moreover, in 2009 through 2013 when Church was performing his cost report analysis and other work, the Relator did not know if the Government would intervene, and it was necessary for the Relator and his attorneys to prepare to litigate this lawsuit.

The United States did not make its intervention decision until 2015, almost nine years after the Relator filed his Complaint.

The FCA provides that a relator who brings an FCA case in which the United States intervenes "*shall* also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs." 31 U.S.C. §3730. Reasonable litigation expenses include fees reasonably charged by qualified experts engaged to assist relators and their attorneys in the analysis of technical issues relevant to an FCA case. See, e.g., *Becker ex rel. Becker v. Tools & Metals, Inc.,* 2013 U.S.Dist. LEXIS 187829 *18 (N.D. Tex. 2012)(FCA *qui tam* case); *Garibaldi*, *supra*, at 567 (E.D.La.) (*qui tam* case). See also *Alcatec, LLC v. United States*, 100 Fed. Cl. 502, 528-29 (Fed. Claims Ct. 2011), *aff'd* 471 Fed. Appx. 899 (Fed. Cir. 2012). See also *Rigsby, supra,* at **61-67 (relator awarded over $120,000.00 for amounts incurred by the relators to pay third-party non-attorney experts).

This court approves the expert expenses requested by the Realtor in the amount of $117,250. 00.

## VI. OTHER EXPENSES

The only objection stated by Defendants to the Relator's request for other expenses is that there are duplications of the requests for mileage.  The Relator acknowledges that in the itemization of out-of-pocket expenses by Attorney Hawkins' law firm there is a "double-counting" of some expenses.  The original Motion included requests for both "mileage" charges (in the amount of $1,843.07, at $.50 cents per mile) *and* payments for "fuel expense" in the amount of $495.75, which was duplicative.

The Relator has removed the request for the $495.75 fuel expense. There is no longer duplication of this expense, and this court approves the other expenses as requested and as listed below.

**Chart 8. Expenses**

| Ecf Document. No. | Attorney | Description of Expenses | Totals |
|---|---|---|---|
| 388 and 388-1 | John Hawkins | $12,088.08  (less $495.75) | $11,592.33* |
| 388 and 388-2 | Cliff Johnson | | |
| 388 and 388-3 | Brad Pigott | $350 filing fee<br>$200 process service<br>$363.75 Relator's deposition<br>$1,010.00 airline and hotel for Philadelphia meeting with DOJ expert for Johnson and Church<br>~~$1535.45 and $749.00~~ disallowed as overhead<br><br>$ 1,923.75 | |
| **TOTAL:** | | | **$13,516.08** |

*The $495.75 originally requested for fuel expense has been deleted.  Mileage is being paid at $.50 cents per mile.

VII. CONCLUSION

The Relator's Motion for Award of Attorney's Fees, Litigation Expenses and Costs **[doc. no. 388]** is **granted in part and denied in part**. The Relator is granted attorneys' fees, expenses, and costs but only to the extent and in the amounts stated herein. The total awarded by this court for fees, expenses, and costs is **$553,007.83.**   The adjusted and final amounts approved by this court to be paid by the Defendants jointly and severally, are as follows:

**Chart 9. Total Fees and Expenses Awarded**

| Category | Amount |
|---|---|
| Lodestar Amount for Legal Work by all 3 attorneys pre-verdict | $322,995.00 |
| Value of 15% upward adjustment | $ 48,449.25 |
| Attorneys' travel time (½ hourly rates) (Johnson and Hawkins) | $ 17,362.50 |
| Lodestar Amount for Attorney Pigott's time in preparing and litigating motion for fees/expenses 74.3 hours | $ 33,435.00 |
| Litigation Expenses required to pay Robert Church | $117,250.00 |
| Remaining litigation expenses and costs by Pigott and Hawkins (after $495 removal of fuel expense for Attorney Hawkins) | $ 13,516.08 |
| **Total** | **$553,007.83** |

SO ORDERED AND ADJUDGED, this 30th day of March, 2022.

    s/ HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE